IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA



FILED
FEB 24 2023
Clerk, US District Court
Greensboro
By

| | |
|---|---|
| *IN RE* APPLICATION OF CAMERON FINDLAY FOR AN ORDER UNDER 28 U.S.C. § 1782 TO CONDUCT DISCOVERY FOR USE IN FOREIGN PROCEEDINGS | Misc. Civil Action No. 23MC5 |

### DECLARATION OF JAMES MEYER

1.    I, James Meyer, pursuant to 28 U.S.C § 1746, declare as follows:

1.1    I am a solicitor and director of Egan Meyer Limited ("Egan Meyer"), the English solicitors instructed by the Applicant ("Mr. Findlay"). I, along with my fellow director Mr. Richard Egan, have the day-to-day oversight of my firm's engagement with Mr. Findlay, including his involvement in these proceedings.

1.2    Mr. Findlay is a UK citizen. He began his career with the Metropolitan Police in London, where he spent the majority of his time working as a detective. He subsequently left that job to become a business and security consultant specialising in corporate investigations and asset tracing. Following a 10-year career in that field, he co-founded a music technology company in England and he continues to work on various business ventures.

1.3    I have personal knowledge of the facts set forth herein, which are all true to the best of my knowledge and belief, except where they have been provided to me

-1-

by my client (and in respect of which privilege is not waived) or I have indicated that my knowledge is based on public information. I submit this declaration in support of Mr. Findlay's application for an order under 28 U.S.C § 1782 (the "Application") to conduct discovery for use in contemplated foreign proceedings.

1.4 I should also note that this declaration refers to a number of allegations that have been made against the Respondents, Dechert LLP ("Dechert") and Mr Neil Gerrard (a solicitor and former Partner of Dechert) in separate judicial proceedings. Although the allegations are, as set out below, very serious, the parties who have made them appear to have credible evidence in support of them, some of which I refer to below. Mr Findlay relies on these allegations upon information and belief in support of this Application. In doing so, I wish to make clear to this court that these allegations are awaiting final judicial determination from the relevant courts.

## 2. SUMMARY OF MR. FINDLAY'S APPLICATION AND THE RELEVANT PARTIES

2.1 This Application seeks discovery from an individual located in this district, Nicholas Del Rosso, and his company, Vital Management Services Inc. ("Vital") (collectively, "Respondents"), for use in foreign proceedings Mr. Findlay intends to commence against the individuals and parties he believes hired the Respondents to help them attempt to steal confidential and proprietary information from him through a series of spear phishing attacks I describe below.

The Respondents live in this district and are not expected to be defendants in the foreign proceedings he is contemplating.

2.2     Vital is a company which purports to provide investigative services located at 1340 Environ Way, Chapel Hill, North Carolina 27517. It is my understanding that Mr. Del Rosso is the president, owner and sole employee of Vital. He resides in Chapel Hill, North Carolina.

2.3     As further explained below, the facts of this case arise out of proceedings brought in the English courts in which Mr. Findlay acted as a witness. These proceedings were issued in September 2017 by Eurasian Natural Resources Limited ("ENRC") against its former lawyers, Dechert and Mr. Neil Gerrard (the "Dechert Proceedings"). ENRC is a corporation incorporated in England & Wales and the holding company in a diversified natural resources group with extensive mining operations. The Dechert Proceedings were heard by a judge in the English High Court over 11 weeks between May and September 2021. Mr. Findlay gave evidence at the trial over three days. Judgment, in which ENRC's claims were comprehensively upheld by the Court, was handed down in May 2022.

2.4     Mr. Findlay seeks discovery for use in support of proceedings he intends to bring (the "Contemplated Proceedings") against Mr. Gerrard and Dechert in the English Courts as a result of, among other things, Mr. Gerrard's attempts to steal

-3-

confidential information from him by way of phishing[1] and spear-phishing[2] email attacks that occurred during the course of the Dechert Proceedings. As noted above, Mr. Findlay was due to be a witness for ENRC in the Dechert Proceedings while the hacking campaign against him was being waged. Mr. Findlay considers that the hacking campaign by Mr. Gerrard and Dechert amounts to an attempt to interfere with the judicial process and his testimony to the English court. As this court will understand, this is a very serious matter.

2.5    As detailed below, Mr. Findlay has a good-faith belief that the Respondents have documents and information that are relevant to Mr. Gerrard's efforts to illegally obtain his confidential information and will be of central importance to the Contemplated Proceedings (in relation to which see paragraph 6.2 below). Mr. Findlay therefore seeks in this Application discovery of such documents and information.

3.    **ENRC'S EXISTING CLAIMS AGAINST MR. GERRARD AND DECHERT IN THE ENGLISH COURTS**

3.1    Between April 2011 and March 2013, ENRC engaged Mr. Gerrard and Dechert to conduct certain internal investigations and subsequently to advise ENRC on its engagement with the UK's Serious Fraud Office ("SFO") (the "Retainer"). During the first 15 months of the Retainer:

---

[1]    Phishing is the term used for the sending of malicious emails or text messages designed to trick the recipient into clicking on a link to a website containing malicious software.

[2]    Spear-phishing involves the use, in the malicious emails or texts, of information *specific to the recipient* which is intended to increase the likelihood of deceiving the recipient.

-4-

(a)    Mr. Findlay (who had worked for ENRC independently of Dechert and Mr. Gerrard on numerous occasions previously) was engaged (through his company Canani Capital Management AG, which traded as Bridge 2 Limited ("Bridge 2")) to provide consultancy services to ENRC, in connection with which he took his day-to-day instructions from Dechert; and

(b)    Mr. Findlay worked closely with Mr. Gerrard.

3.2    ENRC later discovered what it alleged was (and what the English court has now found - in its judgment handed down in May 2022 - to be) highly improper conduct by Mr. Gerrard and Dechert. ENRC terminated Dechert's Retainer in March 2013 and issued the Dechert Proceedings against them in September 2017 in the English Courts. ENRC claimed in those proceedings that, in the course of the Retainer, Mr. Gerrard committed multiple dishonest or reckless breaches of fiduciary, tortious and/or contractual duties to ENRC in order to increase Dechert's fees and Mr. Gerrard's personal profits at ENRC's expense. More specifically, ENRC alleged, among other things, that Mr. Gerrard:

(a)    deliberately leaked ENRC's confidential and privileged material to the national press on at least three occasions, knowing that this would be detrimental to ENRC;

(b)    made repeated secret adverse and highly prejudicial disclosures about ENRC to officers of the SFO, including at clandestine meetings; and

-5-

(c)    secretly facilitated an approach to the SFO by a senior ENRC compliance officer as a whistleblower.

3.3    In making the claim that Mr. Gerrard deliberately leaked ENRC information to the press, ENRC relied in particular on two witness statements Mr. Findlay submitted to the English Court, and his trial testimony, showing that he and another ENRC consultant, Robert Trevelyan, had been instructed by Mr. Gerrard to leak ENRC's confidential and privileged information to *The Times* newspaper in summer 2011 ("*The Times* Leak").

3.4    In the judgment handed down by the English Court in the Dechert Proceedings in May 2022, ENRC's claims against Mr. Gerrard were comprehensively upheld, and included findings of "*extraordinary*" and "*almost unimaginable*" misconduct by Mr. Gerrard, including that he had perpetrated *The Times* Leak (and later two other leaks) and that he gave wrong advice to ENRC purposefully to keep Dechert's Retainer going "*by scaremongering*". Mr. Justice Waksman also held that Mr. Gerrard had "*lied continuously*" in an attempt to cover up his wrongdoing.[3]

## 4.    HACKING ATTEMPTS AGAINST MR. FINDLAY IN 2018

4.1    Between 11 April 2018 and 21 June 2018, Mr. Findlay believes that he was targeted with at least 90 spear-phishing emails (that he identified at the time, but potentially many more unidentified spear-phishing emails) sent to a business

---

[3] (2022) EWHC 1138 (Comm).

Case 1:23-mc-00005-UA-JLW   Document 3   Filed 02/24/23   Page 6 of 23

email address he used at that time, "cameron@powerchord.co.uk" (the "Spear-Phishing Emails").

4.2 Upon Mr. Findlay's information and belief, the Spear-Phishing Emails were sent at Mr. Gerrard's instruction and/or with his involvement in an attempt to:

(a) find out what evidence Mr. Findlay had against Mr. Gerrard to support *The Times* Leak allegation and what he had told ENRC; and

(b) intimidate Mr. Findlay into withdrawing his written statements to the English Court about this issue.

4.3 Mr. Gerrard and Dechert's role in orchestrating the Spear-Phishing Emails is evident from the timing and content of the Spear-Phishing Emails, as outlined below.

4.4 First, the timing of the Spear-Phishing Emails coincided with Mr. Gerrard's attempts to procure Mr. Findlay's and ENRC's withdrawal of the allegation that Mr. Gerrard had instigated *The Times* Leak, as illustrated by the chronology below. The information detailed in the chronology below has been provided to me by my client, Mr. Findlay, and/or is publicly available from court filings.

(a) On 29 January 2018, ENRC issued a claim against Mr. Findlay in the English Commercial Court for breach of confidence in connection with Mr. Findlay's role in *The Times* Leak (the "ENRC-Findlay Proceedings");

-7-

(b)     On 19 February 2018, the ENRC-Findlay Proceedings were settled by way of a settlement agreement between Mr. Findlay and ENRC. Further to this settlement, Mr. Findlay provided ENRC with a witness statement outlining, among other things, his and Mr. Gerrard's involvement in *The Times* Leak (the "2018 Statement"). The fact of the settlement was clear from a publicly available order of the court;

(c)     On 19 and 27 February 2018, Mr. Gerrard's solicitors, Clyde & Co LLP ("Clyde & Co") wrote to Mr. Findlay personally at his home address notifying him that they were aware of the ENRC-Findlay Proceedings and asking him whether he had legal representation in those proceedings, which is indicative of Mr. Gerrard's desire to monitor Mr. Findlay's ongoing role in the proceedings;

(d)     On 6 March 2018, Mr. Gerrard filed an application to have certain parts of ENRC's particulars of claim in the ENRC-Findlay Proceedings ("Findlay Particulars") struck out. In a supporting witness statement, Mr. Gerrard asserted that the Findlay Particulars implicated him in *The Times* Leak without explicitly identifying him as the culprit;

(e)     On 14 March 2018, ENRC's solicitors, Hogan Lovells International LLP ("Hogan Lovells"), wrote to Clyde & Co informing them that "*significant new evidence ha[d] come to light*" which established that Mr. Gerrard had instigated *The Times* Leak;

-8-

(f)     On 11 April 2018, Mr. Findlay received (to his knowledge) the first of the spear-phishing emails. Examples of some of the spear-phishing emails are contained in **Exhibit 1**;

(g)     On 13 April 2018, Hogan Lovells wrote to Clyde & Co enclosing amended particulars of claim in the Dechert Proceedings alleging that Mr. Gerrard had instigated *The Times* Leak;

(h)     On 27 April 2018, Hogan Lovells wrote to Clyde & Co enclosing a redacted version of Mr. Findlay's 2018 Statement which alleged that Mr. Gerrard instigated *The Times* Leak;

(i)     On 1 May 2018, Clyde & Co wrote to Mr. Findlay's former solicitors asking him to withdraw the 2018 Statement, with the threat that a failure to do so may result in them bringing perjury proceedings against him (**Exhibit 2, page 1**). Sitting in the London High Court, Mr. Justice Bryan subsequently indicated he was "slightly surprised" by the letter and noted that a threat of this kind "*in certain circumstances can itself be contrary to the solicitors' Code of Conduct*" (**Exhibit 3 at internal page 92**). He ordered Clyde & Co to give an undertaking to the Court (for its own part) not to intimidate a further relevant witness in its communications with him (**Exhibit 4**); and

(j)     On 21 June 2018, Mr. Findlay received (to his knowledge) the last of the Spear-Phishing Emails.

4.5    Second, the Spear-Phishing Emails contained material that seems designed to threaten and/or intimidate Mr. Findlay and, by elevating the seriousness of the communications, increased the likelihood that Mr. Findlay would click on the malicious links and/or intimidate him into withdrawing his allegations concerning *The Times* Leak:

(a)    One email purported to be from the UK's national law enforcement agency, the National Crime Agency ("NCA"), with the subject line "*You've received a subpoena from the NCA*" (**Exhibit 1, page 5**);

(b)    Another email purported to be from the UK Secretary of State for Justice at the time, the Rt Hon David Gauke MP, and referred to the "*Royal Courts of Justice*", which implies a threat of litigation (**Exhibit 1, page 4**);

(c)    Two emails which purported to have been sent by Mr. Findlay's wife, which distressed her and Mr. Findlay. Mr. Findlay's wife's name was known to Mr. Gerrard, who had met her and with whom Mr. Findlay had formed a close friendship with during the Retainer. Mr. Gerrard had invited Mr. Findlay and his family to visit Mr. Gerrard's country house on at least one occasion in 2011;

(d)    Three emails purported to relate to an on running set of proceedings between ENRC and Dechert relating to the fees charged by Dechert for its Retainer with ENRC, and purported to contain a link to "*ENRC*

-10-

*Dechert Costs Judgment (BRIDGE2 LIMITED)*" (**Exhibit 1, pages 1-3**); and

(e)     Numerous emails referred to Mr. Findlay's former businesses, business partner and associates, implying that the sender had access to non-public and sensitive commercial information about Mr. Findlay, but that was known to Mr. Gerrard from their time working together (**Exhibit 1, pages 8 and 9**).

4.6     With one exception, Mr. Findlay believes that he realised that the Spear-Phishing Emails were not genuine and therefore believes that he did not click on the links contained in them. The exception is that Mr. Findlay recalls that he did click through on the link in one of the first spear-phishing email he received, not realising that it was malicious. Given how sophisticated the hacking campaign against him appears to be, Mr. Findlay is also unable to say for sure that he did not click on the links of other spear-phishing emails that he did not identify as suspicious. Mr. Findlay is therefore unable to say for sure whether the hacking campaign against him was successful. However, these hacking attempts, combined with the intimidating correspondence received from Mr. Gerrard and Dechert's solicitors (referred to above), caused him and his family significant stress and anxiety.

4.7     In addition to receiving the Spear-Phishing Emails, in the period leading up to the Dechert/SFO Trial, Mr. Findlay believes that his home was covertly surveyed on several occasions by individual operatives, one of whom appeared

to be filming his house. Having received covert surveillance training in his role as a police officer, Mr. Findlay is capable of identifying this type of behaviour. These events led him to believe that his and his family's security was at risk and caused considerable distress to his wife and young daughter.

4.8   As a result of the above mentioned events:

(a)   Mr. Findlay installed upgraded CCTV cameras and an access control system at his home in June and July 2018;

(b)   Mr. Findlay was referred to a specialist therapist and prescribed anti-depressants for a period of two and a half years;

(c)   his wife began receiving therapy; and

(d)   Mr. Findlay was asked by colleagues to step away from the day-to-day management of the company he ran at the time, Powerchord Limited (a music technology business).

4.9   Mr. Findlay intends to claim damages against Mr. Gerrard and Dechert in the Contemplated Proceedings so that he is recompensed for the losses he has suffered arising from these matters.

## 5.   PROCEEDINGS IMPLICATING MR. GERRARD, DECHERT, MR. DEL ROSSO, AND VITAL IN OTHER HACKING ATTEMPTS

5.1   For the reasons mentioned above, Mr. Findlay has always suspected that the Spear-Phishing Emails were sent at Mr. Gerrard's instruction and he does not believe that there is anyone else who would have had an interest in hacking him.

-12-

However, without further evidence of Mr. Gerrard's involvement, Mr. Findlay did not pursue the matter at that time.

5.2   It is now a matter of public record, however, as a result of various highly publicised proceedings filed in England and the United States ("US"), that it would appear Mr. Gerrard is implicated in multiple other hacking attempts targeting his and his clients' opponents. These proceedings have also yielded evidence of the Respondents' apparent history of conducting cyber-attacks, such as the attacks launched against Mr. Findlay, at the behest of Mr. Gerrard and Dechert.

5.3   Further, as set out below, Mr. Findlay has also been informed that evidence has come to light that appears to confirm that the same Indian hacking company that the Respondents apparently used to conduct other hacking attacks on the instructions of Mr. Gerrard also prepared and sent the Spear-Phishing Emails to him.

5.4   I should emphasise that Mr. Findlay is not a Plaintiff or Defendant to any of the proceedings set out below and the evidence set out below is drawn from documents that are publicly available.

5.5   **Background to the various legal actions against Mr. Gerrard and Dechert**

5.6   I understand that the various legal actions I refer to in section 5 above all stem from Mr. Gerrard and Dechert's engagement, between 2014 and 2020, by the Ras Al Khaimah Investment Authority ("RAKIA"), the investment authority of the

Case 1:23-mc-00005-UA-JLW   Document 3   Filed 02/24/23   Page 13 of 23

Emirate of Ras Al Khaimah ("RAK"). I further understand, on the basis of the publicly available statements of case served in the various legal actions, that that the engagement involved, in general terms, Mr. Gerrard and Dechert assisting RAKIA and the Ruler of RAK (the "Ruler") in their investigation into RAKIA's former CEO, Dr. Khater Massaad, who was suspected of misappropriating government funds. As part of their engagement, I understand that Mr. Gerrard and Dechert also investigated known associates of Dr. Massaad such as Mr. Farhad Azima (a US businessman) and Mr. Karam Al Sadeq (RAKIA's former General Counsel).

5.7     Mr. Azima and Mr. Al Sadeq subsequently issued proceedings in the English Courts in 2016 and 2020, respectively, against Mr. Gerrard and Dechert in which they allege (in their statements of case), among other things, that they were targeted by hacking, phishing and spear-phishing attacks authorised by and/or coordinated with the assistance of Mr. Gerrard and Dechert. I understand that the English solicitors, Stokoe Partnership Solicitors ("Stokoe"), representing Mr. Al Sadeq in his lawsuit against Mr. Gerrard and Dechert (the "Al Sadeq Claim") were also the targets of such attacks. Stokoe have separately issued proceedings against Mr. Gerrard and Dechert for their involvement in these attacks. As I explain further below, I understand that evidence disclosed in the proceedings issued by Messrs. Azima, Al Sadeq and Stokoe directly implicates the Respondents in the attacks targeting these individuals and suggests that they were acting on the instructions of Mr. Gerrard and Dechert and/or with their

involvement. Mr. Azima's most recent Particulars of Claim in his proceedings are at **Exhibit 5**; the Particulars of Claim in the Al Sadeq Claim are at **Exhibit 6.**

5.8 **Proceedings issued by Mr. Azima against Mr. Gerrard and Dechert**

5.9 I understand, based on the statements of case served in Mr. Azima's proceedings against Mr. Gerrard and Dechert in the English Courts, that Mr. Azima (and others associated with him, including Dr. Massaad) were targeted with over 150 spear-phishing emails in mid-2015. Over a year later, in late summer 2016, 30GB of Mr. Azima's hacked confidential and/or private data was posted online. As a result of the following evidence disclosed in the proceedings, I understand that Mr. Azima alleges that the Respondents, instructed by Mr. Gerrard and Dechert (acting, in turn, at the behest of RAKIA and the Ruler), orchestrated this hack in an effort to implicate Mr. Azima in Dr. Massaad's alleged misappropriation scheme:

(a) Based on bank statements and witness evidence filed in the proceedings, Mr. Azima alleges that two Indian "hack for hire" firms, CyberRoot Risk Advisory Private Limited ("CyberRoot") and Cyber Defence and Analytics, were engaged by Vital to carry out hacking work for RAKIA. Mr. Azima further claims that both firms were specifically instructed by Mr. Del Rosso to hack Mr. Azima's emails and computers and were paid over $1 million by Vital for their services (**Exhibit 5, pages 31-33**). RAKIA has admitted, in its Defence to Mr. Azima's proceedings (**Exhibit**

-15-

7), that the Respondents were engaged by Dechert to undertake work relating to its investigation into Dr. Massaad and that this work included instructing CyberRoot (**Exhibit 7, page 11**) (although RAKIA denies that such instruction included hacking Mr. Azima); and

(b)     According to an affidavit filed in the proceedings by Mr. Stuart Page (a private investigator working for the Ruler), during the course of his engagement with RAKIA, Mr. Gerrard and other advisors to the Ruler were provided with regular "Project Update" reports prepared by an Israeli intelligence company, Insight. These reports, which have belatedly been produced in discovery in Mr. Azima's proceedings, include extracts from emails which were obviously hacked. According to Mr. Page (**Mr. Page's affidavit is attached at Exhibit 8**), efforts were made by Mr. Gerrard and other advisors to the Ruler to conceal Insight's work for RAKIA and the Ruler from the English Courts. These efforts included Mr. Gerrard leading a "mock trial" training session in Switzerland in December 2019 during which he trained individuals to provide perjurious evidence to the English Courts to cover up Insight's involvement. Mr. Page also reports that Mr. Gerrard told him during this trip to Switzerland: "*if they ever believe or prove that we are behind the hacking, then this thing is going to drag on for years*" (**Exhibit 8, pages 9-10**). I understand that Mr. Azima alleges that this was clearly an admission by Mr. Gerrard that RAKIA (with Mr. Gerrard's involvement) had hacked Mr. Azima.

5.10   In his latest Defence in the Azima proceedings in English Court, Mr. Gerrard has admitted receiving at least some of the Project Update reports but claims to be unable to plead materially to the contents of the reports because of an alleged weak memory and "*difficulties in processing information efficiently, in particular information from text*" (while he was a Partner at Dechert) (**Exhibit 9, page 35**).

5.11   Mr. Azima has brought separate proceedings against the Respondents in respect of the hacking in the United States District Court for the Middle District of North Carolina.[4]

5.12   **Proceedings issued by Stokoe against Mr. Gerrard and Dechert**

5.13   Stokoe issued proceedings in the English Courts[5] in summer 2021 against various private investigators, Mr. Gerrard, and Dechert. Stokoe's Particulars of Claim are at **Exhibit 10**. I understand, based on the statements of case filed by Stokoe, that they allege that the phishing and spear-phishing attacks against them in 2020 formed part of a wider campaign by Mr. Gerrard and Dechert, assisted by the Respondents, to improperly obtain confidential information relating to Mr. Al Sadeq's source of funding for the Al Sadeq Claim (the "Stokoe Proceedings"). I understand that this allegation is based on the following (documentary and witness) evidence served in the Stokoe Proceedings:

---

[4]   M.D.N.C. Civil Case No. 20-cv-00954-WO-JLW.
[5]   Case Nos. QB-2020-002218 and QB-2020-002492.

Case 1:23-mc-00005-UA-JLW   Document 3   Filed 02/24/23   Page 17 of 23

(a) In late January 2020, shortly after the Al Sadeq Claim was first issued, Mr. Del Rosso called one of his private investigator contacts, Mr. Patrick Grayson, to ask him to find out how Mr. Al Sadeq was funding the Al Sadeq Claim;

(b) Further to Mr. Del Rosso's call to Mr. Grayson, steps were taken by various private investigators to obtain information about the funding of the Al Sadeq Claim. Such steps included successful attempts in spring 2020 to access Stokoe's main bank account and obtain transactional data, as well as the copying of financial records from a bank account held by Maltin PR (the public relations firm assisting Mr. Al Sadeq with the Al Sadeq Claim);

(c) Parallel requests were made by Mr. Grayson in or about April 2020 to obtain three months of corporate banking transactions of Hogan Lovells. Hogan Lovells have no involvement in the Al Sadeq Claim, they do however represent ENRC in its proceedings against Mr. Gerrard and Dechert (as mentioned above). A few months later, in March 2020, Mr. Grayson sent himself a chart showing alleged links between the various individuals and entities depicted, including many entities connected to the Al Sadeq Claim. The chart also references ENRC, its Luxembourg parent company and Hogan Lovells;

(d) Around the same time, Clyde & Co (the English solicitors acting for Mr. Gerrard and Dechert) wrote to Stokoe in April 2020 on Mr. Gerrard's

instructions asking a series of questions about the funding of the Al Sadeq Claim and threatening an application for security for costs; and

(e)    I understand that in light of the above, and the following, Stokoe allege, in their statement of case, that Mr. Del Rosso's enquiry to Mr. Grayson was made pursuant to the instructions of Mr. Gerrard and/or Dechert: (i) at the time of the attacks targeting Stokoe in 2020, the Respondents, Mr. Gerrard and Dechert had a well-established professional relationship in the context of their work together for RAKIA; (ii) Mr. Gerrard and Dechert are defendants to the Al Sadeq Claim and therefore have an interest in its funding (as confirmed by Clyde & Co's letter at 5.13(d) above), compared with the Respondents who have no obvious interest of their own; and (iii) in light of their involvement in Mr. Azima's hack (as explained above), Mr. Gerrard and Dechert had the means and propensity to order such attacks and to rely on Mr. Del Rosso for his assistance to carry out these attacks.

5.14    Mr. Al Sadeq and Stokoe applied in February 2021 to the US District Court for the Middle District of North Carolina for an order against the Respondents to conduct discovery for use in the Stokoe Proceedings under 28 U.S.C § 1782.[6] The order was granted in October 2021, with Mr. Del Rosso's motion to quash being denied in March 2022. Mr. Del Rosso and Vital filed an objection to the

---

[6]    M.D.N.C. Misc. Case No. 1:21-mc-00006-UA-LPA.

Magistrate Judge's denial of the motion to quash, and that objection is currently pending before U.S. District Court Judge William J. Osteen, Jr.

5.15 **Recent developments**

5.16 On 23 February 2023, my firm, Egan Meyer, received a letter from the English solicitors acting for Mr. Azima, Burlingtons LLP, addressed to Mr. Findlay. In that letter, Burlingtons set out "*matters that have come to light in the course of [Mr. Azima's] investigations into the Indian 'hack for hire' firm, CyberRoot Risk Advisory Private Limited*". A copy of this letter is at **Exhibit 11**; in summary:

(a) Mr. Azima instructed a corporate investigations firm, Athena Intelligence ("Athena") in respect of his proceedings against Mr. Gerrard and Dechert. The letter explained that Athena received an anonymous 'Wetransfer' link on 21 November 2022 which appears to have been from a whistle-blower at CyberRoot.

(b) Athena analysed the data transferred to it and discovered what appeared to be copies of malware and malicious spear-phishing emails.

(c) That data shows that Mr. Azima had been targeted by CyberRoot with those spear-phishing emails.

(d) The data also shows that Mr. Findlay was a target of phishing hacks instigated by CyberRoot: messages prepared and addressed to Mr. Findlay's email address, cameron@powerchord.co.uk, appear within the data provided to Athena (**Exhibit 11, page 2**).

-20-

6. **CONTEMPLATED PROCEEDINGS AGAINST MR. GERRARD AND DECHERT IN THE ENGLISH COURTS**

6.1     As explained above, Mr. Findlay intends to issue the Contemplated Proceedings against Mr. Gerrard and Dechert (as directly or vicariously liable for Mr. Gerrard's wrongdoing), as the directing mind(s) behind the hacking campaign against him, rather than the Respondents, whom Mr. Findlay does not expect to be defendants to the contemplated proceedings.

6.2     Mr. Findlay is presently unable to say with certainty whether or not the Spear-Phishing attacks against him were successful (although, as noted, he does recall clicking through on at least one malicious link). This is a question that may only be resolved through the discovery process, including in the Contemplated Proceedings. As matters stand, Mr. Findlay intends to bring a harassment claim against Mr. Gerrard and Dechert founded on, among other things, the anxiety and distress caused to him and his family by the hacking campaign. Naturally, Mr. Findlay reserves his right to amend his claim against Mr. Gerrard and Dechert to include a claim for misuse of confidential information to the extent that evidence emerges that the attempts to hack him were successful.

6.3     I should also note, for completeness, (and without waiving privilege), that Mr. Findlay has instructed lawyers to bring criminal complaints in the appropriate jurisdictions. Mr. Findlay also reserves his right to adduce any discovery produced by the Respondents in support of any foreign criminal proceedings.

Case 1:23-mc-00005-UA-JLW   Document 3   Filed 02/24/23   Page 21 of 23

6.4    As demonstrated by the above evidence, the Respondents are alleged, acting on Mr. Gerrard's instructions, to have played key roles in orchestrating the above mentioned hacking, phishing and/or spear-phishing attacks targeting the opponents of Mr. Gerrard and his clients, including Mr. Findlay. Accordingly, upon information or belief, the Respondents have documents and information that would constitute significant relevant evidence in the Contemplated Proceedings, particularly with regard to the following key issues:

(a)    the extent of the Respondents' involvement in the sending of the Spear-Phishing Emails;

(b)    who the Respondents received their instructions from; and

(c)    the motivation for sending the Spear-Phishing Emails.

6.5    So far as I am aware, there is no rule prohibiting a litigant in England from seeking evidence through a 28 U.S.C. § 1782 or similar proceeding for use in English proceedings. Rather, the English courts permit litigants to choose the manner in which they obtain the evidence which they need to support their case, which may include both documentary and testimonial evidence obtained from U.S. 28 U.S.C. § 1782 proceedings, provided the materials comply with English requirements regarding disclosure of evidence to opposing parties. I believe that the English courts would be receptive towards any discovery ordered from the Respondents to these proceedings, and that the English courts would permit Mr. Findlay to rely on them in evidence at trial.

-22-

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in London, England
on the 24th of February, 2023.

James Meyer