# EXHIBIT 8

Appellant
S. Page
First Affidavit
Exhibit: "SRP-1"
7 January 2022

**IN THE SUPREME COURT OF THE UNITED KINGDOM**
**ON APPEAL FROM THE COURT OF APPEAL**
**(ENGLAND)**

**UKSC 2021/0084**
**ON APPEAL FROM**
**CA No. A3/2020/1271**
**[2021] EWCA Civ 349**

**BETWEEN**

**RAS AL KHAIMAH INVESTMENT AUTHORITY**

**Respondent**

and

**FARHAD AZIMA**

**Appellant**

---

**AFFIDAVIT OF STUART ROBERT PAGE**

---

I, **STUART ROBERT PAGE**, of 14 Montpellier Road, London, W5 2QP, **STATE ON OATH** as follows:

1   I make this affidavit at the request of Farhad Azima ("**Mr Azima**"), the Appellant, who I understand has a pending application for permission to appeal to the Supreme Court, and that the evidence I give in this affidavit may be relevant to that application.

2   I have prepared this affidavit in a fairly limited time period as I understand that Mr Azima's application may be decided imminently, and so I have not had the opportunity to review the full range of potentially relevant documents that are available to me. I am therefore preparing this affidavit largely from memory and with limited assistance from documents. Subject to this point, and except where I indicate otherwise below, the facts and matters stated in this affidavit are within my own knowledge and are true. Where information has been supplied to me by others, its source is identified and I believe it to be true.

3   In this affidavit I refer to documents which together comprise exhibit "**SRP-1**". References to page numbers in bold in squared brackets in this affidavit are references to that exhibit.

4   As a result of previous work I carried out on behalf of the Ruler of Ras Al Khaimah ("**RAK**") (the "**Ruler**"), I gave evidence for the Ras Al Khaimah Investment Authority ("**RAKIA**"), the Respondent, in these proceedings during the trial which took place in January and February 2020 before Deputy Judge Lenon QC (the "**First Trial**"). As such, I provided a witness statement dated 20 June 2019 [**SRP-1/1-7**] (my "**Witness Statement**") and gave evidence at the First Trial on 29 January 2020. A transcript of my oral evidence is at [**SRP-1/8-35**].

5   I make this affidavit to supplement the evidence which I gave at the First Trial in the present proceedings. I also want take this opportunity to correct part of that evidence, as set out below.

**My role in the investigation of Khater Massaad**

6   I was engaged by the Ruler to investigate Khater Massaad ("**Khater**") in January 2015, in relation to the misappropriation of a large amount of government funds. Khater had previously been the main advisor to the Ruler and a close confidante and friend, and he sat on the board of a number of RAK entities.

7   The Ruler initially asked me to meet with Mr Jamie Buchanan ("**Jamie**"), to whom I reported during the course of my mandate, until Jamie left RAK in the summer of 2019. In the course of my mandate, I also worked alongside Mr Neil Gerrard ("**Neil**") of Dechert LLP ("**Dechert**"), although I was never instructed by him in relation to the investigation into Khater.

8   In addition to the general mandate described above, Jamie provided more detailed instructions and requested that my investigation looked into:

    8.1   Khater's alleged connection with Hezbollah, a prescribed terrorist organisation, in Lebanon, and alleged assistance in relation to their funding;

    8.2   Khater's assets and business interests, particularly in Saudi Arabia;

    8.3   A concern that Khater was allegedly working with other members of the Ruler's family to overthrow the Ruler;

    8.4   Khater's connections with Iran, and in particular an alleged connection to Iran's Islamic Revolutionary Guard Corps (the "**IRGC**"); and

    8.5   Khater's business associates, in particular his association with Viktor Bout (to whom I refer in my Witness Statement).

9       Soon after meeting with Jamie in 2015, I instructed Amit (of Insight – the company which I identified during my oral testimony at the First Trial as having assisted me with the preparation of the reports I presented to the Ruler, Jamie and Neil) to assist with the investigation. Amit is a former Israeli intelligence officer, formerly of Shin Bet (Israel's internal security service), and his team of analysts had previous experience in military intelligence on behalf of the Israeli Defence Force. Consequently, Amit and his team had extensive knowledge of the methods used by Iran and the IRGC to move money in support of terrorist organisations. They also had multiple language skills (in particular Arabic and Farsi), and so were a natural choice for this project.

10     This project was given the codename "Project Beech" which was used between me, Amit and his team.

11     The investigation work was undertaken using three main sources of intelligence, namely:

       11.1    HUMINT – human intelligence, which constituted cultivating individuals to provide information;

       11.2    Open Source – research into corporate and other publicly available records; and

       11.3    SIGINT – signal intelligence, which is intelligence-gathering by the interception of communications.

12     SIGINT is a term that originates from intercepting radio signals and tapping a target's phone, and continues to be used in the intelligence world (including the commercial investigations industry) to include the hacking of confidential emails and unauthorised access to other confidential electronic data, to be used as intelligence in support of an investigation.

13     My main point of contact was Amit, but I know that Amit used a number of analysts to assist with the project by analysing the raw data. I understood from Amit that Insight made use of subcontractors located outside of Israel which employed all the above means of intelligence gathering, including SIGINT and the use of hacking techniques for this purpose.

14     In addition to undertaking some of the investigative work for the project, my role also included ensuring that the reports Amit and Insight prepared were shared with the Ruler, Jamie and, later on, Neil as securely as possible (given the sensitivity of the reports and what they contained).

15      Amit and Insight authored monthly reports that spanned from February 2015 to May 2020. One of the reports entitled "Project Update" (dated 26 March 2015) which I have seen (in redacted form) in the context of the First Trial [**SRP-1/36-52**] was the second of these reports. The reports would generally include an executive summary, some raw data that had been obtained as a result of the investigation (usually contained within an appendix to the report), some analysis of this data, and recommendations and action points.

16      I recall that some of these reports also featured extracts from confidential documents (with the document itself then appended to or embedded in the report) which I concluded must have been obtained as part of Amit's and Insight's SIGINT work. It was obvious to me (and it would have been obvious to anyone else reading the reports) that such documents were obtained as a result of unauthorised access to computers.

17      I was paid around $300,000 per month (sometimes more) for this work from a variety of RAK entities. This sum would be subject to occasional uplifts for specific pieces of additional work or expenditure which fell outside the scope of my original mandate. Approximately $250,000 per month was then paid by me to Amit and Insight for their assistance. At various times, Jamie told me that the Ruler was considering cutting my budget. However, when I explained to Jamie and Neil that this would involve us losing access to some of Amit's sources and methods, Neil and Jamie were successful in ensuring that my budget remained at around this level throughout my engagement.

18      Given the nature of the people and organisations we were investigating (including those set out above), we adopted secure communications protocols for handling Amit's reports and sharing them with Jamie, Neil and the Ruler. The goal of this protocol was to leave no paper trail and to ensure that the reports were destroyed after having been read.

19      An email account was created that only Amit and I (and my personal assistant, Caroline Timberlake (**"Caroline"**)) could access, and to which we knew the username and password. A draft email would be prepared (and stay in the draft folder of the email account) with instructions and a copy of the report. The report would then be downloaded to a standalone laptop (with no connection to my company's servers), printed from a standalone printer, and the draft message would be overwritten. The procedure is an electronic version of a protocol called a "dead letter box" for ensuring that there is no paper trail connecting a sender to a recipient.

20      Amit (or one of his team) would then use a secure messaging application (in the first instance, Silent Circle, and later on, Signal Messenger) to send a coded message to me (or occasionally Caroline) to indicate that there was something to be reviewed. These messages would then be deleted.

21  To discuss matters relating to Project Beech, other members of the team, including Jamie and Neil also used Confide (originally) and then moved to Signal later on. I also recall that Andrew Frank (who was part of RAKIA's strategy team – see below) routinely used Whatsapp.

22  Once the reports had been downloaded and printed in hard copy, Caroline was instructed to delete the electronic copy. The reports were hand-delivered to Jamie for his review, or would be left for him at his hotel in London with the concierge. I would also deliver the report in person to the Ruler in RAK as part of our regular private audiences.

23  At Jamie's request, I would also arrange for a copy of some of the reports (but not all of the reports) to be sent to Neil, starting in 2016. At first the reports were delivered (via courier or hand-delivered by Caroline) to Neil (or Neil's secretary) at Dechert's office in London. However, on one occasion, a report was opened by someone other than Neil or his secretary at Dechert. Given the obvious make-up of the report (as set out above), this caused Neil real concern, as he asked me to send future reports to his home in Nutley, East Sussex. Courier receipts and emails relating to the delivery of reports to Neil at Decherts and at his home are exhibited at [**SRP-1/53-73**].

24  The Ruler instructed me that I was not to send anything to him via electronic means or by courier: if I had something to give to him or something to report, I was to meet with him in person in RAK. Accordingly, for the duration of Project Beech, I met with the Ruler approximately every three to four weeks to provide an update on our investigation. I would usually meet Jamie beforehand and discuss the report in detail, and he would indicate any part of the report that he thought I needed to highlight to the Ruler. Normally Jamie would then also be present at those meetings with the Ruler, and very occasionally Neil would be in attendance as well.

25  A typical meeting with the Ruler would last about 45 minutes, of which the first fifteen minutes would be spent discussing world affairs, of which the Ruler is very knowledgeable. In my experience in the Arab world, Middle Eastern clients are unlikely to read lengthy documents, so frequently the Ruler asked me to give him an overview of where we were in the investigation, and occasionally would read the executive summary at the front of the report, but not the whole document. I would leave the copy of the report with the Ruler before I left.

26  At this point I wish to correct and clarify my evidence given at the First Trial, as I realise that I was unintentionally misleading when I said that my reports to clients, including the Ruler, were "invariably oral". What I meant was that my reports to the Ruler were invariably face to face, in the manner described above.

27  Every few months, Jamie returned to me the hard copies of the reports he held, on the understanding that I would then arrange for the reports to be destroyed (which I then did).

28  I also arranged meetings with Amit, Jamie, Neil and me between 2015 and 2019 in order to obtain guidance from Jamie and Neil as to the direction of the investigation. They were specifically interested in my investigation into the role played by Khater in RAKIA's sale of the Sheraton Metechi Hotel in Tblisi, Georgia to three Iranian buyers: Houshang Farsoudeh, Houshang Hosseinpour and Pourya Nayebi (who at the time of my investigation were on the US sanctions list). I recall that Jamie told me that Mr Azima had introduced the three buyers to the transaction and asked me to look into the sale of the hotel as part of my investigation. To the best of my recollection, the reports produced by Amit and his team in connection with this part of the investigation contained information derived from SIGINT material.

29  Starting in 2016, multiple meetings took place at Dechert's office in London. Dechert required visitors to sign in and show some form of identification. To the best of my knowledge and belief, towards the end of 2016 or the beginning of 2017, Neil became increasingly concerned about meeting at Dechert's office as he did not want a written record indicating that Amit (or any other member of Amit's team) had visited him. It was after this that when we met in London, we gathered at Jamie's suite in the Churchill Hotel or in Amit's suite at the Metropolitan Hotel.

30.  Jamie told me that he also attended strategy meetings in New York every four to six weeks with Andrew Frank (of Karv Communications) Amir Handjani ("**Amir**") (a close advisor to the Ruler) and Neil to discuss the investigation and RAK's litigation.

**Discovery of the hacked data**

31  As set out paragraphs 14 to 15 of my Witness Statement, Jamie told me that he understood that a negative publicity campaign had been threatened by Khater against the government of RAK and the Ruler, and asked me to keep my eye and ears open for anything about such a campaign that might be damaging for RAK.

32  I wish to correct the evidence I gave both in my Witness Statement and during my oral testimony at the First Trial as to the circumstances in which Mr Azima's confidential information came to be discovered.

33  The fact of the matter is that Majdi Halabi ("**Majdi**") had no role in the discovery of Mr Azima's confidential information. I provided incorrect testimony, claiming that (i) I had approached in him in relation to the threatened negative publicity campaign, and (ii) he had discovered the data. In fact, I approached Amit (and not Majdi) and asked him

to monitor the internet and dark web for such information, and it was Amit who told me about the data.

34 In August 2016, Amit provided to me the link to a tranche of Mr Azima's confidential data. To the best of my recollection, he shared the link with me using Signal. I do not know whether Amit found the data or whether he was passing on information that had been found by one of his analysts, but at the time I did not believe that Amit or his team had been involved in unlawfully accessing or disseminating the data. I then passed on the information to Jamie and Neil for their further handling. Amit, his team and I were not instructed to download or review the material, and so I had no further involvement in handling this material. However, in 2018, in the context of these proceedings, it became clear that Neil was desperate to rely on this material for RAKIA's claims against Mr Azima.

35 During the second half of 2018, it therefore became necessary for RAKIA to confirm and commit to a case as to how it had discovered the confidential data. In November 2018, my name was disclosed by RAKIA to Mr Azima in the context of these proceedings as being the person who informed them of the existence of the tranches of data. However, Amit, and later on, Jamie and Neil, had concerns about revealing that Amit was in turn the person who had told me about the data, and Amit told me that he did not want his name disclosed in proceedings, for fear that, by inference, Insight would be accused of being responsible for hacking. Further, there was a concern that it would be politically embarrassing for the Ruler if it came to light that an Israeli firm had been working for RAK. At this time there were no diplomatic relations between the State of Israel and the UAE.

**Meeting in Cyprus**

36 Consequently, there were a series of meetings between (variously) Amit, Jamie, Neil and me to discuss how to respond to Mr Azima's enquiries in these proceedings regarding how his data had been discovered by RAKIA.

37 Amit suggested that he would come up with an individual to act as a cover for the discovery, who later turned out to be Majdi, who I knew as one of Amit's subcontractors. I subsequently met with Majdi and Amit and we discussed the idea of Majdi being used as a cover for Amit's discovery of Mr Azima's data. I then discussed the idea of Majdi being used as a cover story with Jamie and Neil, and it was subsequently agreed that we would all meet to work out the plan. Initially Jamie, Neil and I discussed seeing the 'Israeli boys' (i.e. Amit and his team) in Israel as the safest option, but we later agreed to meet in Cyprus to sign off on the use of Majdi as a cover story.

38  We met in Cyprus on or around 21 November 2018. The meeting was attended by David Hughes (a partner, formerly with Neil at Dechert but, by this time, at Stewarts Law ("**David**")), Neil, Jamie, Majdi, Amit and me. It was agreed at this meeting that we would proceed with the cover story that Majdi (and not Amit) had discovered and passed the link to Mr Azima's confidential data to me, and that, if necessary, Majdi and I would be willing to provide witness testimony to this effect.

39  During this meeting, David raised his objection to the cover story, saying it was "*not credible*" and that it would not work, but Neil made it clear that this was going to be the best way forward, and that David needed to fall in line.

40  I subsequently met with Caroline Black and Dorothy Cory-Wright of Dechert and Lucy Ward of Stewarts Law to prepare my Witness Statement, which I signed on 20 June 2019.

41  I apologise unreservedly for the part I played in misleading the Court during the First Trial, and wish to state that the remainder of my evidence was true.

**Meeting with the FBI**

42  In mid-February 2019, Jamie advised me that the Ruler wished for me to attend a meeting with the FBI. On or around 21 February 2019, I therefore attended a meeting in New York at Dechert's office in order to meet with an FBI agent. My understanding was that the purpose of the meeting was to try to persuade the US authorities to open an investigation into Mr Azima. This is based on my understanding that for some while, RAK had been attempting to persuade the Department of Justice and the FBI to open up such an investigation.

43  When I arrived, I met with Jamie, Neil and a Mr Chris Swecker ("**Chris**") who I understand is a lawyer and an ex-FBI agent. However, after we waited for a considerable time in the meeting for the FBI agent to arrive, I was told that the meeting needed to be cancelled due to a scheduling miscommunication. I returned to the UK and awaited further instructions.

44  In early to mid-March 2019, Jamie then advised me that the Ruler wished for me to return to the US for a further meeting, this time to Houston. I had not been briefed on what the meeting related to, but I was told that my expenses would be covered and that I should just make sure that I made myself available. On or around 17 March 2019, I met with Jamie, Neil, Chris and an FBI agent called Paul Zukas ("**Paul**") at the Hyatt Centric The Woodlands hotel in Houston.

45  In the course of my career, I have had numerous interactions with federal law enforcement agencies and the district attorney's office in New York. Those meetings always took place at the offices of the relevant organisation. I therefore found it

strange that the meeting with the FBI in Houston was held at a hotel and not at the field office. At that meeting, Chris told me that I was being considered as a potential witness for a grand jury and that the purpose of the meeting was to assess my credibility. Following the meeting, Jamie, Neil, Chris and I went for dinner with the assistant special agent in charge ("**ASAC**") of the Houston field office, whose name I do not now recall. In the course of that dinner it became apparent that Chris and the ASAC were friends.

**Meeting in Switzerland**

46  As the trial of the proceedings (i.e. the First Trial) approached (due to commence in January 2020), I was asked by Amit (who had in turn been instructed by Neil) to organise and attend a meeting with him, Jamie, Neil, and Majdi to rehearse our testimony for the First Trial. We settled on Switzerland as the location for the meeting.

47  This meeting took place over three days at a small boutique hotel in the mountains outside of Bern. Having reviewed my travel records [**SRP-1/74-90**], I arrived at the hotel on the evening of 1 December 2019 and I left on 4 December 2019.

48  Shortly before the meeting, I was told by Neil that the Ruler had instructed him to tell Jamie that the meeting was no longer going ahead. As far as I am aware, the Ruler had terminated Jamie's employment in the summer of 2019. I was told by Neil that the Ruler therefore had concerns about whether he could be trusted to attend a meeting which required total secrecy.

49  Amit and some of his team also attended the meeting and provided extensive security for the meeting.

50  I had arranged for a special protocol to be in place to ensure maximum security and secrecy. I told Neil to leave his mobile phone at home or to switch it off so that his location could not be tracked. Neil, Caroline and I used burner phones for communication purposes, and I left my mobile phone at home.

51  To avoid detection, I did not fly direct to Switzerland. On 1 December, I took a series of trains from London to Paris Gare du Nord, then I transferred to Gare de l'Est. From Paris, I then took a train to Strasbourg, then to Basel and finally a train from Basel to Bern. In Bern, I was collected by a member of Amit's security team and driven to the hotel.

52  At the hotel, we went through a mock trial, with Neil acting as both the judge and the cross-examining counsel. An effort was made to perfect the narrative that we were to tell the English court about how I had discovered the hacked data through Majdi.

53  We made use of the hotel's private chef and their wine from the hotel's cellar. The day was a mixture of eating, drinking and sections of cross-examination by Neil to drill into our story. During one of the sessions, Neil said something to the effect of "*if they ever believe or prove that we are behind the hacking, then this thing is going to drag on for years*".

**Termination of my engagement**

54  Following the First Trial, my work for RAK continued until 1 June 2020 when my engagement was terminated. I believe that the last report I prepared was for May 2020. I set out below the circumstances leading up to the termination of my engagement.

55  In March 2020, I received a call from Amir who told me that I should have no further contact with Neil. By this time, Amir had become one of my points of contact for the investigation after Jamie's role had been terminated.

56  I assumed at this point that it was Neil who was being pushed out of the picture by the Ruler. I agreed to have no further contact with Neil.

57  It seemed that I was wrong in my assumption when, on 28 May 2020, I received a letter from the Investment & Development Office of the Government of RAK saying that my engagement had been terminated. The language seemed odd to me given that I had never had a formal written agreement with any particular RAK entity that could be terminated.

58  This came as a shock to me as I had frequently been told by Jamie that the Ruler was grateful for the work I had done for him.

59  I therefore telephoned Amir shortly after receiving the letter to ask what was going on. He told me that he knew nothing about this but that he would check the position with the Ruler. He then called me back along the lines that I should not worry, that it was all connected to internal politics and that I should be re-instated in a few months. However, that never happened, and I received a subsequent letter from the Investment & Development Office on 14 June 2020 confirming payment of my final

LONLIVE\102709903.1

Page 10

Case 1:23-mc-00005-UA-JLW   Document 3-8   Filed 02/24/23   Page 11 of 13

invoice.

**SWORN** by Stuart Robert Page

Signed: _____

Date: 7 January 2022

Before me: _____

Name: CRAMPTON

Occupation: SOLICITOR

Address:  Ashfords LLP
         1 New Fetter Lane
         London
         EC4A 1AN

IN THE SUPREME COURT OF THE UNITED KINGDOM
ON APPEAL FROM THE COURT OF APPEAL (ENGLAND)

BETWEEN

RAS AL KHAIMAH INVESTMENT AUTHORITY

                                                          **Respondent**

and

FARHAD AZIMA

                                                          **Appellant**

---

## AFFIDAVIT OF STUART ROBERT PAGE

---

Burlingtons Legal LLP
5 Stratford Place
London
W1C 1AX

DX 82986 MAYFAIR

DH/AZI0003.2

Tel:    0207 529 5420

Solicitors for the Appellant