# EXHIBIT 9

OFFICE COPY
HIGH COURT
ROLLS BUILDING
OF JUSTICE

This Defence is Amended pursuant to CPR 17.1(2)(a) and the consent order dated 11 March 2022

This Defence is Re-Amended pursuant to the Order of Michael Green V dated 7 November 2022

**IN THE HIGH COURT OF JUSTICE**　　　　　　　**Case No. HC-2016-002798**

**BUSINESS AND PROPERTY COURTS**

**OF ENGLAND AND WALES**

**BUSINESS LIST (ChD)**

Assigned to: **THE HON MR JUSTICE MICHAEL GREEN**

**B E T W E E N :**

**RAS AL KHAIMAH INVESTMENT AUTHORITY**

**Claimant and Defendant to Counterclaim**

-and-

**FARHAD AZIMA**

**Defendant and Counterclaimant**

~~-and-~~

~~STUART ROBERT PAGE~~

~~First Additional Defendant to Counterclaim~~

-and-

**DAVID NEIL GERRARD**

**Second Additional Defendant to Counterclaim**

-and-

**DECHERT LLP**

**Third Additional Defendant to Counterclaim**

-and-

**JAMES EDWARD DENNISTON BUCHANAN**

**Fourth Additional Defendant to Counterclaim**

---

**RE-AMENDED DEFENCE TO COUNTERCLAIM**
**ON BEHALF OF MR GERRARD & DECHERT LLP**

---

Case 1:23-mc-00005-UA-JLW   Document 3-9   Filed 02/24/23   Page 2 of 136

**Introduction**

1. This ~~Re-~~Amended Defence is filed on behalf of Mr Gerrard ~~and Dechert LLP ("Dechert")~~.

2. In this ~~Re-~~Amended Defence:

   2.1.   Paragraph references are (save where the context otherwise requires) to paragraphs of the ~~Re-Re-~~Re-Amended Counterclaim and Claim against Additional Parties ("**the ~~RR~~RACC**").

   2.2.   Definitions from the ~~RR~~RACC are adopted for convenience and without admission.

   2.3.   Where Mr Gerrard ~~and Dechert~~ plead<u>s</u> to issues of foreign law, ~~they do~~ <u>he does</u> so without prejudice to the expert evidence which ~~they~~ <u>he</u> will adduce hereafter in relation to these matters. ~~As explained further from paragraph 124 below, Mr Gerrard and Dechert's primary position is that foreign law does not apply to Mr Azima's claims.~~ Mr Gerrard ~~and Dechert are~~ <u>is</u> not authorised to waive privilege in any communication or document, and no waiver is intended <u>or made</u> herein.

   2.3A.   <u>References are made in the RRRACC to Mr David Hughes. He is a former partner of Dechert LLP ("**Dechert**"), who left the firm in June 2017. Mr Gerrard ~~and Dechert~~ does not plead to allegations concerning Mr Hughes</u> ~~after the point in time when he left Dechert.~~

   2.4.   Each and every allegation in the ~~RR~~RACC is denied save as expressly admitted or not admitted below.

2A.   <u>This Re-Amended Defence sets out Mr Gerrard's defence to the RRRACC, now set out separately from the defence filed on behalf of Dechert.</u>

   2A.1.   <u>Save where expressly admitted or not admitted herein, Mr Gerrard denies the allegations made against him in the RRRACC. Mr Gerrard had no involvement in, and has no knowledge of the circumstances of, the hacking and dissemination of Mr Azima's data. Mr Gerrard did not participate in any "cover up" or in the "coaching" of any witnesses as alleged, nor did he give dishonest, or knowingly false, evidence. He was not party to, and has no knowledge of, any conspiracy or</u>



unlawful combination. Accordingly, Mr Gerrard ~~denies the allegations~~ made against him.

2A.2. Whilst Mr Gerrard's defence is now set out separately from Dechert's, in very many respects Mr Gerrard's defence remains identical to Dechert's, and accordingly (and as is more particularly set out in this statement of case below) Mr Gerrard adopts and/or pleads in the same terms as Dechert's Re-Amended Defence to Counterclaim dated 16 January 2023 (the "**Dechert Defence**").

## RESPONSE TO THE HACKING COUNTERCLAIM

**Summary of ~~the Second and Third Additional Defendants'~~ Mr Gerrard's case**

3. In the First Trial in these proceedings, RAKIA claimed that Mr Azima was a fraudster and a payer of bribes, and that it was entitled to significant damages from him. Following a four week trial in early 2020, Andrew Lenon QC, sitting as a Deputy Judge of the High Court ("**the Deputy Judge**") found in RAKIA's favour and its claims were substantially upheld.

4. In the First Trial, Mr Azima alleged by way of original Counterclaim ("**the OCC**", which was itself a Re-Re-Amended Defence & Counterclaim) that RAKIA had procured or was otherwise responsible for the hacking of his email accounts and computers. Mr Azima failed to establish that case and the OCC was dismissed. On appeal, Mr Azima sought to rely on fresh evidence in support of his hacking claim. In particular, Mr Azima relied upon the witness statement of an investigator, Mr Jonas Rey, who stated that he had been informed by a former employee of a so-called 'hack for hire' company named CyberRoot Risk Advisory Private Limited ("**CyberRoot**") that he and others at CyberRoot had hacked Mr Azima's computers and emails on the instructions of Mr Nicholas Del Rosso, the president and owner of Vital Management Services ("**Vital**"). This former employee of CyberRoot was a Mr Vikash Pandey.

5. On the basis of this fresh evidence, the Court of Appeal was "*narrowly persuaded*" that Mr Azima's Counterclaim should be remitted to the Chancery Division.

6. Upon such remission, Mr Azima made new allegations in an Amended Counterclaim and Claim Against Additional Parties ("**the ACC**"), first served on Mr Gerrard and Dechert in draft in May 2021, that RAKIA and/or its agents had engaged CyberRoot to hack his emails

3

and computers (the "**Hacking Counterclaim**"). In the ACC, Mr Azima relied upon the evidence of Mr Rey regarding the information provided to him by Mr Pandey.[1] Paragraph 38 of the ACC pleaded that Mr Rey had heard from an unidentified source that, from about October 2014, firms in India had been approached by Mr Page (previously the First Additional Defendant to this Counterclaim) to hack Mr Azima.[2]

7. On 30 September 2021, Mr Azima served on Mr Gerrard and Dechert in draft a yet further iteration of his counterclaim, the RACC. On 28 January 2022 and 14 February 2022, Mr Azima served drafts of yet further iterations of the counterclaim, the RRACC. The case ~~now~~ put forward by Mr Azima in the RRACC in relation to how the hacking of his email accounts and computers is said to have taken place ~~is~~ was different from the cases put forward by Mr Azima (i) in the OCC; (ii) at trial; (iii) in the Court of Appeal; ~~and~~ (vi iv) in the ACC; and (vii) in the RACC.

7A. On 29 July 2022, Mr Azima served a further iteration of the counterclaim, the RRRACC, relying on additional Project Update Reports. The RRRACC amended the Hacking Counterclaim. It also added a second counterclaim against RAKIA for the setting aside of the following judgments and orders on the ground that they were procured by fraud: (i) the Judgment of the Deputy Judge dated 22 May 2020 (the "**Judgment**"); (ii) the Order of the Deputy Judge dated 31 July 2020; (iii) the Judgment of the Court of Appeal dated 12 March 2021 (the "**CA Judgment**"); and (iv) paragraphs 4-7 and 12-14 of the Order of the Court of Appeal dated 15 March 2021 (the "**Set Aside Counterclaim**"). Permission was granted by Mr Justice Michael Green to Mr Azima to bring the Set Aside Counterclaim on 7 November 2022, but there is a pending appeal to be heard by the Court of Appeal (Michael Green J having granted permission to appeal) as to whether these amendments amount to an abuse of process. Mr Gerrard pleads back to the Set Aside Counterclaim without prejudice to the outcome of that appeal.

8. The ACC was itself radically different from the case as to how the hacking was said to have taken place that had been put forward in the OCC, as the Court of Appeal noted in its judgment at paragraph 140, describing it as a "*radical change in the account of how the hacking came about*".

---

[1] ACC para 22
[2] ACC para 38 (deleted in the RACC, ~~and~~ RRACC and RRRACC)

9. Mr Azima's case as to how the hacking is said to have taken place has developed as follows across these differing versions of the Counterclaim:

  9.1. There are material differences in the parties alleged to have been involved in the hacking and the alleged conspiracy to hack Mr Azima's computers. Thus:

    9.1.1. Despite the fact that Mr Gerrard gave evidence in the First Trial, it formed no part of Mr Azima's pleaded case that either Mr Gerrard or Dechert were involved in the hacking, or the alleged conspiracy to hack Mr Azima's computers.

    9.1.2. On the contrary, paragraph 96(a) of the OCC alleged that a combination and unlawful means conspiracy was formed and/or furthered by communications between April and July 2015 between or on behalf of RAKIA, RAK Development LLC, the Ruler, Mr Jamie Buchanan, Mr Naser Bustami (a member of the board of RAK Development LLC) and Mr Amir Handjani (a member of the board of RAK Petroleum plc and a senior adviser to Karv Communications).

    9.1.3. Furthermore, in the OCC, Mr Azima alleged that Digitalis Reputation Limited ("**Digitalis**") had been procured by RAKIA and the other parties to the conspiracy to prepare websites attacking him, via instructions given to Digitalis by Bell Pottinger and Karv Communications.

    9.1.4. These very serious allegations that were previously advanced in the First Trial against Mr Bustami, Mr Handjani, Digitalis, Bell Pottinger and Karv Communications were withdrawn in the ACC, RACC, and RRACC and RRRACC (without any explanation or apology from Mr Azima).

    9.1.5. Instead, Mr Azima changed his case in the ACC to allege that different parties were involved in the hacking and the alleged conspiracy to hack. In particular, at paragraphs 78-81 of the ACC, Mr Azima alleged that RAKIA engaged Vital which in turn engaged CyberRoot to carry out the hacking; and a plea that the parties alleged to have conspired against Mr Azima were RAKIA and the four Additional Defendants – which for the first time included Mr Gerrard (and through him, Dechert).

9.1.6. In the RACC, at paragraphs 77A-81C, the last of which Mr Azima's case alleges alleged that RAKIA engaged Vital, which in turn engaged at least two 'hack for hire' firms, CyberRoot and Cyber Defence and Analytics ("**Cyber Defence**"), to carry out the hacking; that a Mr Aditya Jain, owner and operator of Cyber Defence, can provide evidence to that effect but has been subject to an ongoing campaign not to do so since August 2020; and that the parties alleged to have conspired against Mr Azima were those identified in the ACC.

9.1.7. Paragraph 19 of the ACC had relied upon the evidence of Mr Rey (as informed by "*an unidentified source in India*", later identified by Mr Azima's solicitors as Mr Jain) that "*multiple firms in India had been approached by Mr Page*". Without explanation this paragraph has been deleted in the RACC, and RRACC and RRRACC – so it appears that Mr Azima no longer relies on that evidence.

9.1.7A. In the RRACC, Mr Azima relies relied on new evidence from Mr Page and Mr Majdi Halabi in support of a case that Mr Page engaged an Israeli private investigator named Mr Amit Forlit and companies associated with him named Insight Analysis and Research ("**Insight**") and SDC-Gadot ("**Gadot**"), in connection with investigations into Dr Massaad and Mr Azima. He contends that Mr Forlit and Insight/Gadot used hacking as a method of gathering information; and that links to the hacked material were provided by Mr Forlit rather than being discovered by Mr Halabi as RAKIA had alleged at the First Trial.

9.1.7B. In the RRRACC, Mr Azima relies on further documentary evidence in the form of additional Project Update Reports, which are said by him to have been made available to him by Mr Page.

9.1.8. Notably, serious allegations of misfeasance are advanced by Mr Azima against Mr Gerrard and Dechert, despite the fact that there is nothing in the fresh evidence itself, as relied upon in either the ACC, or RACC, or RRACC, or RRRACC which suggests that Mr Gerrard (and through him, Dechert) were involved in the hacking or the conspiracy to hack.

6

9.2.    There are also material differences ~~in the timing~~ of the alleged hacking of Mr Azima's computers:

    9.2.1.   The OCC alleged at paragraph 8J(b) that RAKIA had procured the hacking of Mr Azima's information using spear-phishing emails on or around 14 October 2015, so that RAKIA was aware of his fraudulent conduct by the time the "*View From the Window*" document was prepared in December 2015 (Judgment ~~dated 22 May 2020~~ of the Deputy Judge ("~~the Judgment~~") at paragraph 294; and CA Judgment ~~dated 12 March 2021 of the Court of Appeal ("the CA Judgment")~~ at paragraph 28).

    9.2.2.   That allegation was withdrawn in the ACC. Instead, paragraph 81(f) of the ACC contended that CyberRoot only gained access to some of Mr Azima's data in around March/April 2016.

    9.2.3.   ~~Now t~~The RACC~~, and~~ RRACC and RRRACC, in addition to that contention at paragraph 81(f), allege~~s~~ in paragraph 81B(c) that Vital instructed Cyber Defence to hack Mr Azima's emails in or around December 2015. Paragraph 81B(d) of the RRACC alleges that Mr Jain (presumably in his role for Cyber Defence) used spear-phishing emails to gain ongoing access to Mr Azima's accounts and data at an unspecified time thereafter. This is presumably alleged to have occurred before around April 2016 to June 2016, which is when paragraph 81B(e) of the RRACC contends that Mr Jain regularly delivered Mr Azima's data to Vital.

    9.2.4.   Without explanation, Mr Azima has abandoned his reliance on the allegation (previously pleaded at paragraph 38 of the ACC) that from about October 2014, firms in India had been approached by Mr Page to hack Mr Azima's data.

    9.2.5.   As the Court of Appeal held at CA Judgment paragraph 134, the ACC account (based on the hearsay evidence from Mr Pandey) was at variance both with Mr Azima's case in the first trial, and with what evidence received from Thomson Reuters regarding spear-phishing emails (and adduced by Mr Azima in the Court of Appeal for the first time) was said

to demonstrate. The new accounts in the RAUCDING RRACC and RRRACC are is even further removed from the OCC, and also at variance with what the fresh evidence from Thomson Reuters was said to demonstrate.

9.2.5A. The RRRACC pleads at paragraph 42B that Mr Forlit and/or Insight/Gadot prepared periodic reports from February 2015 and that these reports included on occasion information obtained through hacking. Whilst paragraph 105A alleges that Mr Forlit and Insight/Gadot engaged in hacking to obtain information about Mr Azima and paragraph 105A(d) alleges that "*Mr Forlit and Insight/Gadot, CyberRoot and Cyber Defence and Analytics each engaged in hacking at different points in time, as set out above*", the RRRACC does not advance any positive case as to when it is alleged that Mr Forlit and Insight/Gadot are said to have engaged in hacking Mr Azima's data.

9.3. There are also material differences in the loss and damage that Mr Azima claims he has suffered as a result of the alleged hacking. In particular:

9.3.1. Mr Azima no longer claims damages for defamation, injurious falsehood and commercial disparagement as a result of the alleged hacking.

9.3.2. Mr Azima no longer claims that he has suffered business losses in excess of US$16.7 million as a result of the alleged hacking, and has refused to particularise any business loss pending his appeal to the Supreme Court (and see also now paragraph 9.3.4 below).

9.3.3. The first draft of the ACC provided by Mr Azima on 28 May 2021 stated at paragraph 166(a) that Mr Azima had incurred pecuniary losses of US$183,000 in respect of alleged "*professional services…to investigate and mitigate the hacking*" from an entity named ZP Consultants LLC. Paragraph 167(a) of the revised draft of the ACC (served on 2 July 2021) reduced this claim to US$60,000. Having been asked to provide details of this entity's involvement, in the RACC (served on 5 November 2021), and RRACC and RRRACC Mr Azima no longer claims for this loss at all.

9.3.4   The draft RRRACC served on 29 July 2021 pleaded, at paragraphs 168 and 168A to 168C, business losses in relation to companies in which Mr Azima was said to hold an equity stake, but that issue has been abandoned and those paragraphs have been withdrawn.

10. In short: Mr Azima's changing case as to who was involved in the hacking of his computers, when that hacking occurred, and the extent to which Mr Azima has suffered loss and damage, casts doubt on the truth and veracity of the serious allegations made, the evidence cited in support and the inferences sought to be drawn by Mr Azima.

11. As to the substance of Mr Azima's allegations, it is admitted that access to Mr Azima's computers and/or emails was obtained, by a person or persons unknown, at some point prior to August and September 2016 when data obtained as a result of that hacking were published on the Internet. It is not admitted that any of the data were private, privileged or confidential to Mr Azima, or that Mr Azima has suffered loss and damage as a result of the hacking and dissemination of those any of the data, and Mr Azima is put to strict proof of the same. In any event, at least part of the data, which revealed serious wrongdoing by Mr Azima, was not private or confidential. Mr Gerrard pleads further below in this regard at paragraphs 16A to 16B.

12. For the avoidance of doubt, Mr Gerrard and Dechert had no involvement in, and have has no knowledge of the circumstances of, the hacking and dissemination of Mr Azima's data; nor were they parties was he party to any conspiracy or unlawful combination. The suggestion that Mr Gerrard and Dechert have has been involved in any such unlawful activities, or any cover-up or conspiracy in relation thereto, is strenuously denied. Mr Azima's claims to the contrary are false; are wholly inconsistent with the case which Mr Azima previously pleaded for the purposes of the First Trial; have continually shifted during these proceedings; and are without foundation.

13. The structure of this Re-Amended Defence is as follows:

13.1.   Section I (paragraphs 14 to 16) concerns the parties.

13.2.   Section II (paragraphs 16A to 37) concerns the background and procedural context.

9

13.3.   Section III (paragraphs 38 to 115) concerns the hacking of Mr Azima's information.

13.4.   Section IV (paragraphs 116 to 123) concerns responsibility for the hacking and the allegations of a cover-up.

13.5.   Section V (paragraphs 124 to 128) concerns the proper law.

13.6.   Section VI (paragraphs 129 to 191) concerns Mr Azima's claims under English law, alternatively US Federal Law and Missouri law; his alleged loss and damage; and the relief sought.

13.7   Section VII (paragraphs 192 to 268) responds to the Set Aside Counterclaim (described as the Rescission Counterclaim in the RRRACC).

**I. THE PARTIES**

14. Paragraphs 1 and 2 are admitted.

15. As to paragraph 3:

15.1.   As to sub-paragraph (a) and paragraph 3A, it is noted that Mr Azima no longer pursues a claim against admitted that Mr Stuart Page, is an investigator who operates in the Middle East and other jurisdictions. Mr Gerrard and Dechert pleads further to paragraph 3A below.

15.2.   As to sub-paragraphs (b) and (c), it is admitted that Mr Gerrard is a retired solicitor. Mr Gerrard was a partner in Dechert, a limited liability partnership registered in England and Wales, until his retirement in late 2020. Mr Gerrard was not engaged by RAKIA in his personal capacity. In June 2013, RAK Investment and Development Office ("**RAK IDO**") instructed the global law firm Dechert (which comprises a number of entities including the Third Additional Defendant) to assist with an investigation into transactions carried out by subsidiary companies of RAKIA, in circumstances where RAKIA suspected that Dr Massaad was implicated in fraudulent activities regarding these transactions. In September 2014 RAK Development LLC ("**RAK Development**") replaced RAK IDO as the entity instructing the global law firm Dechert in connection with these investigations. The

global law firm Dechert was engaged by RAKIA  to provide legal advice in relation to two matters connected to Mr Azima ("**the Dechert Retainer**"). It is admitted by Mr Gerrard that Dechert (i.e. the Third Additional Defendant) is liable for the acts and omissions of Mr Gerrard in his capacity as a partner in Dechert.

15.3. As to sub-paragraph (d), it is admitted that Mr James Buchanan was the Chief Executive Officer of ~~Ras Al Khaimah Development LLC ("RAK Development")~~ RAK Development until his retirement in late 2019 and that RAK Development was authorised to progress investigations on behalf of RAKIA. Save as aforesaid, no admissions are made as to Mr Buchanan's authorisation by RAKIA.

15.4. As to sub-paragraph (e):

15.4.1. It is denied that RAKIA is primarily liable for the acts and omissions of Mr Gerrard and Dechert.

15.4.2. No admissions are made as to the vicarious liability of RAKIA.

15.4.3. No admissions are made as to the remainder of this sub-paragraph save that it is denied that Mr Gerrard and Dechert have joint (or any) responsibility for the wrongs set out in the ~~RR~~RACC.

15A. As to paragraph 3A:

15A.1. The first and second sentences are admitted.

15A.2. The third sentence is denied. In a judgment in these proceedings handed down on 17 March 2022, Mr Justice Michael Green determined that no such admissions had been made. As to the fourth sentence, and consistent with that judgment, it is admitted that RAKIA has described Mr Page as its 'agent' ~~in a colloquial sense without intending to refer to~~ but denied that RAKIA thereby accepted that Mr Page and RAKIA were in a strict principal-agent relationship. The nature of RAKIA and Mr Page's relationship is not admitted.

15A.3. As to the fifth sentence, Mr Gerrard ~~and Dechert are~~ is not aware of the terms of Mr Azima's discontinuance and settlement of his claim against Mr Page in the light of Mr Azima's refusal to provide a copy of the settlement agreement between them.

11

However, given Mr Page's conduct since Mr Azima discontinued his claim against Mr Page (including the provision of copies of the "Project Update Reports" to Mr Azima and the signature of an affidavit disavowing the evidence that he gave at the First Trial), it is inferred that Mr Azima discontinued his claim against Mr Page in exchange for (at least) an agreement by Mr Page to provide these documents to Mr Azima and give evidence on his behalf. Mr Gerrard ~~and Dechert~~ reserves ~~their~~ his right to plead further in relation to ~~this point~~ Mr Azima's settlement with Mr Page, including following disclosure and evidence in these proceedings.

15A.4. No admissions are made as to the final sentence and the liability of RAKIA for Mr Page's acts.

16. As to paragraph 4:

16.1.   The first sentence is denied insofar as it concerns Mr Gerrard ~~and Dechert~~ and not admitted insofar as it concerns RAKIA, Dechert, the other Additional Defendants or (unspecified) "*others*". As explained in more detail herein, the complaints made by Mr Azima are not well-founded and, in any event, Mr Gerrard ~~and Dechert have~~ has not sought to conceal these matters.

16.2.   The second sentence is denied insofar as it concerns Mr Gerrard ~~and Dechert~~.

16.3.   The third sentence is denied. Mr Gerrard did not coach witnesses to give perjured evidence and was not party to any such conspiracy.

16.4.   The fourth sentence is noted. It is denied that Mr Azima's Set Aside Counterclaim is well-founded, for the reasons given in Section VII below.

16.5    The fifth sentence is noted.

**II. BACKGROUND AND PROCEDURAL CONTEXT**

16A.   In the Judgment, Deputy Judge Lenon found Mr Azima to be guilty of fraudulent and dishonest conduct. He found him to have made numerous false representations, and to have done so dishonestly and fraudulently. He found him to have conspired with others (including at least Dr Massaad and probably also Mr Al Sadeq) to use unlawful means to harm RAKIA. For the reasons set out in paragraphs 16A to 16C of the Dechert Defence,



which paragraphs Mr Gerrard adopts, those findings impact upon Mr Gerrard's defences to Mr Azima's claims.

16B. Furthermore, in the event that Mr Azima seeks to contend that he was not guilty of that fraudulent and dishonest conduct, Mr Gerrard will rely on the facts and matters set out in Schedule 1 to the Dechert Defence to establish that he was.

17. As to paragraphs 5 and 6:

   17.1.   It is admitted that at some point between 2015 and 2016 Mr Azima's computers and email accounts were accessed.

   17.2.   It is admitted that Mr Azima contends that this was done without his authority or knowledge.

   17.3.   It is admitted that a large volume of data was released on the Internet in August and September 2016.

   17.4.   It is not admitted, and Mr Azima is required to prove, that the data published on the Internet were private and/or confidential to Mr Azima, were his personal information as opposed to business information, and were stored on his personal devices as opposed to on devices owned by or operated on behalf of a business. Insofar as the data published contained documents which were created, sent or received by Mr Azima in the course of committing serious wrongdoing ("**the Iniquity Documents**"), they and the information which they contained were not private or confidential to Mr Azima because there is no confidence or reasonable expectation of privacy in iniquity.

   17.5.   Save as aforesaid, these paragraphs are not admitted.

18. Paragraph 7 is admitted, save that the conspiracy claims were added by amendment in December 2017.

19. Paragraphs 8 and 9 are admitted.

20. Paragraph 10 is admitted. In particular:

   20.1.   Amongst other findings in the Judgment, the Deputy Judge found that Mr Azima:

Case 1:23-mc-00005-UA-JLW   Document 3-9   Filed 02/24/23   Page 14 of 136



20.1.1. Had induced RAKIA to enter into a settlement agreement by fraudulent misrepresentations;

20.1.2. Had manufactured a sham referral agreement intended to conceal his dishonest misappropriation of funds;

20.1.3. Had been guilty of bribery;

20.1.4. Had falsely and dishonestly represented that he had acted in good faith vis-à-vis RAKIA and other RAK entities;

20.1.5. Had engaged in an unlawful means conspiracy regarding the intended sale of a hotel in Georgia (the "**Hotel**");

20.1.6. Had given false evidence at trial, as had his principal witness, Ray Adams; and

20.1.7. Had not proved his hacking allegation such that the OCC fell to be dismissed.

20.2. The Deputy Judge awarded RAKIA damages for fraudulent misrepresentation and unlawful means conspiracy of US$4,162,500, pre-judgment interest of US$1,155,259.16 and costs including an order for payment on account of costs of US$3 million.

20.3. In dismissing Mr Azima's counterclaim, the Deputy Judge found that RAKIA was not responsible for the hacking or posting of the websites with links to the hacked data and that it was not liable for conspiracy.

20.4. Mr Gerrard ~~and Dechert~~ will refer at trial to the Judgment and the Deputy Judge's order for their full terms.

21. Paragraph 11 is admitted. Mr Gerrard ~~and Dechert~~ will refer at trial to the CA Judgment and the Court of Appeal's order for their full terms.

22. As to paragraph 12:

22.1. The first sentence is admitted as an (at least) partial summary of Mr Azima's application for permission to appeal to the Supreme Court.

14



22.2.  The second sentence is ~~noted~~ admitted.

22.3  The exact nature and content of Mr Azima's application for permission to appeal to the Supreme Court, and the two attendant applications for permission to rely on further evidence for the purposes of that appeal, and of the consequences of the refusal of that application, are in issue between the parties in connection with the pending appeal referred to in paragraph 7A above. Mr Gerrard reserves the right to plead further herein in this regard should it be necessary or appropriate to do so.

23. As to paragraph 13, it is denied that Mr Gerrard ~~and Dechert are~~ is liable for the hacking or any of the wrongs alleged by Mr Azima.

24. As to paragraph 14, it is denied that Mr Gerrard ~~and Dechert have~~ has conspired to cover up and conceal the true facts in this matter. Save as aforesaid, this paragraph is not admitted.

25. Paragraphs 15 and 16 plead a summary of alleged facts that are pleaded elsewhere in the RRRACC. Mr Gerrard ~~and Dechert~~ pleads to them in their full context below.

26. As to paragraph 17:

    26.1.  As to sub-paragraph 17(a), it is admitted that shortly after the Judgment was handed down, Mr Gerrard's solicitors at the time, Enyo Law LLP, informed the Court that Mr Gerrard wished to file a corrective witness statement. The corrective witness statement had nothing to do with the allegations of hacking or conspiracy to hack; but related to a wholly different matter, namely the evidence that Mr Gerrard had given with regard to his interviews with Mr and Mrs Al Sadeq.

    26.2.  As to sub-paragraph 17(b):

        26.2.1.  It is admitted that Mr Gerrard served a corrective witness statement on 5 June 2020 in which he made various corrections to the evidence he had given in cross-examination. The evidence given by Mr Gerrard in cross-examination, and the corrective witness statement, were the subject of a further Judgment of the Deputy Judge, handed down on 30 June 2020 (**"the Addendum Judgment"**), in which the Court declined to re-open the Judgment and recall Mr Gerrard for cross-examination.

15

26.2.2. In the Addendum Judgment, at paragraph 21, the Deputy Judge found that the corrective witness statement was irrelevant to, and did not impact on, Mr Azima's ~~h~~Hacking Counterclaim. For the avoidance of doubt, the Addendum Judgment is binding on Mr Azima, who is estopped from contending otherwise and is precluded from advancing a case that is inconsistent with and/or seeks to reopen the Deputy Judge's findings. Mr Gerrard ~~and Dechert~~ will rely on the Addendum Judgment for its full meaning and effect.

26.2.3. It is denied that Mr Gerrard did not satisfactorily explain how he had come to give inaccurate evidence or why there was a delay in correcting it. As Mr Gerrard explained in his corrective witness statement, he did not prepare for the First Trial on the basis that he would be cross-examined in detail in relation to matters regarding his interviews with Mr and Mrs Al Sadeq and had not refreshed his memory beforehand of the interviews he had conducted. During his cross-examination, he believed that he recollected the relevant details but it later became apparent that he was mistaken in some aspects of his recollections. The corrective witness statement was filed as soon as reasonably possible thereafter.

26.3. Save as aforesaid, paragraph 17 is denied.

27. No admissions are made as to paragraph 18, which is not within the knowledge of Mr Gerrard ~~or Dechert~~.

28. It is noted that, in paragraph 19 of the ACC, Mr Azima previously relied upon a witness statement dated 11 February 2021 of the investigator Mr Rey. Mr Azima has now deleted this paragraph in the RACC (and similarly in the RRACC and the RRRACC) without explanation. Mr Gerrard ~~and Dechert~~ reserves ~~their~~ his position in relation to these matters and Mr Azima's changes in case in this regard.

29. As to paragraph 20:

29.1. It is admitted that in January 2021 documents which appear to be redacted bank statements of CyberRoot were disclosed in other proceedings and that they appear



to show that over US$1 million had been paid to CyberRoot between 2015 and 2017 by Vital, which is a company controlled by Mr Nicholas Del Rosso.

29.2.   No admissions are made as to the authenticity or veracity of the said bank statements.

29.3.   From around August/September 2014, on the instructions of RAK Development, Dechert engaged Vital to assist with investigations in a number of jurisdictions, including India, into assets which had been stolen from RAKIA and the Government of RAK. Vital was engaged to carry out asset tracing, due diligence inquiries and background research.

29.4.   After Mr Azima's computers had already been hacked, and the hacked data published on the Internet, in August and September 2016, RAK Development instructed Dechert to engage Mr Del Rosso and Vital to assist in retrieving the hacked data from the Internet.

29.5.   No admissions are made as to any engagement of CyberRoot, which was not undertaken by Mr Gerrard ~~and Dechert~~ and in respect of which ~~they have~~ he has no knowledge. It is specifically denied that any instructions were given to CyberRoot by Mr Gerrard ~~and Dechert~~.

29.6.   Further, it is specifically denied that the engagements of Vital, ~~CyberRoot or~~ and Mr Del Rosso referred to in paragraphs 29.3 and 29.4 above were ~~engaged~~ carried out by Mr Gerrard in his own right, as opposed to in his capacity as a partner in Dechert.

29.7.   It is denied that Mr Gerrard ~~(or Dechert)~~ gave any instructions to Vital, CyberRoot or Mr Del Rosso to hack Mr Azima; and thus it is denied (insofar as alleged) that any payments made to Vital related to work conducted on instructions from Mr Gerrard ~~or Dechert~~ to hack Mr Azima. For the avoidance of doubt, no payments were made by Mr Gerrard ~~or Dechert~~ to CyberRoot.

29.8.   Save as aforesaid, paragraph 20 is not admitted.

30. Paragraph 21 is outside the knowledge of Mr Gerrard ~~and Dechert~~ and is not admitted.

17

31. As to paragraph 22:

    31.1.    As explained in paragraph 28 above, paragraph 19 of the ACC placed reliance on the witness statement of a Mr Rey. Mr Rey stated that he had been informed by a former CyberRoot employee named Vikash Kumar Pandey that he and others at CyberRoot had been instructed by Vital to hack Mr Azima's computers and emails. It is not clear, but it appears to be the case, that Mr Pandey is the former CyberRoot employee referred to in paragraph 22. It is also unclear ~~whether~~ the basis upon which Mr Azima ~~continues~~ claims to be able to maintain the allegations in paragraph 22 (see paragraph 10 of Mr Azima's Reply to the Defence of Mr Gerrard and Dechert), in circumstances where he has deleted the reference to Mr Rey's evidence at paragraph 19 of the RRRACC. Paragraph 9 above is repeated.

    31.2.    In the premises, no admissions are made as to paragraph 22; but, for the avoidance of doubt, it is denied that Mr Gerrard ~~or Dechert~~ gave any instructions to any person (including CyberRoot or Vital) to hack Mr Azima's computers or emails.

32. As to paragraph 22A:

    32.1.    No admissions are made as to the identity and role of Mr Jain, who is not known to Mr Gerrard ~~or Dechert~~.

    32.2.    It is unclear from paragraph 22A to whom Mr Jain is alleged to have made the admission pleaded; but this is outside the knowledge of Mr Gerrard ~~and Dechert~~. The veracity of that "*admission*" is not admitted.

    32.3.    In view of the deletion of paragraph 19 of the ACC, the use of "*also*" in paragraph 22A is not understood and is not admitted: paragraph 31.1 above is repeated in relation to the withdrawal of allegations regarding Mr Pandey.

    32.4.    For the avoidance of doubt, it is specifically denied (if alleged) that Cyber Defence, or Mr Jain, was engaged by Mr Gerrard ~~or Dechert~~ to hack Mr Azima's data; and no payments were made to Cyber Defence by ~~Dechert or~~ Mr Gerrard.

    32.5.    Save as aforesaid, paragraph 22A is not admitted.

33. As to paragraph 23:

33.1.    It is averred that Vital was instructed by Dechert to carry out work for RAK Development (as opposed to RAKIA). The nature of that engagement was as explained in paragraph 29 above.

33.2.    Save as ~~consistent with the~~ aforesaid, paragraph 23 is not admitted.

34. As to paragraph 24:

34.1.    The first sentence is admitted as a summary of the proceedings referred to ("**the Al Sadeq Proceedings**"). The Al Sadeq Proceedings are set down for a 55 day joint trial with related proceedings by a Mr Quzmar, now at a date to be determined in 2024 (having been adjourned yet again) ~~commencing on 3 October 2022 and due to conclude in Hilary Term 2023~~. Those proceedings have been joined together with the Stokoe Proceedings described in paragraph 36 below.

34.2.    Mr Gerrard ~~and Dechert deny~~ denies the allegations against ~~them~~ him, as do ~~their~~ his co-defendants in the Al Sadeq Proceedings. The~~y~~ defendants in those proceedings deny that they had any involvement in any alleged mistreatment of Mr Al Sadeq (or Mr Quzmar), or that they participated in or are liable for any such treatment.

34.3.    As to sub-paragraph (a), it is admitted that Stokoe are acting as Mr Al Sadeq's solicitors in the Al Sadeq Proceedings.

34.4.    As to sub-paragraph (b), it is admitted that Stokoe obtained *Norwich Pharmacal* relief in the proceedings it commenced as referred to in paragraph 36 below (as opposed to in the Al Sadeq Proceedings). No admissions are made as to the information obtained as a result.

34.5    ~~Save as aforesaid, paragraph 24 is not admitted.~~

35. As to paragraph 25:

35.1.    As to the first to third sentences, no admissions are made in relation to the matters pleaded in these sentences, which are outside the knowledge of Mr Gerrard ~~and Dechert~~. For the avoidance of doubt, it is specifically denied (if alleged) that Mr



Gerrard ~~and Dechert~~ engaged Mr Grayson of CPW on behalf of RAKIA. Mr Gerrard ~~and Dechert have~~ has no knowledge of Mr Jain.

 35.2. The fourth sentence is noted.

36. As to paragraph 26:

 36.1. It is admitted that Stokoe has brought two sets of proceedings in the ~~Queen's~~ King's Bench Division (Claim No. QB-2020-002218 and Claim No. QB-2020-002492) against Mr Page and others. Mr Gerrard and Dechert were added as defendants to Claim No. QB-2020-002492 pursuant to an amended Claim Form dated 24 September 2021, which followed an order of 9 September 2021 (the "**Stokoe Proceedings**").

 36.2. It is not admitted that Mr Page made the statement alleged; but, if the statement was made by Mr Page, then it is admitted that the individuals referred to were as pleaded.

**36A. As to paragraph 26A:**

 36A.1. It is admitted that an affidavit was sworn by Mr Page in January 2022 and an affidavit was sworn by Mr Halabi in February 2022.

 36A.2. Insofar as Mr Page and Mr Halabi state in these affidavits that Mr Gerrard ~~and/or Dechert were~~ was involved in the procurement or provision of evidence ~~they~~ he knew to be false, the truth of the affidavits is denied. Mr Gerrard ~~and Dechert~~ specifically ~~deny~~ denies the allegation that ~~they were~~ he was involved in the fabrication of evidence for the purposes of RAKIA's proceedings against Mr Azima.

 36A.3. As such, the use of the words "*admissions*" and "*admitting*" is denied.

**36B. As to paragraph 26B:**

 36B.1. As to the first sentence, it is admitted that a number of Project Update reports were prepared. It is not admitted that the March 2015 Project Update or any other Project Update Reports were prepared by Mr Forlit or Insight (the role and methods of which are similarly not admitted). To the best of Mr Gerrard's knowledge, the

information contained in the March 2015 Project Update was not obtained by hacking. As far as the first sentence refers to other reports, Mr Gerrard adopts the label "Project Update Reports" in this paragraph and below to refer compendiously to the reports which have been disclosed by Mr Azima as at the date of this Re-Amended Defence. However, no admissions are made, and Mr Gerrard reserves his position pending any further disclosure, as to any additional reports which Mr Azima may disclose. Mr Gerrard responds further in paragraph 36B.4 below.

36B.2. As to the second and third sentences, no admissions are made regarding Mr Forlit's association with Gadot or as to the means used by Gadot to obtain information.

36B.3. As to the fourth sentence, it is admitted that the March 2015 Project Update was provided to Mr Gerrard by Mr Buchanan as set out in paragraph 53.1 below (and not by Mr Page as alleged). No admissions are made as to the provision of any Project Update reports to the other persons referred to, but it was Mr Gerrard's understanding that the reports were provided to Mr Buchanan. No admissions are made in relation to any other reports save as expressly addressed herein.

36B.4. As to the fifth sentence:

36B.4.1 In respect of the March 2015 Project Update, it is denied that the report made it obvious that any information therein had been unlawfully obtained; and, at the time he received the March 2015 Project Update, Mr Gerrard did not understand any information therein to have been unlawfully obtained. It is not admitted that the March 2015 Project Update report contained information or extracts from hacked communications and no admissions are made in respect of any other such reports.

36B.4.2. The general allegation that "*at least some*" of the Project Update Reports "*contained information or extracts from hacked communications*" is impermissibly vague. In any event, no admissions are made as to whether the Project Update Reports in fact contained information from, or extracts from, hacked communications, and Mr Azima is required to prove the same.

21

36B.4.3. Furthermore, the general allegation that the whole of the Project Update Reports contained information which was "*referenced so as to make the fact that they had illicitly been obtained obvious to persons reading those reports*" is too vague to permit a response. It is not clear what is being referred to, or what is meant by "*illicitly obtained*".

36B.4.4. Without prejudice to the foregoing, Mr Gerrard pleads as follows to the allegation that the reports contained information which was "*referenced so as to make the fact that they had illicitly been obtained obvious to persons reading those reports*":

36B.4.4.1 Mr Gerrard pleads as to the engagement he had at the time with the reports, and with Mr Buchanan and Mr Page in relation to the reports, in paragraph 55E below.

36B.4.4.2 It is admitted that a reasonable reader who read the Project Update Reports in their entirety would appreciate that they contained information relating to Mr Azima which was not likely to have been willingly provided by Mr Azima or with his authorisation. This is because that information was adverse to Mr Azima's interests and revealed serious wrongdoing by Mr Azima, which he had sought to conceal. It does not follow that the reports contained "*information or extracts from hacked communications*" (emphasis added) that was obtained "*illicitly*", if by that it is meant that it was obtained by hacking and/or wrongfully or using illegal methods. Such information could legitimately have been passed to an investigator by someone other than Mr Azima, without his consent, since Mr Azima had no proper basis for seeking to conceal it and no legal basis to assert it was private or confidential given that it evidenced his dishonesty. Furthermore, Mr Gerrard was aware at the time (from such engagement at the time as he had with the reports and with Mr Buchanan and Mr Page in relation to the reports, as to which see paragraph 55E below) that Mr Page claimed to have "sources" who were providing

22



information to him; Mr Page did not tell Mr Gerrard who those "*sources*" were, and Mr Gerrard did not know who those "*sources*" were.

36B.4.4.3  It is denied, insofar as it is alleged, that Mr Gerrard knew at the time that the Project Update Reports contained "*information or extracts from hacked communications*" that was obtained "*illicitly*".

36C.  As to paragraph 26C:

36C.1. As to the first sentence, it is admitted that at the First Trial Mr Page and Mr Halabi gave evidence as to the discovery of the hacked materials by Mr Halabi. To the best of the knowledge of Mr Gerrard ~~and Dechert~~ at the time of the First Trial, the evidence given by Mr Page and Mr Halabi was true. In the light of the new affidavits sworn by Mr Page and Mr Halabi nearly two years after the First Trial, Mr Gerrard ~~and Dechert are~~ is presently unable to admit or deny the truth of the evidence given by Mr Page and Mr Halabi at the First Trial.

36C.2. As to the second and third sentences, Mr Gerrard ~~and Dechert~~ repeats paragraph 36C.1 above and no admissions are made.

36C.3. As to the fourth sentence, the reference to "*media reports and judicial findings*" is presumed to be a reference to the article and judgment cited in paragraph 42A; as to which, Mr Gerrard ~~and Dechert~~ pleads in paragraph 52A.2 below.

36D.  As to paragraph 26D:

36D.1. The first sentence is denied insofar as it concerns Mr Gerrard and it is otherwise not admitted (save that, so far as Mr Gerrard ~~and Dechert were~~ was aware, there was no such agreement).

36D.2. The second sentence is denied. Mr Gerrard did not coach Mr Page or Mr Halabi to give false evidence (nor, for the avoidance of doubt, did anyone else at Dechert, to the best of Mr Gerrard's knowledge).

36E.  As to paragraph 26E:

23

36E.1. To the best of the knowledge of Mr Gerrard and Dechert RAKIA did not knowingly and deliberately plead a dishonest case of discovery through Mr Halabi in pleadings signed by Mr Hughes.

36E.2. Mr Gerrard did not believe that RAKIA's case of discovery through Mr Halabi was false.

36E.3. Save as aforesaid, no admissions are made.

36F.    As to paragraph 26F:

36F.1. Mr Gerrard and Dechert repeats paragraphs 29.5 to 29.7 29 above in relation to CyberRoot and paragraph 32.4 32 above in relation to Cyber Defence and Analytics. No admissions are made as to Forlit and Insight/Gadot.

36F.2. It is denied, insofar as alleged (which is not clear from the unparticularised nature of the allegations in this paragraph), that Mr Gerrard and/or Dechert were was involved in any concealment or dishonesty as regards the roles of any of the individuals or entities referred to in paragraph 26F.

37. Paragraph 27 is noted.

**III.    THE HACKING**

**A. THE SO-CALLED "RAK PROJECT"**

38. As to paragraph 28:

38.1.   It is admitted that Dr Massaad was the CEO of RAKIA from 2005 to 2012.

38.2.   It is admitted that, in around 2012, RAKIA discovered that Dr Massaad was responsible for systemic wrongdoing and embezzlement. He fled RAK and was tried, convicted and sentenced *in absentia* for fraud, embezzlement and bribery offences.

38.3.   RAKIA engaged in negotiations with Dr Massaad and his representatives with a view to locating and recovering its assets. In the context of those negotiations, Dr Massaad asserted that he was owed sums in connection with his work as RAKIA's CEO.

24

Save as aforesaid, no admissions are made.



39. Paragraph 29 is admitted.

40. As to paragraph 30:

40.1.  Insofar as paragraph 30 concerns Mr Gerrard ~~and Dechert~~, it is denied that the term *"RAK Project"* was a term of art or was used by Mr Gerrard (or, to the best of Mr Gerrard's knowledge) ~~and~~ Dechert to refer to the activities referred to in paragraph 29. To the best of Mr Gerrard ~~and Dechert~~'s knowledge, there was no single *"RAK Project"* as alleged.

40.2.  Insofar as paragraph 30 concerns other *"individuals on RAKIA's side"*, it is not admitted.

**B. RAKIA'S ALLEGED AGENTS**

41. As to paragraph 31:

41.1.  Paragraph 15.2 above is repeated as to the engagement of Dechert. It is admitted that RAKIA instructed Dechert pursuant to the Dechert Retainer as explained in paragraph 15.2 above.

41.2.  RAKIA did not separately engage any individual partners of Dechert (nor, for the avoidance of doubt, did any other RAK entity or the Ruler).

42. As to paragraph 32:

42.1.  To the best of Mr Gerrard's knowledge, it ~~It~~ is denied that Stuart Page, or companies controlled by him ~~including Stuart Page MEFZ~~, was engaged by Dechert on behalf of RAKIA or on behalf of any other RAK entity or the Ruler.

42.2.  It is admitted that, in around August/September 2014, RAK Development instructed Dechert to engage Vital to investigate assets stolen from RAKIA and the Government of RAK, as set out in paragraph 29.3 above. In particular, Vital was engaged to carry out asset tracing, due diligence inquiries and background research involving a number of jurisdictions.

42.3. It is admitted that in April 2014, RAK IDO instructed Dechert to engage Karv to provide advice in relation to media management in relation to the investigations undertaken by RAKIA and RAK entities; and in February 2016 Dechert renewed the engagement of Karv on behalf of RAK Development.

42.4. It is admitted that, in August and September 2016, after the hacking had taken place and after the hacked data had been published on the Internet, RAK Development instructed Dechert to engage Mr Del Rosso and Vital to assist in retrieving the hacked data from the Internet.

42.5. Save as consistent with the aforesaid, it is denied (insofar as alleged) that ~~Dechert (or~~ Mr Gerrard~~)~~ engaged the persons or entities pleaded at sub-paragraphs 32(a) to (d) on behalf of RAKIA.

42.6. Save as aforesaid, paragraph 32 is not admitted.

43. As to paragraph 33, Mr Gerrard ~~and Dechert~~ repeats paragraph 15.3 in relation to Mr Buchanan. Save as consistent with the aforesaid, no admissions are made.

44. As to paragraph 34:

44.1. Paragraph 40.1 above is repeated in relation to the term "*RAK Project*".

44.2. It is admitted that Mr Buchanan provided instructions on behalf of RAKIA and RAK entities to Dechert (including in particular to Mr Gerrard) in relation to legal advice and assistance.

44.3. It is admitted that Mr Gerrard, in his capacity as a partner in Dechert, provided instructions to Vital on behalf of RAK Development in relation to the engagements pleaded at paragraphs 29.3 and 29.4 above.

44.4. It is ~~denied~~ noted that Mr Azima has withdrawn the allegation that Mr Gerrard provided instructions to Mr Page and his companies ~~on behalf of RAKIA, although it. It~~ is admitted that Mr Gerrard communicated with Mr Page.

44.5. Save as consistent with the aforesaid, paragraph 34 is denied insofar as it relates to Mr Gerrard ~~and Dechert~~ and not admitted in relation to any other party.

45. As to paragraph 35, no admissions are made insofar as this paragraph concerns the other Additional Defendants, ~~Mr Page,~~ Mr Del Rosso and Mr Grayson (and their companies). Insofar as it concerns Mr Gerrard ~~and Dechert~~:

45.1. As to the first sentence, it is denied that Mr Gerrard ~~and Dechert were~~ was a servant~~s~~ of RAKIA. It is admitted that Dechert was engaged by RAKIA under the Dechert Retainer as explained in paragraph 15.2 above and that Dechert and Mr Gerrard were agents of RAKIA insofar as they performed that engagement on the instructions of RAKIA within the scope of the Dechert Retainer.

45.2. As to sub-paragraph 35(a):

45.2.1. As explained in paragraph 40.1 above, the term "*RAK Project*" was not used by Mr Gerrard ~~and Dechert~~ in the manner pleaded in paragraph 30. Paragraph 40.1 above is repeated. As such, no such knowledge is attributable to RAKIA as alleged.

45.2.2. It is specifically denied that Mr Gerrard was authorised to act "*as*" RAKIA or that he acted as the directing mind and will of RAKIA. In his capacity as a partner in Dechert, Mr Gerrard took instructions from RAKIA and was authorised to act on behalf of RAKIA within the scope of the Dechert Retainer. There is no basis for inferring a wider authorisation to act as alleged. No admissions are made as to how RAKIA and/or Mr Buchanan regarded Mr Gerrard's authorisation.

45.2.3. As to sub-paragraph 35(b), it is denied that Mr Gerrard ratified the acts or omissions of any of the Additional Defendants, Mr Del Rosso or Mr Grayson or their companies. Mr Azima fails to provide particulars of the alleged acts or omissions or the means of ratification, and Mr Gerrard ~~and Dechert~~ reserves the right to plead further in the event that further particulars are provided.

45.2.4. As to sub-paragraph 35(c), no admissions are made as to the vicarious liability of RAKIA. As explained in paragraph 40.1 above, the term "*RAK Project*" was not used by Mr Gerrard (or, to the best of Mr Gerrard's knowledge) ~~and~~ Dechert as pleaded in paragraph 30. To the best of Mr

27

Gerrard ~~and Dechert~~'s knowledge, there was no such single project; and ~~they~~ neither Mr Gerrard nor Dechert were ~~not~~ engaged in respect of such a project.



45.2.5. Save as aforesaid, no admissions are made.

46. As to paragraph 36:

46.1. As to sub-paragraphs 36(a) and (b), paragraph 40.1 above is repeated regarding the use of the term "*RAK Project*". To the best of Mr Gerrard ~~and Dechert~~'s knowledge, there was no such single project. It is admitted that Mr Page was engaged to perform investigatory work and that he produced reports in relation to his work, though no admissions are made as to by whom (which person or entity) Mr Page was engaged, since such matters are outside the knowledge of Mr Gerrard. Mr Gerrard notes, in this regard, that Mr Buchanan pleads that Mr Page was not engaged by RAKIA, but rather that "*his engagement was on behalf of the Ruler and the Government of RAK*".

46.2. As to sub-paragraph 36(c), no admissions are made as to the intentions of Mr Page or RAKIA; but it is admitted that Mr Page asked Mr Gerrard to return his reports to him.

46.3. As to sub-paragraph 36(d), whilst Mr Gerrard assumed that Mr Page would have required payment for, and would have been being paid for, any work he was doing, Mr Page's remuneration is outside the knowledge of Mr Gerrard ~~and Dechert~~ (as indeed is his engagement and his instructions).

46.4. Save as aforesaid, no admissions are made.

47. As to paragraph 37, no admissions are made by Mr Gerrard ~~and Dechert~~ in relation to the allegations made against Mr Page in respect of the other proceedings referred to.

48. Paragraph 38 of the ACC made reference to the witness statement of Mr Rey and contended that he had been informed by an unidentified source in India that, from about October 2014, multiple firms in India had been approached by Mr Page to hack Mr Azima. Without explanation, Mr Azima appears to have abandoned these allegations: paragraphs 4 to 9

28



above are repeated. Mr Gerrard ~~and Dechert~~ reserves his ~~their~~ position in relation to these matters and Mr Azima's changes in case in this regard.

49. As to paragraph 39, which is outside the knowledge of Mr Gerrard ~~and Dechert~~, no admissions are made.

49A. As to paragraph 39A:

    49A.1. As to the first sentence, no admissions are made as to the engagement of individuals or entities by Mr Page, which is outside the knowledge of Mr Gerrard ~~and Dechert~~. However, Mr Gerrard became aware that Mr Forlit (who was referred to by Mr Page as Amit) was working for Mr Page in relation to the investigation into Dr Massaad.

    49A.2. As to the second sentence, it is admitted that the investigation into Dr Massaad was referred to at times as "*Project Beech*". Mr Gerrard did not understand this term to refer specifically to the engagement of Mr Forlit or Insight/Gadot.

    49A.3. As to the third sentence, no admissions are made as to the methods used by Mr Forlit and Insight/Gadot; but to the best of the knowledge of Mr Gerrard ~~and Dechert~~, hacking was not used as a method of gathering information on Mr Azima or Dr Massaad.

49B. As to paragraph 39B, Mr Gerrard ~~and Dechert~~ repeats paragraph 49A above insofar as it concerns ~~them~~ him; and no admissions are made insofar as it concerns the other persons referred to. It is specifically denied that Mr Gerrard knew or approved of the use of hacking in connection with investigations into Dr Massaad or Mr Azima.

49C. As to paragraph 39C:

    49C.1. The first sentence is outside the knowledge of Mr Gerrard ~~and Dechert~~ and no admissions are made.

    49C.2. As to the second sentence, it is denied insofar as it concerns Mr Gerrard, and otherwise not admitted. Mr Gerrard was not aware of what sums Mr Page was paying to Mr Forlit or companies associated with him (if any), or the purpose of such sums.



49C.3. As to the third sentence, it is denied insofar as it concerns Mr Gerrard, and otherwise not admitted.

50. As to paragraph 40:

50.1. No admissions are made as to sub-paragraphs 40(a) and 40(aa). It is specifically denied (if alleged) that Mr Gerrard ~~and Dechert were~~ was involved in the engagement of Mr Jain, CyberRoot, Cyber Defence, or any other entity, to hack Mr Azima's data.

50.2. As to sub-paragraph 40(b), it is admitted that Mr Del Rosso and Vital arranged for the hacked data ~~was~~ to be downloaded from the Torrents on behalf of RAK Development.

50.3. Save as consistent with the aforesaid, paragraph 40 is denied.

50A. As to paragraph 40A:

50A.1. The first sentence is admitted.

50A.2. The second and third sentences are not admitted and paragraphs 29, 31, and 32 above are repeated in relation to CyberRoot, Cyber Defence and Analytics, and Mr Jain.

50A.3. As to the fourth sentence, it is not admitted that Mr Del Rosso and Vital used the services of Mr Robinson and Company Documents Limited in investigations undertaken by them.

50B. Paragraph 40B is not admitted, being outside the knowledge of Mr Gerrard ~~and Dechert~~. Further, the allegations in this paragraph are the subject of separate proceedings in ~~this Court~~ the King's Bench Division, namely Claim No. QB-2020-002492, as referred to in paragraphs 24 and 40C of the RRRACC and paragraph 36.1 above. The parallel determination of allegations in relation to Mr Robinson in these proceedings gives rise to a risk of abuse of process and inconsistent or irreconcilable judgments; and thus these allegations fall to be struck out of the RRRACC. The remainder of this Amended Defence proceeds without prejudice to that fundamental objection to the inclusion of these



allegations, which are not appropriate matters for ~~disclosure and/or~~ evidence in these proceedings.

50C. As to paragraph 40C, Mr Gerrard ~~and Dechert~~ repeats paragraph 50B above. This paragraph is not admitted, save that it is denied that the inferences pleaded fall to be drawn.

50D. As to paragraph 40D, it is denied that the inference pleaded falls to be drawn.

51. Paragraph 41 is admitted. Mr Azima has brought a further set of proceedings against Mr Gerrard, Dechert and others in the US District Court.

51A. Paragraph 41A alleges matters outside Mr Gerrard's knowledge and is not admitted. Insofar as this paragraph is intended, *sub silentio*, to make an allegation against Mr Gerrard, any such allegation is denied.

## C. THE PROJECT UPDATE REPORTS

52. As to paragraph 42, no admissions are made as to RAKIA's use of investigators or as to whether RAKIA had identified Mr Azima as an adversary. It is admitted (without any waiver of privilege) that by about February 2015 Dechert's work as referred to in paragraph 15.2 above included the gathering of information about Mr Azima. Save as aforesaid, no admissions are made.

52A. As to paragraph 42A:

52A.1. As to the first sentence, Mr Gerrard was aware in general terms ~~it is admitted~~ that Mr Page used Mr Forlit to gather information in relation to Dr Massaad; but it is not admitted (if alleged) that there was a separate investigation into Mr Azima or any "*others working with him*". Save as aforesaid, no admissions are made.

52A.1A. As to the second sentence, the allegation that "*other techniques*" were used "*to obtain information*" is so vague as to be impossible to plead to. In any event, ~~Nn~~o admissions are made as to the involvement of Insight/Gadot or the methods used by them.

52A.2. As to the ~~second~~ third sentence, it is admitted that Mr Forlit was publicly named in the article referred to from *The Financial Times*; but it is denied that the article identified Mr Forlit as having been involved in hacking, kidnapping, or other

31

wrongdoing. As to the judgment referred to from the Belgian Court, it is admitted that Mr Forlit was named in Section A (which summarised the "*progress of the investigation*" and the evidence given by witnesses, some of whom mentioned Mr Forlit); but it is denied that Mr Forlit was mentioned in Section B (the Belgian Court's "*Review of the charges*"), that the Belgian Court made any findings (let alone adverse findings) in relation to Mr Forlit, or that the judgment otherwise "*identified*" Mr Forlit as having been involved in any wrongdoing.

52B.   As to paragraph 42B:

52B.1. As to the first sentence, it is admitted that reports, usually labelled as "*Project Update Reports*" and/or "*Project Beech Reports*", were provided periodically from at least March 2015 onwards by Mr Page. The first sentence is otherwise not admitted.

52B.2. ~~The second sentence is not admitted.~~ As to the second sentence, Mr Azima does not identify the "*extracts from confidential documents that had been obtained through hacking*" that he relies upon. The Project Update Reports contained extracts from documents relating to Mr Azima which revealed serious wrongdoing by him. Paragraphs 17.4 and 36B.4.4 above are repeated. Save as aforesaid, the second sentence is not admitted.

52B.3. The third sentence is ~~not admitted~~ denied, given that the Project Update Reports referred repeatedly to their contents coming from "*our source*", "*sources*" or a "*source*". It is also denied (if alleged) that the obtaining of documents relating to Mr Azima was necessarily wrongful, even if they were obtained without "*authorisation*", in circumstances where Mr Azima had committed serious wrongdoing and had wrongfully sought to conceal the documents that revealed that conduct. Paragraph 36B.4.4 above is repeated. In addition, Mr Gerrard pleads further in paragraph 55E below.

52B.4  Save as aforesaid, paragraph 42B is not admitted.

52C.   As to paragraph 42C:

32

52C.1. As to the first and second sentences concerning Stop Statoil by Mr Page, no admissions are made; but it is Mr Gerrard's understanding that Mr Page provided reports to Mr Buchanan.

52C.2. As to the third sentence, it is admitted that Mr Page arranged for some reports to be provided to Mr Gerrard, primarily at Dechert's London office. It is further admitted that, on occasion, certain reports were provided to Mr Gerrard at his home.

52C.3. The fourth sentence is denied. The second sentence of paragraph 49B above is repeated.

53. As to paragraph 43:

53.1. It is admitted that the March 2015 Project Update was provided to Mr Gerrard by Mr Buchanan in May 2015.

53.2. Save as aforesaid, no admissions are made.

54. As to paragraph 44, it is admitted that a copy of the March 2015 Project Update was disclosed in redacted form in these proceedings and later disclosed in unredacted form. Save as aforesaid, no admissions are made.

55. Paragraph 45 is admitted insofar as it provides a summary of the relevant passages of the March 2015 Project Update. Save as aforesaid, no admissions are made.

55A. Paragraph 45A repeats the allegations made in paragraph 41A. Paragraph 51A is repeated.

55B. As to paragraph 45B:

55B.1. As to paragraph 45B(a), it is admitted that the Project Update Reports show that Mr Page had begun to investigate Mr Azima in March 2015 and continued to do so from time to time thereafter. No admissions are made as to whether this was on behalf of RAKIA. Mr Azima was not the primary (or even a significant) focus of the Project Update Reports, as to which Mr Gerrard refers to paragraphs 55E.6 and 57B.1 below.



55B.2. As to paragraph 45B(b) (which is impermissibly vague as pleaded) and paragraph 45B(c), paragraph 36B.4.4 above is repeated.

55B.3. Paragraph 45B is otherwise not admitted.

55C. As to paragraph 45C:

55C.1. The quotations from the Project Update Report dated 4 August 2015, pleaded at paragraph 45C, are admitted. It is admitted that the Report appears to contain financial information relating to Mr Azima and screenshots of emails he has sent. Mr Gerrard will rely at trial on the full contents of the Report.

55C.2. It is noted that this Report is cited by Mr Azima by way of "*example*", presumably meaning an example of the general and unparticularised allegations advanced at paragraph 45B.

55C.3. The Project Update Report dated 4 August 2015 is an example of a report that identifies extensive and serious wrongdoing by Mr Azima. Mr Gerrard adopts paragraph 55C.3 of the Dechert Defence in this connection.

55C.4. It is denied that it would have been obvious to any reasonable reader that the information had been obtained unlawfully and/or by hacking. The report refers repeatedly to "*our source*", "*sources*" and a "*source*". Insofar as necessary and/or appropriate, paragraph 36B.4.4 above is repeated.

55C.6. Mr Gerrard pleads further in paragraph 55E below.

55C.7. Paragraph 45C is otherwise not admitted.

55D. Paragraph 45D is not admitted.

55E. As to paragraph 45E:

55E.1. Mr Gerrard pleads only to the allegation directed at him. No admissions are made by Mr Gerrard in respect of the allegations directed at the Ruler, RAKIA and/or Mr Buchanan.

55E.2. It is admitted that Mr Gerrard received, or was briefed orally by Mr Buchanan or Mr Page on, a number, but not all, of the Project Update Reports.

34



55B.2. As to paragraph 45B(b) (which is impermissibly vague of pleaded) and paragraph 45B(c), paragraph 36B.4.4 above is repeated.

55B.3. Paragraph 45B is otherwise not admitted.

55C. As to paragraph 45C:

55C.1. The quotations from the Project Update Report dated 4 August 2015, pleaded at paragraph 45C, are admitted. It is admitted that the Report appears to contain financial information relating to Mr Azima and screenshots of emails he has sent. Mr Gerrard will rely at trial on the full contents of the Report.

55C.2. It is noted that this Report is cited by Mr Azima by way of "*example*", presumably meaning an example of the general and unparticularised allegations advanced at paragraph 45B.

55C.3. The Project Update Report dated 4 August 2015 is an example of a report that identifies extensive and serious wrongdoing by Mr Azima. Mr Gerrard adopts paragraph 55C.3 of the Dechert Defence in this connection.

55C.4. It is denied that it would have been obvious to any reasonable reader that the information had been obtained unlawfully and/or by hacking. The report refers repeatedly to "*our source*", "*sources*" and a "*source*". Insofar as necessary and/or appropriate, paragraph 36B.4.4 above is repeated.

55C.6. Mr Gerrard pleads further in paragraph 55E below.

55C.7. Paragraph 45C is otherwise not admitted.

55D. Paragraph 45D is not admitted.

55E. As to paragraph 45E:

55E.1. Mr Gerrard pleads only to the allegation directed at him. No admissions are made by Mr Gerrard in respect of the allegations directed at the Ruler, RAKIA and/or Mr Buchanan.

55E.2. It is admitted that Mr Gerrard received, or was briefed orally by Mr Buchanan or Mr Page on, a number, but not all, of the Project Update Reports.

55E.3. Mr Gerrard suffers from dyslexia. As a result, he has (and had at the material time), *inter alia*, difficulties in processing information efficiently, in particular information from text, and a weak working memory, which will have affected his processing at the time and his recall of that which he processed at the time. Mr Gerrard also suffers from various mental health issues, in particular, anxiety, depression and stress. Such issues, and anxiety in particular, exacerbate and have exacerbated his problems with memory. For these reasons (at least in part, and alongside the facts and matters pleaded in sub-paragraphs 4 to 6 below), and in any event, Mr Gerrard has very limited recollections of the Project Update Reports generally. Accordingly, as to the reports mentioned in paragraph 45E, he does not admit that he received or was briefed orally on each such report.

55E.4. It is denied that Mr Gerrard '*read … every Project Update Report*' or was '*briefed on the contents of every Project Update Report*'. Paragraphs 55E.2 and 55E.3 above are repeated. Mr Gerrard has very limited recollections of the Project Update Reports generally, and as such is only able to plead in general terms. Subject to that caveat, as to those reports which Mr Gerrard did receive or in respect of which he received an oral briefing from Mr Buchanan or Mr Page:

55E.4.1.  Insofar as he received an oral briefing, it was such limited oral briefing as Mr Buchanan or Mr Page saw fit to provide. It is denied that such oral briefing would have provided, or did provide, Mr Gerrard with the entire contents of such reports as he was briefed about, or with a detailed understanding of such contents or specific individual parts or elements of such contents.

55E.4.2.  As for the reports he received, Mr Gerrard does not now recall whether he reviewed any given report (and/or the appendices or attachments to the same) in full or in detail. Generally, however, Mr Gerrard did not review the reports in detail. He relied primarily on the oral briefing he received when one was provided or, in the instances in which he did not receive an oral briefing, on a review of the summary typically contained at the beginning of the report.



55E.4.3.  Mr Gerrard pleads further in this regard in paragraphs 55E.5 and 55E.6 below.

55E.5. More generally, as to such Project Update Reports as Mr Gerrard did receive and/or in respect of which he received an oral briefing from Mr Buchanan or Mr Page, Mr Gerrard pleads as follows:

55E.5.1.  Mr Page was not instructed by Mr Gerrard. (It is noted that Mr Page's affidavit expressly denies that he received instructions from Mr Gerrard). Whilst Mr Gerrard understood, or came to understand, Mr Page's work, and the reports, to relate to the investigation of Dr Massaad, and was accordingly able to infer that Mr Page's instructions must at least have included or encompassed instructions to that effect, Mr Gerrard was not aware of what Mr Page's instructions were, or from whom he received them.

55E.5.2.  Mr Gerrard's instructions (and those of Dechert), however, were focused on Dr Massaad, and the investigations into his wrongdoing.

55E.5.3.  The investigation in which Mr Gerrard and Dechert were involved (i.e. the investigation into Dr Massaad and his wrongdoing) was of significant size, breadth and complexity.

55E.5.4.  Within that context, and within the context of the work in which he was engaged, Mr Gerrard did not consider the reports, or their contents insofar as he was aware of it, to be of particular significance for or to provide anything of great use for, the investigation. He did not attach much weight to them.

55E.6. Furthermore, so far as Mr Azima is concerned, whilst Mr Azima featured in the investigation into Dr Massaad and his wrongdoing in which Mr Gerrard and Dechert were engaged, Mr Azima was not the focus of that investigation. *Ex hypothesi*, therefore, and in any event, insofar as the reports, or their contents insofar as he was aware of it, related to Mr Azima, Mr Gerrard did not consider them to provide anything of great use for the investigation in which he was engaged, and accordingly he did not afford them any great focus.

36

56. As to paragraph 46, it is admitted that Mr Page stated in his witness statement for the First Trial that his briefings to clients were "*invariably*" oral and that he had first heard of Mr Azima in early 2016. Save as aforesaid, no admissions are made.

57. As to paragraph 47:

    57.1. It is admitted that the said witness statements were provided for the First Trial.

    57.2. It is admitted that Mr Gerrard did not refer to the March 2015 Project Update in his witness statements for the First Trial, but it is denied that Mr Gerrard suggested that he had first encountered Mr Page in August 2016. In his first witness statement, Mr Gerrard stated that he was first engaged by RAK in 2014 and that, "*At some stage in my relationship with RAK I was introduced to Stuart Page*". It is further admitted that Mr Gerrard did not refer to any other reports provided to him by Mr Page, nor did he refer to the inclusion within those reports of information and/or extracts from other documents that it is alleged were obviously obtained without authorisation, through hacking. It is not admitted that any such reports contained such information any information obtained through hacking. It is admitted that the Project Update Reports contained information that it is likely Mr Azima had not willingly provided or authorised to be disclosed, but denied (if alleged) that it necessarily followed that the information had been disclosed as a result of any wrongdoing: paragraph 36B.4.4 above is repeated. In any event, Mr Gerrard explained in cross-examination at the First Trial that he did not refer to other reports provided by Mr Page because they were not relevant. No admissions are made as to the authorship of the reports provided by Mr Page to Mr Gerrard.

    57.3. No admissions are made in relation to the witness statements of Mr Buchanan or the Ruler. Nor are any admissions made as to the authorship of the Project Update Reports.

57A. Paragraph 47A is admitted as a broad summary of evidence that was given by either Mr Gerrard or Mr Buchanan at trial. It is denied that either of them gave evidence in precisely this form.

37

57B. Paragraph 47B is denied as far as it concerns Mr Gerrard. Mr Gerrard gave evidence honestly and to the best of his recollection. Without prejudice to the generality of the foregoing, Mr Gerrard pleads as follows:

57B.1 Mr Gerrard understood and understands that work undertaken by Mr Page related to an investigation into assets allegedly misappropriated by Dr Massaad. It appears that the work undertaken by Mr Page did concern an investigation into assets allegedly misappropriated by Dr Massaad. This is supported by the contents of the Project Update Reports disclosed in this litigation and in the Al Sadeq Proceedings, which clearly show that Dr Massaad was the primary focus of the investigation (and that investigations into Mr Azima were undertaken only as an adjunct to that primary focus).

57B.2 Paragraphs 55C.4 and 55E are repeated. It is denied that Mr Gerrard knew that any material relating to Mr Azima was obtained unlawfully.

58. As to paragraph 48:

58.1. Insofar as this paragraph concerns Mr Gerrard, it is denied that he intentionally concealed any "*true facts*" about the March 2015 Project Update, or any other Project Update Reports, or Mr Page's reporting to RAKIA, including any other periodic reports.

58.2. Sub-paragraph 48(c) refers to "*those proposals*" without providing particulars of any such proposals, such that Mr Gerrard and Dechert cannot plead to it.

58.1A. As to sub-paragraph 48(d), it is admitted that RAKIA sought to obtain information concerning Dr Massaad, as pleaded at paragraph 15.2 above, and that in the course of those investigations the work undertaken by Dechert, including Mr Gerrard, involved the gathering of information about Mr Azima. No admissions are made in relation to the other persons referred to.

58.1B. As to sub-paragraph 48(e):

58.1B.1. The first sentence is denied insofar as it concerns Mr Gerrard and otherwise not admitted. Mr Gerrard had no involvement in or knowledge of the use of hackers as a means of obtaining information about Mr Azima.

38



58.1B.2. Insofar as the second sentence concerns Mr Gerrard, it is denied that Mr Gerrard knowingly received information or materials obtained by hackers.

58.3. Save as aforesaid, no admissions are made.

58A. As to paragraph 48B, ~~in the premises it is denied that the inference pleaded falls to be drawn in respect of Mr Gerrard, and~~ it is specifically denied that Mr Gerrard in fact used hacking (or was willing to use hacking) as a means of obtaining information about Mr Azima or information confidential to him. No admissions are made in respect of the other persons to whom reference is made; but, to the best of the knowledge of Mr Gerrard ~~and Dechert~~, hacking was not used as a method of gathering information on Mr Azima.

58B. As to paragraph 48C, it is ~~denied~~ not admitted that the ~~inference pleaded falls to be drawn~~ sentence quoted from the March 2015 Project Update leads to the conclusion that there was a proposal to gather information through hacking. Mr Gerrard did not write the report and makes no admissions as to paragraph 48C.

58C. Paragraph 48D is noted. Paragraph 9 above is repeated in relation to the numerous shifts and inconsistencies in Mr Azima's case on the hacking, which will be explored at trial.

**D. THE RULER'S ALLEGED INSTRUCTIONS TO "TARGET" AND "GO AFTER" MR AZIMA**

59. As to paragraph 49, no admissions are made as to instructions given by the Ruler to Mr Buchanan.

60. As to paragraph 50:

60.1. It is admitted that in an email dated 4 April 2015, Mr Bustami (a member of the board of RAK Development) proposed that he, Mr Handjani (a US lawyer and director of RAK Petroleum plc) and Mr Buchanan "*hook up and coordinate our attack*".

60.2. Mr Handjani advised the Ruler against seeking to pursue charges against Mr Azima at that time so as not to undermine ongoing efforts to negotiate with Dr Massaad through his lawyer.

60.3. It is noted that, as set out in paragraph 9.1.4 above, although allegations have previously been made by Mr Azima that Mr Handjani and Mr Bustami were involved in the conspiracy to hack Mr Azima, those allegations have now been withdrawn without explanation or apology by Mr Azima.

60.4. Save as consistent with the aforesaid, no admissions are made.

61. As to paragraph 51, no admissions are made as to the instructions given by the Ruler or the alleged discussions thereof by Mr Handjani and Mr Buchanan.

62. As to paragraph 52:

62.1. Insofar as this paragraph concerns Mr Gerrard ~~and Dechert~~ in ~~their~~ his capacity as an agent~~s~~ for RAKIA, it is denied that ~~they~~ he took any steps to procure the hacking of Mr Azima's data; and it is denied that the inferences pleaded fall to be drawn.

62.2. Save as aforesaid, no admissions are made.

62A. Paragraph 52A is denied. The Project Update Reports do not "show" that the inference pleaded at paragraph 52 is true.

**E. MALICIOUS EMAILS RECEIVED BY MR AZIMA AND OTHERS**

63. Paragraph 53 is admitted.

64. No admissions are made in relation to paragraph 54, which is outside the knowledge of Mr Gerrard ~~and Dechert~~.

65. As to paragraph 55:

65.1. As to paragraph 55(aa), it is admitted that the Project Update Reports dated 16 March and 26 March 2015 identify that Dr Massaad is associated with Star Industrial Holdings Limited. It is denied that those reports say that Dr Massaad owned Star Industrial Holdings Limited (they identify several other shareholders) or that they say Star Industrial Holdings Limited is a "*potential target for investigation*".

65.2. Save as aforesaid, n~~N~~o admissions are made in relation to paragraph 55, which is outside the knowledge of Mr Gerrard ~~and Dechert~~.

66. As to paragraph 56, it is denied that there is any basis for ~~inferring that the~~ emails referred to were sent by persons acting on ~~RAKIA's direct or indirect instructions, and in particular on~~ the instructions of Mr Gerrard ~~or Dechert~~ on behalf of RAKIA. There is no basis for such an inference, nor is any alleged basis pleaded. <u>No admissions are made as to any wider or further inference said to arise, save that it is noted that no alleged basis is pleaded for any such inference.</u>

## F. SUSPICIOUS ACCESS TO CERTAIN EMAIL ACCOUNTS

67. No admissions are made in relation to paragraph 57, which is outside the knowledge of Mr Gerrard ~~and Dechert~~.

## G. THE "VIEW FROM THE WINDOW" DOCUMENT

68. As to paragraph 58:

 68.1. It is admitted that a document entitled "*View from the Window*" was sent by Mr Andrew Frank to Mr Gerrard on 4 January 2016, and that it contained the said passages.

 68.2. Save as aforesaid, no admissions are made.

69. As to paragraph 59:

 69.1. No admissions are made in relation to sub-paragraph 59(a). Paragraph 40.1 above is repeated in relation to the term "*RAK Project*".

 69.2. Sub-paragraph 59(b) is admitted.

70. As to paragraph 60:

 70.1. This paragraph is premised on an assertion that it is incumbent on Mr Gerrard to explain statements made in the "*View from the Window*" document. That is not the case. This document was produced by Mr Frank, and Mr Gerrard bore no responsibility for its contents.

 70.2. Further and in any event, it is denied that the proper reading of this document is that any fraud by Mr Azima had, at that stage, been "*exposed as fact*". Mr Gerrard ~~and Dechert~~ will rely on the "*View from the Window*" document for its full meaning

at trial and also on the conclusions of the Deputy Judge in relation to it at paragraph 309 of the Judgment. Without prejudice to the foregoing, and to the submissions that will be made at trial:

70.2.1. The "*View from the Window*" document was clearly a draft document, and furthermore was heavily caveated.

70.2.2. The expression "*exposed as fact*" appeared in the eighth line of the document, and was not connected to the reference to Mr Azima which appeared in the fifteenth and sixteenth lines of the document.

70.2.3. As explained in paragraphs 9.2.1 and 9.2.2 above, it is noted that in the OCC the hacking had been said to take place around October 2015 and thus had taken place by the time of the "*View from the Window*" document. That allegation has now been withdrawn and it is now said that the hacking post-dated the "*View from the Window*" document.

70.3. Save as aforesaid, paragraph 60 is not admitted.

70A. As to paragraph 60A, it is admitted that the Project Update Reports indicate that at least some of Mr Azima's information had been obtained prior to December 2015, but it is not admitted that RAKIA had done so. It is not admitted that any of that information was confidential, and it is denied that it was confidential insofar as it related to Mr Azima's wrongdoing. Mr Gerrard's pleas above in response to paragraphs 45A to 45E are repeated.

71. As to paragraph 61:

71.1. The inference pleaded is denied. Paragraph 70 above is repeated as to the proper reading of this document. Paragraph 70A is also repeated.

71.2. Further, there is no reference in the "*View from the Window*" document to any confidential data of Mr Azima, nor any suggestion that his data had been accessed. The basis for the allegation that "*FA, a US citizen, appears to have orchestrated, if not (fully) participated in numerous fraudulent activities*" was not specified in the document.

## H. THE RULER'S "WIDER OBJECTIVES"



72. Paragraph 62 is admitted.

73. As to paragraph 63:

   73.1.   It is admitted that drafts of the Settlement Agreement were produced by Dechert. It is denied, however, that the *"Settlement Agreement was drafted by Mr Gerrard"*. Mr Gerrard had limited involvement in the drafting of the Settlement Agreement.

   73.2.   The Settlement Agreement was negotiated in late 2015 and early 2016 between Dechert, on behalf of RAKIA, and Mr Kirby Behre of the Washington DC law firm Miller & Chevalier, on behalf of Mr Azima and HeavyLift.

   73.3.   Sub-paragraphs 63(a) and (b) are admitted. The provision for an express duty of good faith upon Mr Azima was suggested by Mr Behre on 28 January 2016. It was put forward by Mr Behre as a replacement for a clause included in Dechert's original draft whereby Mr Azima expressly warranted that he had not *"acted improperly"* against RAK entities, which had been defined as *"below the standard expected of reasonable business persons"*.

74. As to paragraph 64, it is admitted that the said recommendation was made in a letter dated 15 February 2016.

75. As to paragraph 65:

   75.1.   This paragraph is an impermissible attempt to reopen factual findings in the Judgment which are not within the scope of the issues remitted for trial by the Court of Appeal. Paragraph 65 is liable to be struck out on this basis.

   75.2.   Without prejudice to that contention:

      75.2.1.   As to sub-paragraph 65(a), no admissions are made as to what was meant by Mr Buchanan and Mr Bustami.

      75.2.2.   As to sub-paragraph 65(b), it is denied that the good faith clause was *"key"* or that it was *"key"* for the reason alleged. As explained in paragraph 73.3 above, the good faith clause was put forward by Mr Azima, and was

accepted by RAKIA, in place of a warranty that Mr Azima had not acted improperly against RAK entities. The good faith clause did not *"enable RAKIA to make damaging allegations against Mr Azima"*. RAKIA could have made damaging allegations against Mr Azima in any event, because Mr Azima had committed serious wrongdoing including (as RAKIA later alleged, and Deputy Judge Lenon found) falsely claiming to have invested $2.6 million via HeavyLift in a joint venture with RAKIA, and paying bribes to Dr Massaad and accepting unauthorised payments from RAKIA in relation to the sale of the Georgian hotel owned by RAKIA. Those allegations were damaging to him because they exposed his serious wrongdoing. Neither the allegations, nor the resulting damage to Mr Azima, depended on the good faith clause.

75.2.3. As to sub-paragraph 65(c), no admissions are made as to RAKIA's belief, which is outside the knowledge of Mr Gerrard ~~and Dechert. As at the time of entry into the Settlement Agreement, Mr Gerrard and Dechert were not aware that anyone had begun to obtain access to Mr Azima's data; and it is not admitted that anyone had.~~

75.3. Save as aforesaid, paragraph 65 is not admitted.

## I. THE MEETING OF 16 JULY 2016

76. As to paragraph 66:

76.1. It is admitted that, on 16 July 2016, a meeting took place between Mr Azima, Mr Buchanan, Mr Gerrard and a Dechert associate ("**the 16 July 2016 Meeting**").

76.2. This meeting was without prejudice. In responding to the specific allegations made by Mr Azima in paragraph 66, nothing that is said herein is intended to, or does, waive privilege as to the discussions at the meeting.

76.3. Sub-paragraph 66(a) is admitted.

76.4. As to sub-paragraph 66(b):

76.4.1. It is admitted that Mr Gerrard was aware of HeavyLift and Eurasia Hotel Holdings Limited and that he asked Mr Azima about his involvement with those entities.

76.4.2. No admissions are made as to Mr Buchanan's knowledge or beliefs, which are outside the knowledge of Mr Gerrard ~~and Dechert~~. Mr Gerrard was concerned about the conduct of HeavyLift and Eurasia and asked Mr Azima about this in the light of those concerns. That is not inconsistent with a belief on the part of Mr Buchanan that Mr Azima had engaged in fraudulent activities and wrongdoing only after publication of the hacked data on the Internet in August and September 2016.

76.5. As to sub-paragraph 66(c):

76.5.1. It is denied that Mr Gerrard wanted Mr Azima to shift alignment to assist RAKIA in its dispute with Dr Massaad; on the contrary, Mr Gerrard wanted Mr Azima to bring Dr Massaad to a resolution with RAKIA.

76.5.2. It is admitted that Mr Gerrard told Mr Azima that the risk was that, the further the dispute went, the more likely it would be that collateral damage would eventuate and the more difficult it would be to keep the scope of RAK's actions within a narrow compass.

76.6. Save as aforesaid, paragraph 66 is denied.

77. As to paragraph 67:

77.1. It is denied that the inference pleaded falls to be drawn, insofar as it concerns Mr Gerrard. Mr Gerrard did not have knowledge of Mr Azima's confidential data and had no anticipation that it would be publicised or used by RAKIA against Mr Azima.

77.2. No admissions are made regarding the knowledge and expectations of RAKIA and Mr Buchanan.

**J. THE EMAILS "BREAKING THE NEWS"**

78. Paragraphs 68 to 70 are admitted.

45

79. As to paragraph 71:

79.1. It is denied that (as pleaded in the opening words of sub-paragraph 71(a)) these emails suggest that the existence of the websites was first reported to RAKIA by Mr Page in and around 15 to 16 August 2016. The email from Mr Gerrard pleaded at paragraph 68 referred to "*another call*" from Mr Page confirming "*again*" that there was a website relating to Mr Azima. The natural reading of that email is that Mr Page had already mentioned the existence of such a website prior to 15 August 2016.

79.2. As to the specific matters pleaded at sub-paragraphs 71(a)(i)-(vii):

79.2.1. Sub-paragraphs 71(a)(i)-(ii) are admitted. Paragraph 79.1 above is repeated.

79.2.2. Sub-paragraph 71(a)(iii) is admitted.

79.2.3. Sub-paragraph 71(a)(iv) is denied. As set out in the email pleaded at paragraph 68, Mr Page provided Mr Gerrard with certain details regarding the websites (for example, that the websites were thought to have been generated by a UAE source), and Mr Gerrard asked Mr Page for further details.

79.2.4. Sub-paragraphs 71(a)(v)-(vi) are not admitted.

79.2.5. As to sub-paragraph 71(a)(vii), it is admitted that at the First Trial Mr Handjani gave evidence that he did not know who Stuart Page was in 2016.

79.3. It is denied that these emails were intentionally written to confect a documentary trail purporting to evidence the "*innocent discovery*" of the Torrents as alleged or at all. It is denied that the inference pleaded falls to be drawn, insofar as it concerns Mr Gerrard.

## K. THE TORRENTS

80. As to paragraph 72:



80.1. It is admitted that large volumes of Mr Azima's data appeared on the Torrents. The precise dates and volumes of data are not admitted.

80.2. It is not admitted, and Mr Azima is required to prove, that the hacked data contained any information which was private, confidential or privileged. At least some of the information in the hacked data was not private, confidential or privileged, insofar as it revealed serious wrongdoing by Mr Azima, and paragraph 17.4 above is repeated.

80.3. Save as aforesaid, paragraph 72 is not admitted.

81. As to paragraph 73:

81.1. No admissions are made as to whether the data were obtained without Mr Azima's authorisation.

81.2. It is admitted that the data included the types of data listed at sub-paragraph 73(c) and emails from the accounts listed at sub-paragraph 73(b).

81.3. No admissions are made as to the precise contents of the data.

82. As to paragraph 74:

82.1. As to sub-paragraphs 74(a) to (c), it is admitted that, in August and September 2016, RAKIA acquired copies of the hacked data from the Internet, and that it analysed this material. Save as aforesaid, no admissions are made.

82.2. As to sub-paragraph 74(d), it is admitted that, on 23 September 2016, Dechert on behalf of RAKIA sent a pre-action letter to Miller & Chevalier on behalf of Mr Azima. RAKIA's pre-action letter made reference to documents within the hacked data as downloaded from the Torrents and enclosed copies of some of those documents. It is denied that any of those were confidential.

82.3. Sub-paragraphs 74(e) to (f) are admitted.

83. As to paragraph 75:

83.1. As to sub-paragraph 75(a), it is admitted that RAKIA relied upon the second witness statement of its external solicitor Mr Hughes dated 13 July 2018 in relation

47



to its discovery and download of the hacked data. <ins>It is admitted that Mr Hughes was a partner of Stewarts by 13 July 2018.</ins>

83.2. As to sub-paragraph 75(b), it is admitted that RAKIA's pleadings made the allegations set out at sub-paragraphs 75(b)(i) and (ii).

83.3. Save as aforesaid, no admissions are made.

84. As to paragraph 76:

84.1. It is denied that RAKIA's account of how it obtained the hacked data was not supported by any documentary evidence.

84.2. As to sub-paragraph 76(a), the first two sentences are admitted. As to the third sentence, it is presumed that the email referred to in this sub-paragraph is that from Mr Del Rosso to Mr Chris Swecker dated 9 August 2016 (and not 9 September 2016). It is admitted that in this email Mr Del Rosso suggested that a deep web search had indicated that data relating to Mr Azima was on a site; and that he had subsequently been told that another site also held the same or additional information. Save as aforesaid, no admissions are made.

84.3. As to sub-paragraph 76(b), it is denied that the said emails were inconsistent with the email from Mr Del Rosso; or with Mr Page's evidence.

84.4. As to sub-paragraph 76(c), no admissions are made.

84.5. As to sub-paragraph 76(d), no admissions are made.

84A. As to paragraph 76A, it is not admitted that the true position is as now pleaded by Mr Azima.

85. As to paragraph 77:

85.1. No admissions are made as to this paragraph, save insofar as it concerns Mr Gerrard.

85.2. It is denied that Mr Gerrard knew the case presented by RAKIA as to how it obtained the hacked data and its knowledge of who created the Torrents to be untrue. ~~There is no basis for the said inference, including by reference to "*the*~~

48

~~matters set out below in respect of CyberRoot and Cyber Defence and Analytics~~".

Mr Gerrard ~~(and Dechert)~~ had no involvement in, and ~~have~~ has no knowledge of the circumstances of, the hacking and dissemination of Mr Azima's data. The evidence given by Mr Gerrard at the First Trial on this subject was true to the best of his knowledge and belief at the time he gave it. In the light of the new evidence filed by Mr Page and Mr Halabi nearly two years after the First Trial, Mr Gerrard ~~and Dechert are~~ is not presently able to admit or deny the truth of Mr Gerrard's evidence insofar as it was based on information provided by Mr Page or Mr Halabi; but it is denied that Mr Gerrard's evidence was dishonest.

85.3.   No admissions are made as to the final sentence, which does not concern Mr Gerrard ~~and Dechert~~.

85A.   As to paragraph 77AA:

85A.1. As to sub-paragraph 77AA(a), the first sentence is denied insofar as it concerns Mr Gerrard and otherwise not admitted. As to the second sentence, paragraph 52A.2 above is repeated. The third and fourth sentences are not admitted.

85A.2. As to sub-paragraph 77AA(b), the first sentence is noted and no admissions are made as to the second sentence. Mr Gerrard ~~and Dechert~~ repeats paragraphs ~~29.5 to 29.7~~ 29 above in relation to CyberRoot and paragraph ~~32.4~~ 32 above in relation to Cyber Defence and Analytics.

85A.3. As to sub-paragraph 77AA(c), the first sentence is not admitted, save that it is denied (insofar as alleged, which is not clear) that Mr Forlit made this suggestion to Mr Gerrard or, as far as Mr Gerrard is aware, anyone else at Dechert. As to the remainder of this sub-paragraph:

85A.3.1. It is denied that Mr Gerrard attended any meeting in Cyprus in October 2018.

85A.3.2. It is admitted that Mr Gerrard attended a meeting in Cyprus on 21 November 2018 with Mr Hughes, Mr Halabi, and Mr Page. Ms Linda Goldstein of Dechert dialled in for part of the meeting. Mr Gerrard does not recall either Mr Forlit or Mr Buchanan to have been present. The

meeting was subject to legal professional privilege and Mr Gerrard ~~and Dechert are~~ is not able to plead further in respect of the detail of it. It is denied that Mr Gerrard was involved in a conspiracy to provide dishonest evidence.

85A.4. As to sub-paragraph 77AA(d):

85A.4.1. It is not admitted that Mr Gerrard attended meetings in London on 1-3 May 2019. The final sentence of paragraph 85A.3.2. above is repeated as to the denial in respect of dishonest evidence.

85A.4.2. It is admitted that a meeting took place on 3 May 2019 in the London offices of Dechert, attended by Mr Halabi, Ms Dorothy Cory-Wright and Ms Goldstein (by video link) on behalf of Dechert, and Ms Lucy Ward and an associate from Stewarts Law LLP. Mr Forlit was not present, nor was Mr Gerrard. This meeting was subject to legal professional privilege and Mr Gerrard ~~and Dechert are~~ is not able to plead further in respect of the detail of it.

85A.5. As to sub-paragraph 77AA(e), it is admitted that Mr Page and Mr Halabi signed their witness statements on the said dates. In the light of the new evidence filed by Mr Page and Mr Halabi nearly two years after the First Trial, Mr Gerrard ~~and Dechert are~~ is not presently able to admit or deny the truth of the previous evidence of Mr Page or Mr Halabi.

85A.6. As to sub-paragraph 77AA(f):

85A.6.1. It is admitted that Mr Gerrard attended meetings at the Hotel Moosegg in Switzerland on or around 1-4 December 2019 with Mr Page and Mr Forlit. Mr Gerrard does not recall whether Mr Halabi was present.

85A.6.2. To the best of Mr Gerrard's recollection, the meetings had two purposes: (i) to discuss information that Mr Page had, or might be able to obtain, about geopolitical issues relating to the Ruler's family; and (ii) to discuss RAKIA's ongoing litigation with Mr Azima. The first of these purposes was and is irrelevant to Mr Azima's claims in the present proceedings. Mr

Gerrard ~~and Dechert~~ considers that the second of these purposes was subject to legal professional privilege. However, RAKIA and RAK Development have expressly waived any privilege in respect of and in relation to the meetings at the Hotel Moosegg. It is on this basis (and expressly without any wider or collateral waiver of privilege) that Mr Gerrard ~~and Dechert~~ pleads further in respect of these meetings below.

85A.6.3. In pursuance of the second of the purposes pleaded in paragraph 85A.6.2 above, Mr Gerrard explained to Mr Page the process of giving evidence, explained the importance of familiarity with one's witness statement, and read through Mr Page's witness statement with him. Mr Gerrard believes that, if Mr Halabi was in fact present (as to which paragraph 85A.6.1 above is repeated), he would also have done the same with Mr Halabi.

85A.6.4. In the premises, the second sentence is denied. The purposes of the meetings at the Hotel Moosegg were as pleaded in paragraph 85A.6.2 above. Further, paragraphs 16.3 and 36D.2 above are repeated in respect of the denial that Mr Gerrard coached witnesses, and the final sentence of paragraph 85A.3.2 above is repeated as to the denial in respect of dishonest evidence.

85A.7. Sub-paragraph 77AA(g) is denied. Paragraph 85A.6 above is repeated. Mr Gerrard did not conduct a "*mock trial*" as alleged or at all.

85A.8. Sub-paragraph 77AA(h) is denied. Paragraph 85A.6 above is repeated. Mr Gerrard did not state words to the effect alleged, nor has he admitted (whether by the alleged statement or otherwise, and whether in relation to himself or others) any involvement in or culpability for the hacking of Mr Azima's emails and data (which is in any event denied as set out herein). Further (and without prejudice to the foregoing), it is denied that the words alleged to have been said would, if said, have constituted an admission by Mr Gerrard of involvement in the hacking, or of his culpability for (or of the culpability of the other Defendants to this Counterclaim for) the hacking.

**L. VITAL'S ENGAGEMENT OF 'HACK FOR HIRE' FIRMS**

51



86. As to paragraph 77A:

    86.1. No admissions are made as to the allegation in paragraph 77A, which is outside the knowledge of Mr Gerrard ~~and Dechert~~.

    86.2. For the avoidance of doubt, it is denied (if alleged) that Mr Gerrard ~~or Dechert~~ gave instructions to any person to hack Mr Azima's data. Mr Gerrard ~~and Dechert~~ had no involvement in, and ~~have~~ has no knowledge of the circumstances of, the hacking and dissemination of Mr Azima's data.

    86.3. Paragraphs 4 to 9 above are repeated in relation to the changes in Mr Azima's case in relation to the hacking. Mr Gerrard ~~and Dechert~~ reserves the right to make submissions in due course as to the significance of those repeated changes in Mr Azima's case.

87. As to paragraph 77B, no admissions are made: these matters are outside the knowledge of Mr Gerrard ~~and Dechert~~.

**1. CyberRoot**

88. Paragraph 29 above is repeated in relation to the payments made to CyberRoot. Save as aforesaid, paragraph 78 is not admitted, being outside the knowledge of Mr Gerrard ~~and Dechert~~.

89. As to paragraph 79:

    89.1. No admissions are made in relation to the extent to which the payments pleaded at paragraph 78 represented work performed for RAKIA on the instructions of Mr Del Rosso.

    89.2. It is specifically denied (if alleged) that Mr Gerrard ~~and Dechert~~ gave instructions to Mr Del Rosso or Vital to engage CyberRoot.

    89.3. Save as aforesaid, no admissions are made.

90. As to paragraph 80:

90.1. No admissions are made as to the payments alleged to have been made by Gravitas to CyberRoot, which are outside the knowledge of Mr Gerrard ~~and Dechert~~.

90.2. It is specifically denied (if alleged) that Mr Gerrard ~~and Dechert were~~ was involved in the engagement of CyberRoot by Gravitas.

90.3. Save as aforesaid, no admissions are made.

91. As to paragraph 81:

91.1. It is not admitted that CyberRoot is a "*hack for hire*" firm. Paragraph 29 above is repeated.

91.2. No admissions are made as to whether CyberRoot hacked Mr Azima's emails and devices on behalf of RAKIA, nor as to the specific matters pleaded at sub-paragraphs 81(a) to (i). Mr Gerrard ~~and Dechert~~ had no involvement in, and ~~have~~ has no knowledge of the circumstances of, the hacking and dissemination of Mr Azima's data.

91.3. Sub-paragraph 81(g) makes reference to statements allegedly made by Mr Pandey to Mr Jain in 2020. No admissions are made as to the veracity of those statements.

**2. Cyber Defence**

92. As to paragraph 81A, no admissions are made in relation to the allegations concerning Cyber Defence, which are outside the knowledge of Mr Gerrard ~~and Dechert~~.

93. As to paragraph 81B:

93.1. No admissions are made as to the allegation that Cyber Defence hacked Mr Azima's emails and devices on behalf of RAKIA.

93.2. For the avoidance of doubt, it is denied (if alleged) that Mr Gerrard ~~or Dechert~~ gave instructions to Cyber Defence to hack Mr Azima's data. Mr Gerrard ~~and Dechert~~ had no involvement in, and ~~have~~ has no knowledge of the circumstances of, the hacking and dissemination of Mr Azima's data.

93.3. Save as aforesaid, no admissions are made.

94. As to paragraph 81C:

94.1. Mr Gerrard ~~and Dechert have~~ has no knowledge of the matters pleaded in respect of the alleged ongoing campaign against Mr Jain (and, for the avoidance of doubt, have had no involvement in any such campaign).

94.2. In the premises, paragraph 81C is not admitted.

## M. THE DELETION OF MR BUCHANAN'S EMAILS

95. Paragraph 82 is admitted, insofar as it relates to disclosure given in advance of the First Trial regarding Mr Azima's hacking allegations. RAKIA provided disclosure in relation to Mr Azima's hacking allegations from Mr Buchanan as well as other sources within RAK Development and third parties.

96. Paragraph 83 is admitted.

97. Paragraph 84 is admitted, save for the word "*allegedly*" insofar as ~~this~~ it is ~~intended to imply that it was untrue that~~ suggested by Mr Azima that this word was used by RAKIA when RAKIA explained that a number of Mr Buchanan's emails had been deleted ~~on 12 October 2016~~ and could not be recovered.

98. As to paragraph 85:

98.1. It is admitted that one of the 198 individual emails sent to Mr Azima by Mr Buchanan that were disclosed by Mr Azima appears in the image of Mr Buchanan's sent items. However, it is noted that a number of the other 198 emails appear within email chains in that image.

98.2. Similarly, 83 of the 106 emails sent to Mr Buchanan by Mr Azima that were disclosed by Mr Azima appear individually in the image of Mr Buchanan's inbox; and others appear within email chains.

98.3. Save as aforesaid, paragraph 85 is not admitted.

99. Paragraph 86 is admitted.

100. As to paragraph 87:

100.1. ~~It is denied that Mr Buchanan's account was false and that Mr Buchanan deliberately destroyed emails in order to conceal evidence of wrongdoing. Indeed,~~ ~~a~~After cross-examination on this issue at the First ~~Trial,~~ <u>the</u> Deputy Judge held at paragraph 76 of the Judgment that Mr Buchanan's account was true and that no emails had been deliberately destroyed. <u>It is accordingly denied that Mr Buchanan's account was false and that Mr Buchanan deliberately destroyed emails in order to conceal evidence of wrongdoing.</u> The Deputy Judge's findings are binding on Mr Azima, he is estopped from contending otherwise, and he is precluded from advancing a case that is inconsistent with and/or seeks to reopen the Deputy Judge's findings.

100.2. As to the specific allegations in sub-paragraphs 87(a) to (e):

   100.2.1. Sub-paragraph (a) is <u>outside Mr Gerrard's knowledge and accordingly not admitted</u> ~~denied~~. <u>Mr Buchanan's account is that t</u>~~T~~he emails were deleted from Mr Buchanan's email account by an Apple Store employee in October 2016 because of concerns over Mr Buchanan's mailbox size.

   100.2.2. Sub-paragraph (b) is not admitted.

   100.2.3. Sub-paragraph (c) is <u>outside Mr Gerrard's knowledge and accordingly not admitted</u> ~~denied~~. <u>Mr Gerrard understands</u> ~~It is admitted and averred~~ (without any waiver of privilege) that Mr Buchanan informed Dechert about the Apple Store incident on 22 October 2016; and that, thereafter, steps were taken by Mr Buchanan to attempt to restore the deleted emails in October 2016 and to image Mr Buchanan's email account in December 2016.

   100.2.4. Sub-paragraph (d) is denied. RAKIA's disclosure included contemporaneous emails referring to the deletion of Mr Buchanan's emails.

   100.2.5. As to sub-paragraph (e), it is admitted that in cross-examination, Mr Buchanan said that another person accompanied him to the Apple Store; he was not asked who that person was.


## N. MR GERRARD'S AND MR HUGHES' EVIDENCE AS TO DEALINGS WITH MR AL SADEQ

101. There is no basis for the inclusion of paragraphs 17, 88 to 95, 107(t) and 110(i) of the RRRACC (the "**Al Sadeq Paragraphs**"). These paragraphs plead matters that have no relevance to the issues for determination in these proceedings; go solely to matters of Mr Gerrard's credit; are scandalous and vexatious; and give rise to a risk of inconsistent judgments. Furthermore, as the Deputy Judge found (at paragraph 22 of the Addendum Judgment), these issues are irrelevant to Mr Azima's ~~hacking claim~~ Hacking Counterclaim.

102. Pursuant to the order of the Honourable Mr Justice Michael Green made at the hearing on 19 July 2021, permission to amend the Hacking Counterclaim was granted in respect of the Al Sadeq Paragraphs on the basis that the inclusion of the Al Sadeq Paragraphs in the Hacking Counterclaim was without prejudice to RAKIA and the Additional Defendants' position that the underlying allegations in the Al Sadeq Proceedings are not relevant to the issues in these proceedings, and without prejudice to their rights (i) to object to disclosure in relation to the facts and matters raised in the Al Sadeq Paragraphs; and (ii) to object to the admissibility at trial of the facts and matters raised in the Al Sadeq Paragraphs.

103. Without prejudice to the above contentions, Mr Gerrard ~~and Dechert~~ responds to the Al Sadeq Paragraphs as follows.

104. Paragraph 88 is admitted. By way of background:

104.1. Mr Al Sadeq was convicted of defrauding RAKIA and other RAK entities, and is currently in prison for those offences. Further, the Deputy Judge held at paragraph 249 of the Judgment that Mr Al Sadeq had probably been a party to the unlawful conspiracy in which Mr Azima received illicit payments totalling US\$1,652,500 and a bribe of US\$500,000 was paid to Dr Massaad.

104.2. As explained in paragraph 15.2 above Dechert was engaged by RAK IDO in June 2013, and later by RAK Development, to assist with the investigation of complex frauds that appeared to have been committed by officers of RAKIA and others.

104.3. In September 2014, the local authorities in the UAE arrested Mr Al Sadeq. They also arrested Mr Quzmar, a former judge of the Supreme Judicial Council of RAK and legal adviser to the Ruler in September 2014.

56

104.4. After Mr Al Sadeq and Mr Quzmar were arrested, Mr Gerrard and other Dechert partners and employees attended a series of meetings and interviews with each of them, in order *inter alia* to gather evidence relating to their potential involvement with the frauds referred to in paragraph 104.2 above. Mr Al Sadeq ultimately admitted that he had been involved in fraudulent transactions, while Mr Quzmar made no such admissions. Both were later tried and convicted of various offences in the RAK criminal courts.

105. Paragraphs 89 and 90 are admitted.

106. Paragraph 91 is admitted.

107. As to paragraph 92, it is admitted that Mr Gerrard provided a corrective witness statement following the handing down of the Judgment, as summarised in paragraph 92. Paragraph 26 above is repeated.

108. Paragraph 93 is admitted.

109. As to paragraph 94:

109.1. The inferences alleged in this paragraph represent an impermissible attempt to re-open the factual findings made in the Addendum Judgment and paragraph 94 is liable to be struck out on this basis. The Deputy Judge held at paragraph 20 of the Addendum Judgment that he was not prepared to find that Mr Gerrard's evidence either at trial or in the corrective witness statement was deliberately untrue, and that human memory is fallible and honest witnesses often make errors when recollecting past events. Further, he held that the suggestion that Mr Gerrard had deliberately delayed giving corrective evidence, as alleged at sub-paragraphs 94(b) and (c) of the RRRACC, did not make sense.

109.2. It is denied that the inferences pleaded fall to be drawn. Paragraph 26 above is repeated as to the circumstances of the filing of Mr Gerrard's third witness statement, and paragraphs 16 and 85A above are repeated as to the allegations of his involvement in the concoction of false evidence (which are denied).

109.3. In the premises, paragraph 94 is denied.

110. As to paragraph 95:



110.1. It is not admitted that the Defendants in the *Bedford* proceedings complained of hacking.

110.2. It is admitted that Mr Hughes represented RAKIA in those proceedings.

110.3. Sub-paragraphs 95(a) and (b) are admitted, save the no admissions are made as to the use of the word "purported".

110.4. As to sub-paragraph 95(c), it is admitted that Mr Hughes' evidence at paragraph 8 of 8th Hughes was incorrect; and that, in fact, Mr Al Sadeq had been interviewed prior to October 2015. ~~At the time of making 8th Hughes, Mr Hughes believed its contents to be true.~~

110.5. The inference pleaded at sub-paragraph 95(d) is denied. There is no basis for an inference that Mr Hughes deliberately gave false evidence to serve RAKIA's interests, still less that Mr Gerrard or RAKIA were parties to him doing so.

110.6. Save as aforesaid, paragraph 95 is not admitted.

**O. MR PAGE'S THREAT TO "IMPLICATE" OTHERS**

111. As to paragraph 96, the first sentence is not admitted. As to the second sentence, if the statement was made by Mr Page, then it is admitted that the individuals referred to were as pleaded.

112. No admissions are made in relation to paragraph 97, save that it is denied that Mr Page's affidavit has "*confirmed*" any wrongdoing on the part of Mr Gerrard ~~or Dechert~~.

113. As to paragraph 98, no admissions are made insofar as this paragraph concerns parties other than Mr Gerrard ~~and Dechert~~. Insofar as it concerns ~~them~~ him, it is denied that Mr Page has information showing ~~them~~ him to be involved in wrongdoing and in particular in attempts to obtain confidential information from Mr Al Sadeq's legal team and/or from Mr Azima or his associates, or attempts to deceive the Court. It is specifically denied that Mr Page's affidavit, provided nearly two years after the First Trial in exchange, it appears, for (at least) the proceedings against him being discontinued, has "*confirmed*" these matters to be true.

58



**P. FURTHER PUBLICATION ON WETRANSFER SITES**

114. As to paragraph 99:

    114.1. It is admitted that large volumes of Mr Azima's data appeared on WeTransfer sites. The precise dates and volumes of data are not admitted.

    114.2. Save as aforesaid, paragraph 99 is not admitted.

115. As to paragraph 100:

    115.1. As to the first sentence, no admissions are made regarding the truth of statements allegedly made by Mr Pandey or Mr Rey.

    115.2. As to the second sentence, insofar as it concerns Mr Gerrard ~~and Dechert~~, the inference pleaded is denied; and, insofar as it concerns other agents of RAKIA, it is not admitted.

**IV. THE HACKING OF MR AZIMA AND THE ALLEGED COVER-UP OF THE FACTS RELATING TO IT**

116. Paragraph 101 is noted.

117. Paragraphs 102 to 105 are not admitted <u>save that sub-paragraphs 103(a) and (c) are</u> ~~is~~ <u>pleaded to further below</u>. Mr Gerrard ~~and Dechert~~ had no involvement in, and ~~have~~ <u>has</u> no knowledge of the circumstances of, the hacking and dissemination of Mr Azima's data. <u>As to sub-paragraph 103(a):</u>

    <u>117.1. No admissions are made as to the first sentence, which is outside the knowledge of Mr Gerrard</u> ~~and Dechert.~~

    <u>117.2. As to the second sentence, Mr Gerrard</u> ~~and Dechert~~ <u>repeats paragraphs 36B and 58.1B above. It is specifically denied that Mr Gerrard directed or acquiesced in any hacking.</u>

<u>117AA. As to paragraph 103(c), insofar as it concerns Mr Gerrard, it is admitted that one or more Project Update Reports were provided to Mr Gerrard. Paragraph 55E above is repeated in this connection. No admissions are made as to other persons or entities referred to. In addition, no admissions are made as to any alleged *"information gathered by Vital"* (let</u>



alone, "*at least some information gathered by Vital*"), which please is in any event too vague to be responded to.

117A. As to paragraph 105A:

    117A.1. As to the first sentence, no admissions are made as to the involvement in the hacking of Mr Azima's data of any of the persons or entities referred to; but it is specifically denied (insofar as alleged (which is not clear from the unparticularised nature of the allegations in this paragraph)) that Mr Gerrard ~~and/or Dechert were~~ was involved in any concealment or dishonesty as regards the roles of any of the individuals or entities referred to.

    117A.2. The second sentence is noted.

    117A.3. As to the third sentence, it is not admitted that any of the matters pleaded at sub-paragraphs 105A(a) to (g) have been "*revealed*" as "*facts*". Mr Gerrard ~~and Dechert~~ repeats paragraph 9 above as to the numerous changes in Mr Azima's case in this regard. As to the matters pleaded in those sub-paragraphs, no admissions are made; and it is denied that the inferences pleaded fall to be drawn.

118. As to paragraph 106:

    118.1. Mr Gerrard ~~and Dechert~~ had no involvement in, and ~~have~~ has no knowledge of the circumstances of, the hacking and dissemination of Mr Azima's data.

    118.2. Save that it is denied that RAKIA is primarily liable for Mr Gerrard's acts, no admissions are made as to the remainder of paragraph 106.

119. As to paragraph 107:

    119.1. As explained above, Mr Gerrard ~~and Dechert~~ had no involvement in, and ~~have~~ has no knowledge of the circumstances of, the hacking and dissemination of Mr Azima's data. It is specifically denied that Mr Gerrard coached witnesses to provide false evidence, and it is further denied that (insofar as alleged, which is not clear) Mr Gerrard ~~and Dechert were~~ was involved in the provision of false evidence and/or a false pleaded case during the First Trial.

119.2. Without prejudice to that overriding contention, it is denied that the matters of inference and circumstantial evidence pleaded at paragraph 107 support the contention that RAKIA did the acts alleged at paragraph 96.

119.3. Further, the specific allegations pleaded in sub-paragraphs 107(a) to (w) repeat matters pleaded elsewhere in the ~~RR~~RACC. The position of Mr Gerrard ~~and Dechert~~ in respect of these sub-paragraphs is as pleaded herein.

120. As to paragraph 108:

120.1. As to sub-paragraph 108(a), paragraph 40.1 above is repeated in relation to the "*RAK Project*". It is admitted that the words quoted appear in the March 2015 Project Update.

120.2. As to sub-paragraph 108(b), paragraph 46.2 above is repeated.

120.2A. Sub-paragraph 108(ba) is not admitted.

120.3. As to sub-paragraph 108(c), no admissions are made as to the veracity of Mr Page's evidence. Paragraph 36A above is repeated as to the affidavit referred to at paragraph 26A of the RRRACC.

120.4. As to sub-paragraph 108(d), paragraph 47 ~~56~~ above is repeated.

120.5. As to sub-paragraph 108(e), paragraph 111 above is repeated. Insofar as the impermissibly unparticularised reference to "*various individuals in RAKIA's camp*" is intended to allege wrongdoing on the part of Mr Gerrard ~~or Dechert~~, that is denied.

120.6. As to sub-paragraph 108(f), paragraph 46.3 above is repeated.

120.7. As to sub-paragraph 108(g), it is noted that Mr Azima has withdrawn (without explanation) the allegation that Mr Page was identified by an unnamed source as having sought assistance with hacking Mr Azima from as early as October 2014.

120.8. As to sub-paragraph 108(h), no admissions are made as to Mr Page's alleged involvement in hacking, the alleged cover up of that hacking, or the alleged provision of false evidence to the Court in the First Trial. It is noted that the Deputy



~~Judge did not believe Mr Page's evidence at the trial. It is denied that the inference pleaded falls to be drawn.~~

121.  As to paragraph 109:

121.1.  As to sub-paragraph 109(a), paragraph 40.1 above is repeated in relation to the "*RAK Project*". Paragraph 15.3 above is repeated as to Mr Buchanan's role; it is admitted that Mr Buchanan was a leading figure in RAKIA's investigations.

121.2.  As to sub-paragraph 109(b), paragraph 44.2 above is repeated as to the instructions provided to Mr Gerrard.

121.2A.  Sub-paragraph 109(ba) is not admitted.

121.3.  As to sub-paragraph 109(c), paragraphs 59 to 61 above are repeated.

121.4.  As to sub-paragraph 109(d), no admissions are made as to Mr Buchanan's briefing of the Ruler; and paragraph 73 above is repeated in relation to the inclusion of the duty of good faith in the Settlement Agreement.

121.5.  As to sub-paragraph 109(e), it is admitted that Mr Buchanan attended the 16 July 2016 Meeting. It is denied that Mr Gerrard threatened Mr Azima: paragraph 76.5 above is repeated.

121.6.  As to sub-paragraph 109(f), paragraph 30 above is repeated.

121.7.  As to sub-paragraph 109(g), no admissions are made.

121.8.  As to sub-paragraph 109(h), paragraphs 83 to 85 above are repeated.

121.9.  As to sub-paragraph 109(i), paragraphs 78 to 79 above are repeated.

121.10.  As to sub-paragraph 109(j), paragraphs 97 to 100 are repeated.

121.11.  As to sub-paragraph 109(k), no admissions are made as to Mr Buchanan's alleged involvement in hacking, the alleged cover up of that hacking, or the alleged provision of false evidence in relation to Mr Halabi's role ~~it is denied that the inference pleaded falls to be drawn~~.

Case 1:23-mc-00005-UA-JLW   Document 3-9   Filed 02/24/23   Page 64 of 136



122. As to paragraph 110:

    122.1. As to sub-paragraph 110(a):

        122.1.1. Paragraph 40.1 above is repeated in relation to the so-called "*RAK Project*".

        122.1.2. It is admitted that Mr Gerrard, in his capacity as a partner in Dechert, was closely involved in RAKIA's investigations. It is further admitted that he was party to and/or involved in the development of its strategy in regard to Mr Azima; but it is not admitted that he was so involved "*at all material times*", which is not sufficiently specific to permit a response.

    122.2. As to sub-paragraph 110(b):

        122.2.1. It is denied that (as previously alleged) Mr Gerrard gave instructions to Mr Page on behalf of RAKIA. It is admitted that Mr Gerrard communicated with Mr Page from time to time in the context of the investigations into Dr Massaad. Paragraph 44.4 above is repeated.

        122.2.2. The allegation that Mr Gerrard was privy to Mr Page's wrongful activities is, impermissibly, not particularised; and in any event it is denied.

        122.2.3. It is denied that Mr Gerrard was party to false evidence about Mr Page's activities at the First Trial; and Mr Azima has not (whether in paragraphs 46 to 48 of the RRACC or elsewhere) explained any basis for that allegation.

    122.2A. As to sub-paragraph 110(ba), it is denied that Mr Gerrard knowingly received hacked materials obtained by Mr Forlit and/or Insight, and it is denied that he approved of Mr Forlit and/or Insight carrying out hacking.

    122.3. As to sub-paragraph 110(c), it is admitted that Mr Gerrard, in his capacity as a partner in Dechert, gave instructions on behalf of RAK Development to Vital in relation to the engagement pleaded at paragraphs 29.3 and 29.4 above. It is specifically denied that he gave instructions to any person to engage CyberRoot to procure the hacking of Mr Azima's information.

63

122.4. As to sub-paragraph 110(d), it is admitted that Mr Gerrard was party to the emails pleaded at paragraphs 68 to 70. It is denied that any inference falls to be drawn from this. Paragraph 79 above is repeated.

122.5. As to sub-paragraph 110(e), it is denied that any "*false version*" was advanced by Mr Gerrard or with the knowledge of Mr Gerrard in the First Trial as to the discovery of the Torrents. Paragraphs 85 to 89 above are repeated.

122.6. As to sub-paragraph 110(f), it is admitted that Mr Gerrard received the "*View from the Window*" document as pleaded in paragraph 68 above. It is denied that any inference falls to be drawn from this. Paragraph 70 above is repeated.

122.7. As to sub-paragraph 110(g), it is denied that Mr Gerrard "*threatened*" Mr Azima as alleged; and paragraph 76 above is repeated as to the 16 July 2016 Meeting.

122.8. As to sub-paragraph 110(h), the alleged statement by Mr Page is not admitted; and, in any event, it is denied that any inference falls to be drawn from this statement if made.

122.9. As to sub-paragraph 110(i), it is denied that Mr Gerrard knowingly gave false evidence as to his involvement with Mr Al Sadeq; and paragraph 26 above is repeated. It is denied that Mr Gerrard was party to Mr Hughes giving false evidence and paragraph 110 above is repeated.

122.10. As to sub-paragraph 110(j), In the premises, it is denied that Mr Gerrard was party to any hacking, any staged release of Mr Azima's data, or any cover up (including in particular the alleged fabrication of any evidence given as to Mr Halabi's role). It is specifically denied that Mr Gerrard actively encouraged Mr Halabi or Mr Page to give false evidence or that he attempted to prepare them for doing so. any inferences fall to be drawn against Mr Gerrard on the basis of the allegations at sub-paragraphs 110(a) to (j).

123. As to paragraph 111:

123.1. It is admitted that Mr Gerrard's knowledge and conduct in his capacity as a partner in Dechert are to be attributed to Dechert; and it is admitted that Dechert is vicariously liable for his acts in that capacity.



123.2. Save as aforesaid, no admissions are made.

## V. PROPER LAW

124. The matters pleaded in the first two sentences of paragraph 112 are admitted. The response below to paragraphs 113 to 116 is pleaded on the basis that it is common ground between Mr Azima and RAKIA that the claims made by Mr Azima against RAKIA are governed by English law.

125. As to ~~the third sentence of paragraph 112 and~~ paragraph<u>s</u> 113 <u>to 115</u>:

125.1. ~~It is denied that~~ <u>Mr Gerrard admits that</u> the proper law of the claims made by Mr Azima against ~~Dechert and/or~~ Mr Gerrard is the <u>Federal</u> law of the United States of America and~~/or~~ the <u>State</u> law of the State of Missouri (<u>**"US and Missouri law"**</u>). ~~The proper law of such claims is English law.~~

125.2. <u>This admission is made without prejudice to Mr Gerrard's case that Mr Azima does not, in fact, have any cause of action against Mr Gerrard under US and Missouri law, as set out below.</u> ~~Paragraphs 113(a) and (b) are admitted.~~

125.3. <u>The specific basis for the alleged application of US and Missouri law set out by Mr Azima at paragraph 113 is denied, as regards the claims based upon breach of privacy and breach of confidence (comprising the claims at paragraphs 122 to 128 and 159 to 162), and the claims for breach of data protection legislation (comprising the statutory claims under US and/or Missouri law at paragraphs 139 to 146, 151 to 154 and 155 to 158). The applicable law rules for these claims are set out in sections 11 and 12 of the Private International Law (Miscellaneous Provisions) Act 1995 (**"the 1995 Act"**) rather than Rome II. But, in circumstances where the proper law is not in dispute, Mr Gerrard does not plead further on this issue.</u> ~~Paragraph 113(c) is denied insofar as it seeks to allege that each of the claims set out in the RRACC are subject to Article 4 of Rome II. In particular:~~

125.3.1. ~~Article 1(2) of Rome II excludes certain claims from the scope of Rome II. These include, pursuant to Article 1(2)(g):~~

~~"*non-contractual obligations arising out of violations of privacy and rights relating to personality, including defamation.*"~~

65

125.3.2. Mr Azima's claims in equity and/or at common law being upon breach of privacy and breach of confidence (comprising the claims at paragraphs 122 to 128 and 159 to 162), and his claims for breach of data protection legislation (comprising the statutory claims under English law at paragraphs 117 to 121 and the statutory claims under US and/or Missouri law at paragraphs 139 to 146, 151 to 154 and 155 to 158) fall within the scope of Article 1(2)(g).

125.3.3. The proper law of such claims is to be determined in accordance with the applicable law rules set out in sections 11 and 12 of the Private International Law (Miscellaneous Provisions) Act 1995 ("**the 1995 Act**"). Section 11 provides, in relevant part, that:

"(1)   The general rule is that the applicable law is the law of the country in which the events constituting the tort or delict in question occur.

(2)   Where elements of those events occur in different countries, the applicable law under the general rule is to be taken as being—

...

(c)   ... the law of the country in which the most significant element or elements of those events occurred."

Section 12 provides that:

"(1)   If it appears, in all the circumstances, from a comparison of—

(a)   the significance of the factors which connect a tort or delict with the country whose law would be the applicable law under the general rule; and

(b)   the significance of any factors connecting the tort or delict with another country,

that it is substantially more appropriate for the applicable law for determining the issues arising in the case, or any of those issues, to be the law of the other country, the general rule is displaced and

66



*the applicable law for determining those issues or that issue (as the case may be) is the law of that other country.*

*(2)   The factors that may be taken into account as connecting a tort or delict with a country for the purposes of this section include, in particular, factors relating to the parties, to any of the events which constitute the tort or delict in question or to any of the circumstances or consequences of those events.*"

125.4.   In the premises paragraphs 113(a)-(e) and 115 are not relevant, but (for the avoidance of doubt) paragraphs 113(a) and (b) are admitted and otherwise no admissions are made as to the allegations made therein. ~~Paragraph 113(d) is not admitted. Mr Azima is required to prove his place of residence at the time the hacking and/or the publication occurred and the place(s) from which he conducted business at those times.~~

~~125.5.   In any event, it is clear from all the circumstances of the case that the alleged torts/delicts are manifestly more closely connected with England, and that English law is accordingly the proper law of the claims which are subject to Rome II, pursuant to Article 4(3) of Rome II. In particular:~~

~~125.5.1.   Dechert is a Limited Liability Partnership constituted under English law, which is domiciled in England.~~

~~125.5.2.   Mr Gerrard is a United Kingdom citizen who is domiciled in England.~~

~~125.5.3.   The claims by Mr Azima against RAKIA are governed by English law, pursuant to the Settlement Agreement between Mr Azima and RAKIA. These include claims against RAKIA that are pleaded in identical terms and/or based on the same factual allegations as those pleaded against Mr Gerrard and Dechert. It would be inconsistent for claims based on materially identical matters to be governed by different systems of law.~~

~~125.5.4.   RAKIA is also alleged to be vicariously liable for the acts of Mr Gerrard and Dechert and, on Mr Azima's own case, Mr Gerrard and/or Dechert were acting as agents for RAKIA. Mr Azima thereby seeks to hold RAKIA liable for alleged acts of Mr Gerrard and/or Dechert. Mr Azima~~

67

has identified no coherent basis for the allegation that NBK/KIA's liability for the acts of Mr Gerrard and/or Dechert is governed by English law, whilst Mr Gerrard and/or Dechert's own liability for the same acts is governed by a different system of law.

125.5.5. None of the alleged acts of hacking and/or publication of the hacked material are alleged to have taken place in Missouri, or elsewhere in the US (beyond the fact that Mr Azima's electronic devices are alleged in paragraph 113(e)(ii) to have been in Missouri, in respect of which no admissions are made). Neither Dechert nor Mr Gerrard is alleged to have taken any steps in relation to the alleged hacking and/or publication in Missouri or the US.

125.6. As to paragraph 113(e):

125.6.1. Paragraph 113(e) appears to advance a case that "*claims brought by Mr Azima for invasions of his privacy*" are governed by the 1995 Act, and that Missouri law would be applied pursuant to section 11 of that Act, although the 1995 Act is not mentioned in the RRACC. It is also unclear from the opening words of paragraph 113(e) ("*further and/or alternatively*") if the said case is advanced by Mr Azima as a primary case, or as an alternative case which is only pursued in the event that Rome II does not apply to Mr Azima's claims. It is similarly unclear what claims are alleged by Mr Azima to be properly characterised as claims for "*invasions of his privacy*". Proper particulars of Mr Azima's case on these issues should be provided. Pending such particulars, paragraphs 125.3.2 to 125.3.3 above are repeated.

125.6.2. Subject to the foregoing, paragraph 113(e) is not admitted. Mr Azima is required to prove the matters alleged at sub-paragraphs 113(e)(i)-(iv).

125.7. In any event, even if Missouri law would be applied under section 11 of the 1995 Act, in light of the factors which connect the alleged torts and/or delicts with England, and the factors connecting the torts and/or delicts with other countries, it is substantially more appropriate for English law to apply to determine the issues

68



arising from those claims. The claims are therefore governed by English law. Paragraph 125.5 above is repeated.

126. As to paragraph 114:

    126.1. The specific matters pleaded at paragraphs 114(a)-(d) are not admitted.

    126.2. In any event, it is denied that US and/or Missouri law would govern Mr Azima's claims under Article 4(3) of Rome II or section 12 of the 1995 Act. Paragraphs 125.5 and 125.7 above are repeated.

127. As to paragraph 115:

    127.1. Paragraph 115(a) is admitted as regards the claims against Mr Gerrard and Dechert. Paragraphs 125.5 and 125.7 above are repeated.

    127.2. Paragraph 115(b) is denied. It is not understood on what basis such a case can be advanced consistently with the allegation in paragraph 112.

128. Paragraph 116 is noted.

## VI. MR AZIMA'S CLAIMS

## A. CLAIMS UNDER ENGLISH LAW

### 1. Claims for unauthorised access, hacking, and theft of data

129. Paragraphs 117 to 121 have been deleted as Mr Azima has withdrawn the claims in these paragraphs. Mr Gerrard and Dechert reserves their his rights in respect of that withdrawal and the associated costs. is admitted.

130. As to paragraph 118:

    130.1. The first sentence is admitted.

    130.2. As to the second sentence, the bare assertion that the territorial limitations are inapplicable is denied.

131. As to paragraph 119:

69

131.1. It is denied (if alleged) that Mr Gerrard and Dechert gained unauthorised access to Mr Azima's computers and emails, hacked or stole his data, or disclosed his data on websites.

131.2. It is further denied that there was any breach of the DPA that is actionable by Mr Azima by reason of Mr Gerrard and Dechert's use of the hacked material, on the instructions of RAKIA, to investigate and seek legal redress for wrongdoing by Mr Azima.

131.3. As to sub-paragraphs 119(a) to (e), insofar as they relate to other Additional Defendants or RAKIA, they are not admitted; and, insofar as they relate to Mr Gerrard and Dechert, the position is as follows:

131.3.1. Sub-paragraph 119(a) is denied: Mr Gerrard and Dechert did not hack Mr Azima's data and did not become data controllers under section 1(1) of the DPA.

131.3.2. As such, sub-paragraph 119(b) is also denied: there was no such duty on Mr Gerrard and Dechert.

131.3.3. Sub-paragraph 119(c) is also denied. There was no breach of the data protection principles in Schedule 1 to Part 1 of the DPA. Mr Gerrard and Dechert did not disclose Mr Azima's data online or use them in pursuit of a campaign against him. Further or alternatively, any processing of Mr Azima's personal data was undertaken by Mr Gerrard and Dechert in their capacity as lawyers instructed by RAKIA and was undertaken for the purposes of investigating wrongdoing by Mr Azima and pursuing legal redress for such wrongdoing, and as such was necessary for the pursuit of RAKIA's legitimate interests within the meaning of paragraph 6(1) of Schedule 2 to the DPA. These purposes were specified and lawful within the meaning of paragraph 2 of Schedule 1 to the DPA. Further or alternatively, the processing was reasonably necessary for the administration of justice within the meaning of paragraph 5 of Schedule 2 to the DPA.

70



131.3.4. In the premises, sub-paragraphs 119(d) and (e) are denied. Mr Azima is not entitled to the relief sought, or to any relief.

132. As to paragraph 120:

132.1. As to the first sentence, it is denied that the CMA applies, for the reasons set out herein.

132.2. The second sentence is admitted.

132.3. As to the third sentence, the bare assertion that the territorial limitations are inapplicable is denied; and no admissions are made in relation to the allegations in respect of RAKIA.

133. Paragraph 121 is denied. In particular:

133.1. The CMA is a criminal statute and does not create any cause of action for breach of statutory duty.

133.2. Accordingly, any offence under section 1 of the CMA (which is denied) does not give rise to a civil cause of action as alleged at paragraph 121(a).

133.3. Further and in any event, it is denied that Mr Gerrard and Dechert were involved in any hacking of Mr Azima's computers; such that no claim lies against them and they are not liable to pay damages.

133.4. In any event, it is not admitted that Mr Azima has suffered loss and damage as alleged or at all, and he is put to proof of the same.

**2. Alleged breach of confidence and/or misuse of private information**

133A. Mr Gerrard pleads to paragraphs 122 to 137 of the RRRACC without prejudice to his admission above that the applicable law of Mr Azima's claims is US and Missouri law, such that the claims in English law do not arise.

134. As to paragraph 122:

134.1. In the RRRACC (and the previous iterations thereof) Mr Azima failed to plead any proper particulars of the information which he claims was obtained through the

hacking. In his response dated 15 October 2020 to the Request for Further Information made by RAKIA ("**the RAKIA RFI Response**") at Response 11 Mr Azima provided limited further allegations as to the nature of such information, in the most general of terms: for example, "*Correspondence or other data concerning business activities held by Mr Azima or passing between Mr Azima and his employees and business associates*". This does not amount to proper particulars of the information obtained through the hacking which would permit a response by Mr Gerrard ~~and Dechert~~. In such circumstances, no admissions are made as to the contents and 'nature' of such information. Mr Azima is put to proof as to the specifics of such information, and what the 'nature' of that information was.

134.2. As to the information to which his claim relates, Mr Azima is put to proof that (i) he had a reasonable expectation of privacy in respect thereof and/or (ii) the information was of such a nature that it had the necessary quality of confidence (with particular regard to the extent to which such information was already in the public domain and/or trivial).

134.3. It is specifically denied that any of the information contained in the Iniquity Documents was private or confidential to Mr Azima. Paragraph 17.4 above is repeated.

134.4. Save as aforesaid, no admissions are made.

135. As to paragraph 123:

135.1. As to the first sentence, paragraph 134 above is repeated and Mr Azima is required to prove that any of the information obtained through hacking was private and confidential to him. It is denied that Mr Gerrard ~~and Dechert were~~ was responsible for the hacking and, in any event, ~~or~~ it is denied that any hacking of the Iniquity Documents constituted an infringement of ~~infringed~~ Mr Azima's ~~reasonable expectation of~~ privacy. Save as aforesaid, no admissions are made.

135.2. No admissions are made in relation to RAKIA or the other Additional Defendants.

136. As to paragraph 124:

138. As to paragraph 126, it is denied that any legally relevant harm has been caused to Mr Azima by the accessing, publication or use of any Iniquity Documents. Paragraph 126 is otherwise not admitted.

139. Paragraph 127 does not contain any express averments in respect of Mr Gerrard ~~and Dechert~~, and no admissions are made in respect of the allegations against RAKIA. Insofar as paragraph 127 is intended to contain an allegation that Mr Gerrard ~~or Dechert~~ misused and/or engaged in an unjustified publication of ~~published~~ private information and/or breached confidence, it is denied for the reasons explained above. It is denied in any event that any acquisition, publication and/or use of the Iniquity Documents constitutes an unjustified publication of private information and/or a breach of confidence.

140. As to paragraph 128:

140.1. In the premises, it is denied that Mr Azima is entitled to the relief sought, or any relief, from Mr Gerrard ~~and Dechert~~.

140.2. No admissions are made in respect of Mr Azima's claims against RAKIA or the other Additional Defendants.

140.3. No admissions are made as to the allegation that Mr Azima suffered distress as a result of the release of his information into the public domain.

140.4. Further and in any event, insofar as Mr Azima's claim relates to the publication, distribution or use of the Iniquity Documents or the use of any hacked data in legal proceedings, he is not entitled to compensation or damages.

140.5. Save as aforesaid, paragraph 128 is denied.

**3. Alleged conspiracy to injure**

141. As to paragraph 129:

141.1. It is denied that Mr Gerrard ~~and Dechert~~ entered into any combination or agreed course of conduct with the predominant (or any) intention of harming Mr Azima. It is further denied that any such intention falls to be inferred, whether from the matters set out in Sections II and III above or otherwise.

141.2. As to sub-paragraphs 129(a) to ~~(d)~~(e), no admissions are made insofar as they concern RAKIA or the other Additional Defendants. Insofar as they concern Mr Gerrard ~~and Dechert~~:

141.2.1. Sub-paragraph 129(a) is denied. Mr Gerrard ~~and Dechert~~ had no involvement in, or knowledge of the circumstances of, the hacking and dissemination of Mr Azima's data.

141.2.2. As to sub-paragraph 129(b), no intention on the part of Mr Gerrard ~~and Dechert~~ falls to be inferred from any alleged instructions on the part of the Ruler (as to which no admissions are made).

141.2.3. As to sub-paragraph 129(c), no intention on the part of Mr Gerrard ~~and Dechert~~ falls to be inferred from any statement(s) in the March 2015 Project Update.

141.2.4. As to sub-paragraph 129(d), paragraph 76.5 above is repeated. It is denied that any intention on the part of Mr Gerrard ~~and Dechert~~ falls to be inferred from any comments made by ~~Mr Gerrard~~ him at the 16 July 2016 Meeting.

141.2.5. As to sub-paragraph 129(e), no intention on the part of Mr Gerrard falls to be inferred from any statement(s) in the report dated 26 January 2016.

141.2.6. Further, and in any event, Mr Gerrard adopts paragraphs 141.2.2-141.2.3 of the Dechert Defence in this connection.

141.3. Save as aforesaid, paragraph 129 is denied.

142. As to paragraph 130:

142.1. It is denied that Mr Gerrard ~~and Dechert were~~ was a party to any combination, whether covert or otherwise, as alleged.

142.2. It is denied that RAKIA through Mr Gerrard gave instructions to Mr Page, Vital and/or Mr Del Rosso to take steps to obtain Mr Azima's private information and ensure it became accessible on the Internet. No admissions are made as to the allegation that RAKIA gave such instructions through other means.

75



142.3. It is denied that any combination was formed and/or furthered as alleged in sub-paragraphs 130(b) and (c) or otherwise.

142.4. Save as aforesaid, paragraph 130 is denied.

143. As to paragraph 131:

143.1. It is denied that Mr Gerrard ~~and Dechert were~~ was party to any conspiracy, and it is therefore denied that ~~they~~ he put it into effect by the steps alleged at sub-paragraphs 131(a) to ~~(d)~~(e) or otherwise. As to paragraph 131(e), Mr Gerrard responds to the Set Aside Counterclaim in Section VII below.

143.2. For the avoidance of doubt, it is denied that Mr Gerrard ~~and Dechert~~ procured the hacking, procured the publication of Mr Azima's data on the Internet, procured or promoted the websites drawing attention to the exposure of his private and confidential information, or sought to conceal and cover up such behaviour (whether through withholding evidence or otherwise).

143.3. No admissions are made in respect of other alleged parties to the alleged conspiracy.

143.4. Save as aforesaid, paragraph 131 is denied.

144. As to paragraph 132:~~, no admissions are made.~~

144.1. It is denied that any legally relevant harm has been caused to Mr Azima by the public exposure of his dishonest and fraudulent conduct.

144.2. It is denied that non-pecuniary harm, including injury to feelings or reputation, is capable of being a relevant harm for the purposes of a claim in conspiracy to injure.

144.3. It is noted that in the RAKIA RFI Response at Response 14, Mr Azima purports to provide further particulars of the types of damage incurred by him, but is unable to provide any concrete examples. It is noted in particular that in Response 14(d), Mr Azima baldly asserts that he has suffered "*Damage to his business interests*" without identifying those interests or any harm allegedly suffered by him. In any event, no claim for business losses is now pursued by Mr Azima.



144.4. Save as aforesaid, paragraph 132 is not admitted.

145. As to paragraph 133:

    145.1. In the premises, it is denied that Mr Gerrard ~~and Dechert are~~ is liable to Mr Azima for damages as alleged or otherwise. Paragraph 141.2 above is repeated.

    145.2. No admissions are made in respect of RAKIA or the other Additional Defendants.

**4. Alleged unlawful means conspiracy**

146. As to paragraph 134:

    146.1. It is denied that Mr Gerrard ~~and Dechert were~~ was party to any conspiracy, and it is therefore denied that ~~they~~ he acted in furtherance of the alleged conspiracy.

    146.2. In addition, insofar as paragraph 134 is premised on the conspiracy alleged by Mr Azima at paragraph 129 (i.e. the alleged *"combination and…agreed course of conduct, with the predominant intention of harming Mr Azima"*), paragraph 141.2 above is repeated.

    146.3. As to sub-paragraphs 134(a) to ~~(d)~~(g):

        146.3.1. As to sub-paragraph 134(a)~~.~~:

            146.3.1.1. ~~i~~It is admitted that computer hacking is unlawful under the criminal law in England and Wales, the US and Missouri. No admissions are made as to the content of other foreign criminal laws.

            146.3.1.2. It is noted that Mr Azima no longer pleads a claim that hacking is a civil wrong under English law, having deleted his Data Protection Act claim. The assertion that this is "*set out above*" in paragraph 134(a) is not understood.

            146.3.1.3. It is denied that a breach of foreign law can be a relevant unlawful means for the purposes of a claim in unlawful means conspiracy under English law.

77

146.3.2. As to sub-paragraph 134(b), it is denied ~~(if alleged) that~~ Mr Gerrard ~~and Dechert~~ committed any breach of confidence or misuse of private information. Paragraphs 134-139 above are repeated. See further Section B below in respect of allegations under US and Missouri law. In addition:

146.3.2.1. It is denied that a breach of foreign law can be a relevant unlawful means for the purposes of a claim in unlawful means conspiracy under English law.

146.3.2.2. It is denied that an unlawful means conspiracy can properly be based on a claim for breach of confidence and/or infringement of privacy.

146.3.3. As to sub-paragraph 134(c), it is denied that Mr Gerrard ~~and Dechert~~ procured or promoted websites drawing attention to the exposure of Mr Azima's private or confidential information. Paragraphs 134-139 and paragraphs 146.3.2.1-146.3.2.2 above are repeated. See further Section B below in respect of allegations under US and Missouri law.

146.3.4. As to sub-paragraph 134(d)-(f), it is denied that Mr Gerrard ~~and Dechert~~ concealed or covered up hacking, including by the giving of false evidence. It is denied in any event that the giving of false evidence or a breach of disclosure obligations can be a relevant unlawful means for the purposes of the tort of unlawful means conspiracy under English law.

146.3.5. As to sub-paragraph 134(g), Mr Gerrard responds to the Set Aside Counterclaim in Section VII below.

146.4. Save as aforesaid, paragraph 134 is denied.

147. Paragraph 135 is denied. In particular, it is denied that Mr Gerrard ~~and Dechert~~ violated any private right of Mr Azima, or that they acted in furtherance of any conspiracy. In any event, it is averred that no Defendant can be liable for unlawful means conspiracy unless he, she or it knows that the alleged unlawful means is actually unlawful. Alternatively, it is averred that a Defendant cannot be liable for an unlawful means conspiracy insofar as the



alleged conspiracy is based on a violation of private rights caused to, and/or it knows that violation is unlawful.

148. Paragraph 136 is not admitted, and paragraph 144 above is repeated. In addition, it is denied that non-pecuniary harm, including injury to feelings or reputation, is capable of being a relevant harm for the purposes of a claim in unlawful means conspiracy.

148A. Further, Mr Gerrard adopts paragraph 148A of the Dechert Defence in respect of intention to injure.

149. As to paragraph 137:

    149.1. In the premises, it is denied that Mr Gerrard ~~and Dechert are~~ is liable to Mr Azima for damages as alleged or otherwise.

    149.2. No admissions are made in respect of RAKIA or the other Additional Defendants.

**B. CLAIMS UNDER US FEDERAL LAW AND MISSOURI LAW**

150. ~~Mr Gerrard and Dechert's response below to paragraphs 138 to 165 is without prejudice to their primary case, as pleaded at paragraph 125 above, that the proper law of Mr Azima's claims is English law and that none of the provisions of US Federal Law and Missouri Law pleaded in the said paragraphs applies to the claims against them.~~ [Not used]

**1.** **Conspiracy to Disclose and Use Intercepted Wire, Oral, or Electronic Communications under the Wiretap Act (18 U.S.C. §§ 2511(1)(d) and 2520, 18 U.S.C. § 371; and Disclosure and Use of Wire, Oral, or Electronic Communications under the Wiretap Act (18 U.S.C. §§ 2511(1)(c) and 2520)**

151. As to paragraph 138:

    151.1. Mr Gerrard ~~and Dechert~~ repeats the matters pleaded above in relation to "*their conduct described above*".

    151.2. It is not admitted that Mr Azima has suffered any loss and it is denied that Mr Gerrard ~~and Dechert are~~ is liable to him for any losses suffered under US ~~Federal Law~~ law or under Missouri ~~Law~~ law, for the reasons set out below.

152. As to paragraph 139:

152.1. It is denied that Mr Gerrard ~~and Dechert~~ knowingly ~~agreed and conspired with each other~~Dechert, with CyberRoot or with any others to intercept Mr Azima's data and/or data confidential to him by hacking or to disclose his intercepted data, or that Mr Gerrard ~~and Dechert~~ took steps in furtherance of any alleged conspiracy.

152.2. In any event it is denied that Mr Gerrard is liable for any violation of 18 U.S.C. §§ 2511(1)(d) and 2520 for the reasons set out below. ~~In the premises, paragraph 139 is denied~~.

153. As to paragraphs 139A, 139B, and 140:

153.1. The existence of the provisions cited from the US Wiretap Act ("**the Wiretap Act**") is admitted; but their relevance is denied. ~~Section 2511(1) imposes criminal liability and does not give rise to a civil remedy.~~

153.2. The Wiretap Act only applies where there has been a contemporaneous interception of electronic communications, meaning that the electronic communications must be intercepted during transmission rather than after the electronic communications have come to rest in storage on a computer system. There is no evidence that Mr Azima's communications were intercepted during transmission (as opposed to being accessed at a later date).

153.2A. Section 2511(1) imposes criminal liability and does not give rise to a civil remedy. Civil liability is imposed in certain circumstances by section 2520 of the Wiretap Act. However:

153.2A.1. Section 2520 applies only against those who directly intercept, disclose, or use a communication in violation of the Act. There is no cause of action for conspiracy to violate the Wiretap Act.

153.2A.2. Further, it is Mr Azima's case (at paragraph 35) that the Additional Defendants were agents of RAKIA. As a matter of US Federal Law and Missouri law, there can be no conspiracy between an agent and a principal or between the agents of a principal. As such, there can be no valid plea of conspiracy against the Defendants in these proceedings under US or Missouri law.

153.2A.3. Further, civil claims under section 2520 of the Wiretap Act are subject to a limitation period of two years from the date when the claimant first has a reasonable opportunity to discover the violation. Mr Azima alleges at paragraph 72 that his data were publicly available on the Torrents from around 4 August 2016 onwards. As such, any claim under the Wiretap Act became time-barred on (at the latest) 4 August 2018. The claims against Mr Gerrard and Dechert on this basis are therefore out of time and liable to be struck out.

153.3. Still further, the Wiretap Act does not apply extraterritorially. Insofar as the activity about which complaint is made by Mr Azima took place outside the US, it does not give rise to a claim under the Wiretap Act. It is not alleged that Mr Gerrard and Dechert, or any of the other Defendants, engaged in conduct violating the Wiretap Act within the US. As such, there is no cause of action under the Wiretap Act in respect of Mr Azima's claims.

153.3A. Accordingly, it is denied that Mr Gerrard has any liability to Mr Azima under the Wiretap Act.

153.4. The remainder of this section proceeds without prejudice to these fundamental objections.

153.5. Further, as to the definition of "*intercept*" pleaded at paragraph 139A 140(a), the Wiretap Act only covers a "*contemporaneous*" interception of electronic communications, meaning that the electronic communications must be intercepted during transmission rather than after the electronic communications have come to rest in storage on a computer system.

154. As to paragraph 141:

154.1. It is denied that Mr Gerrard and Dechert intercepted Mr Azima's data by the hacking of his computers and email accounts and/or the hacking of accounts with data confidential to Mr Azima. There is no evidence of any involvement by Mr Gerrard and Dechert in these matters. Further, it is specifically denied that Mr Gerrard and Dechert were was involved in obtaining persistent, real-time access to

81

those ~~Mr Azima's~~ accounts: there is no evidence that any party had such access, still less that Mr Gerrard ~~and Dechert~~ did.

154.2. Paragraph 141 (and the following paragraphs 142 to 146) make reference to Mr Azima's "*data*" without particularising the contents of such data. However, at paragraph 73(c), Mr Azima alleges that the "*hacked data*" included his "*appointments, call history, photos, recordings, SMS messages, Viber messages, videos, voicemails, WhatsApps, contacts and notes*", as well as 161,702 emails, 13,736 photographs or other images, and 840 voice recordings. The Wiretap Act only covers communications to or from Mr Azima, and does not cover data stored on his computers concerning items that are not communications, such as appointments, call history, photos, recordings, videos, contacts, and notes. This point is not repeated each time it is pleaded below, but applies in respect of each reference to "*data*" in paragraphs 141 to 146.

154.3. Moreover, the Wiretap Act only covers contemporaneous interception of communications: paragraph 153.2 ~~153.5~~ above is repeated. As explained at paragraph 154.1 above, there is no evidence that Mr Azima's communications were intercepted during transmission (as opposed to being accessed at a later date). The alleged "*hacking of his computers and email accounts*" does not qualify as an "*interception*" of his communications for the purposes of establishing a violation of the Wiretap Act.

154.4. Still further, as pleaded at paragraph 153.3 above, the Wiretap Act does not apply extraterritorially. Insofar as the activity about which complaint is made by Mr Azima took place outside the US, it does not give rise to a claim under the Wiretap Act.

154.5. In the premises, paragraph 141 is denied.

155. As to paragraph 142:

155.1. It is denied that Mr Gerrard ~~and Dechert~~ disclosed or endeavoured to disclose Mr Azima's data by publishing the intercepted data on the Torrents, or that they added new links to his data at any time. There is no evidence of any involvement by Mr Gerrard ~~and Dechert~~ in these matters.

82

155.2. Paragraphs 153.2 and 154.3 above are is repeated. Even if established, the allegations in paragraph 142 (which are denied) would not amount to a violation of the Wiretap Act, which is concerned with the contemporaneous interception of communications.

156. As to paragraph 143:

156.1. As pleaded at paragraph 75 above, it is admitted that RAKIA analysed the hacked material and went on to use the hacked data at the First Trial. Without waiving privilege, it is admitted that, in their capacity as RAKIA's lawyers, Mr Gerrard and Dechert used the hacked data Iniquity Documents in connection with those proceedings (in which Mr Azima was ultimately the subject of a number of adverse findings and was found to be liable as set out in paragraph 20.1 above). It is denied (if alleged) that any such use of the hacked data Iniquity Documents would give rise to a cause of action under the Wiretap Act, which is concerned with the contemporaneous interception of communications. Paragraphs 153.2 and 154.3 above are repeated.

156.2. Save as aforesaid, it is denied that Mr Gerrard and Dechert used the hacked data against Mr Azima; and it is denied that they he conspired to damage him.

156.3. Further, as noted in paragraph 153.2A.1 153.1 above, section 2511 of the Wiretap Act does not give rise to a civil cause of action. Section 2520 provides a civil remedy for certain violations of section 2511. However, civil liability arises only against those who directly intercept, disclose, or use a communication in violation of the Act; and there is no cause of action for conspiracy to violate the Wiretap Act.

156.4. Save as aforesaid, paragraph 143 is denied.

157. As to paragraph 144:

157.1. It is denied that Mr Gerrard and Dechert were parties was a party to the hacking or the dissemination of Mr Azima's data.

157.2. In the premises, paragraph 144 is denied.

158. As to paragraph 145:

158.1. It is denied that there was any conspiracy as alleged or otherwise, and paragraph 156.3 above is repeated as to the absence of any cause of action in respect of conspiracy in this regard.

158.1A. As to the final sentence, it is admitted that each instance in which ~~data was~~ communications were intercepted, or was then disclosed or otherwise used, in circumstances falling within the scope of section 2511 of the Wiretap Act, would constitutes a breach of that section. It is denied that Mr Azima has any cause of action in this regard: paragraphs 153 ~~154.3 and 155.2~~ above is repeated.

158.2. It is not admitted that Mr Azima has suffered damage and he is required to prove his losses as alleged. Mr Gerrard ~~and Dechert~~ repeats paragraphs 179 to 181 below in relation to Mr Azima's ~~present inability to particularise his~~ alleged losses.

158.3. It is noted that in Response 17 of the RAKIA RFI Response, Mr Azima again purports to provide further particulars of the types of damage incurred by him, but is unable to provide any concrete examples. It is noted in particular that in Response 17(d), Mr Azima baldly asserts that he has suffered "*Damage to his business interests*" without identifying those interests or any harm allegedly suffered by him. As to Response 17(f) of the RAKIA RFI Response, it is denied (if alleged as against Mr Gerrard ~~and Dechert~~) that Mr Azima is entitled to statutory damages in addition to (as opposed to in the alternative to) the other relief sought.

159. As to paragraph 146:

159.1. It is not admitted that Mr Azima's data was "*stolen*", which is not a term used in the Wiretap Act or elsewhere in Mr Azima's Hacking Counterclaim and which is accordingly not (in this context) understood; nor is it admitted that it has continued to be publicly available on WeTransfer since at least June 2019.

159.2. It is denied that links to Mr Azima's data were created by Mr Gerrard ~~and Dechert~~, whether on WeTransfer or otherwise.

159.3. It is not admitted that Mr Azima has suffered damage and he is required to prove his losses as alleged. Mr Gerrard ~~and Dechert~~ repeats paragraphs 179 to 181 below in relation to Mr Azima's present inability to particularise his losses.


**2.** **Misappropriation of Trade Secrets, 18 U.S.C. §§ 1831, 1832, 1836**

160. As to paragraph 147:

    160.1. The existence of these provisions of the Defense of Trade Secrets Act ("**DTSA**") is admitted, but their relevance is ~~not admitted~~ denied. Section 1832 only imposes criminal liability and does not give rise to a civil cause of action.

    160.2. A civil action under the DTSA is subject to a three-year limitation period under section 1836(d). Under that section, time runs from "*the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered*". As explained at paragraph 153.2 above, time began to run for these purposes on (at the latest) 4 August 2016; and limitation in respect of any DTSA claim expired on (at the latest) 4 August 2019. The claims against Mr Gerrard ~~and Dechert~~ on this basis are therefore out of time and liable to be struck out.

    160.2A Insofar as the hacked data constituted Iniquity Documents, it is denied that they can constitute a "trade secret" for the purposes of the DTSA. Paragraph 17.4 above is repeated.

    160.2B Further, it is Mr Azima's case (at paragraph 35) that the Additional Defendants were agents of RAKIA. As a matter of US Federal Law and Missouri law, there can be no conspiracy between an agent and a principal or between the agents of a principal. As such, there can be no valid plea of conspiracy against the Defendants in these proceedings under US or Missouri law.

    160.3. The remainder of this section proceeds without prejudice to these fundamental objections.

161. As to paragraph 148:

    161.1. No admissions are made as to the allegation that Mr Azima's email accounts and computer systems stored trade secrets owned by Mr Azima personally, and Mr Azima is put to strict proof of the same. It is accordingly not admitted that Mr Azima was the owner "*in the sense used in the statute*".

161.2. Mr Azima fails to plead sufficient detail about the alleged trade secrets to permit a response by Mr Gerrard ~~and Dechert~~. It is noted ~~that:~~

161.2.1. ~~i~~In Response 19 of the RAKIA RFI Response, Mr Azima states that the quantity of information stolen was very large and analysis of it is not straightforward. It is denied that this would provide any justification for his failure to plead his claim with proper particularity, even if it was true. Mr Azima has had six years to analyse the hacked data and brings claims making extremely serious allegations, in circumstances where at least some of the hacked documents reveal serious wrongdoing by him. If he alleges that other hacked documents genuinely contained trade secrets, he should be able to identify those documents with precision.

161.2.2. ~~He~~ Mr Azima also attaches~~d~~ a Table 2 to the RAKIA RFI Response, which in turn refers~~red~~ to four electronic folders entitled "*ALG*", "*Brownies*", "*Grand Hotel Europe*" and "*Shollar Bottling Company*" and one entitled "*other business activities*". Each of these folders contains a limited number of documents, none of which have been explained by Mr Azima, which are said to contain the trade secrets relied upon by him. In the absence of any explanation of these documents, Mr Gerrard ~~and Dechert are~~ is unable to respond to Mr Azima's case in this regard; and Mr Azima is put to strict proof as to the allegation that his data contained trade secrets owned by him personally.

161.2.3. Paragraph 160.4 above is repeated as regards the data in the Iniquity Documents. This data cannot constitute a trade secret.

161.3. ~~In the premises~~ Save as aforesaid, no admissions are made as to paragraph 148.

162. As to paragraph 149:

162.1. It is denied that Mr Gerrard ~~and Dechert were parties~~ was a party to any conspiracy, whether as alleged or otherwise.

162.2. Further and in any event, the allegation of conspiracy cannot give rise to a claim under US and Missouri Law in the circumstances of this case. Paragraph 160.2B

above is repeated. Paragraph 149 therefore does not support any claim under the DTSA. it is Mr Azima's case (at paragraph 35) that the Additional Defendants were agents of RAKIA. As a matter of US Federal Law and US State law, there can be no conspiracy between an agent and a principal or between the agents of a principal. As such, there is no valid plea of conspiracy against the Defendants in these proceedings.

162.3. It is further denied that Mr Gerrard and Dechert did take, appropriate or obtain Mr Azima's trade secrets or take any steps to disseminate them.

162.4. It is denied that Mr Gerrard and Dechert knew that Mr Azima's email account contained trade secrets (and it is not admitted that they did contain such trade secrets) or that they he intended to steal them or to harm Mr Azima.

162.5. In the premises, paragraph 149 is denied.

163. As to paragraph 150:

163.1. The allegation of conspiracy is denied and paragraph 162 above is repeated.

163.1A. It is noted that all the losses alleged at paragraph 150 constitute business losses, which Mr Azima no longer claims. It therefore appears that Mr Azima does not claim any losses as a result of the alleged breach of the DTSA.

163.2. In any event, Iit is not admitted that Mr Azima has suffered damage and he is required to prove his losses as alleged. Mr Gerrard and Dechert repeats paragraphs 179 to 181 below in relation to Mr Azima's present inability to particularise his alleged losses. It is noted that in Response 22 of the RAKIA RFI Response, Mr Azima states baldly that he has "*suffered damage to his business interests, including loss in the value of trade secrets and confidential information, and loss of goodwill (in respect of which it is confirmed that Mr Azima's claim is subject to the decision of the Supreme Court on his proposed appeal).*" He does not provide any particulars of such damage, and it is denied that Mr Azima is entitled to any of the relief addressed in this Response from Mr Gerrard or Dechert.

**3. The United States Computer Fraud and Abuse Act**



164. As to paragraph 151:

    164.1. The first sentence is admitted. Any claim under the CFAA is subject to a two-year limitation period under section 1030(g), which runs from the date of the act complained of or the date of the discovery of the damage.

    164.2. As explained at paragraph 153.2 above, time began to run for these purposes on (at the latest) 4 August 2016; and limitation in respect of any CFAA claim expired on (at the latest) 4 August 2018. The claims against Mr Gerrard ~~and Deehert~~ on this basis are therefore out of time and liable to be struck out.

    164.3. The remainder of this section proceeds without prejudice to that fundamental objection.

    164.4. Sub-paragraph 151(a) is admitted.

    164.5. Sub-paragraph 151(b) is not admitted. Mr Azima is put to proof of the specific computers which he alleges were accessed without his authorisation and is required to prove that they constituted "*protected computers*" within the meaning of the CFAA.

    164.6. Sub-paragraph 151(c) is admitted.

    164.7. As to sub-paragraph 151(d), no admissions are made as to the position of RAKIA or the other Additional Defendants. As to Mr Gerrard ~~and Deehert~~, it is denied that ~~they~~ he accessed Mr Azima's devices, whether knowingly, intentionally or otherwise, and thereby obtained his data. Mr Gerrard ~~and Deehert~~ had no involvement in, and have no knowledge of the circumstances of, the hacking and dissemination of Mr Azima's data.

    164.8. As to sub-paragraph 151(e), it is not clear (given the reference to "*RAKIA's hacking*") whether any allegation of breach is made against Mr Gerrard ~~and Deehert~~ but, if such an allegation is made, it is denied.

165. Save that sub-paragraph 152(a) is denied, paragraph 152 is admitted.

Case 1:23-mc-00005-UA-JLW   Document 3-9   Filed 02/24/23   Page 89 of 136

166. As to paragraph 153:

166.1. No admissions are made as to the allegation that Mr Azima was forced to dispose of or replace the computers infected as part of the hacking.

166.2. No admissions are made as to the allegation that Mr Azima's business was disrupted (in respect of which Mr Azima has failed to provide any particulars and in respect of which he no longer makes any claim for losses). Without prejudice to the generality of that contention, it is denied that disruption of Mr Azima's business would give rise to an actionable claim for damages under the CFAA.

167. As to paragraph 154, no admissions are made as to the position of RAKIA or the other Additional Defendants. As to Mr Gerrard and Dechert:

167.1. It is denied that Mr Gerrard and Dechert caused damage or actionable loss, whether recklessly or otherwise, and it is denied that they are he is liable to Mr Azima under the CFAA.

167.2. As explained at paragraph 166.2 above, Mr Azima is not entitled to damages under the CFAA in respect of business loss or disruption; and, insofar as his "*damage and actionable loss*" relate to such disruption, it is denied that he is entitled to bring a claim under the CFAA in respect thereof. No such losses are now claimed by Mr Azima, in any event. It is noted that Responses 24 and 25 of the RAKIA RFI Response purport to provide further particulars of the losses suffered by Mr Azima, sub-paragraph 25(iv) of which claims damage to his business interests. He is not entitled to damages under the CFAA in respect of such damage (which, in any event, has not been particularised and is not admitted). Mr Azima is put to strict proof in relation to the other losses and costs pleaded in Response 25.

167.3. Save as aforesaid, paragraph 154 is denied.

**4. The Missouri Computer Tampering Act ("MCTA")[3]**

168. Paragraph 155 is admitted. The MCTA does not apply ~~extraterritorially~~. Insofar as the activity about which complaint is made by Mr Azima took place outside the US, it does not give rise to a claim under the MCTA. It is not alleged that Mr Gerrard engaged in conduct violating the MCTA within the US. As such, there is no cause of action under the MCTA in respect of Mr Azima's claims against Mr Gerrard. The remainder of this section proceeds without prejudice to that fundamental objection.

169. Paragraph 156 is admitted, save that it is denied that section 537.525 of the Revised Statutes of Missouri ~~does not~~ state*s* that an owner "*is entitled to recover*" compensatory damages: the said section states that an owner "*may bring a civil action*" for compensatory damages.

170. Paragraph 157 is not admitted, and Mr Azima is put to proof thereof. It is denied that the MCTA applies to acts committed outside Missouri.

171. As to paragraph 158, no admissions are made as to the position of RAKIA or the other Additional Defendants. As to Mr Gerrard ~~and Dechert~~:

   171.1. It is denied that Mr Gerrard ~~and Dechert~~ accessed Mr Azima's devices, whether knowingly, intentionally or otherwise, and thereby obtained his data. Mr Gerrard ~~and Dechert~~ had no involvement in, and ~~have~~ has no knowledge of the circumstances of, the hacking and dissemination of Mr Azima's data.

   171.2. In the premises, it is denied that Mr Gerrard ~~and Dechert are~~ is liable to Mr Azima, whether jointly or severally with Dechert or otherwise, for compensatory damages.

   171.3. Further, and in any event, no case is advanced that Mr Gerrard engaged in action violating the MCTA within the State of Missouri. It is denied that he did so. ~~I~~insofar as Mr Gerrard ~~and Dechert are~~ is alleged to have received or used the hacked data, ~~they~~ he did so outside of Missouri. Given the territorial limitation of the MCTA, it is denied that any such action on the part of Mr Gerrard ~~and Dechert~~ could give rise to a claim under the MCTA.

---

[3]  The reference to the MCTA is adopted for convenience, notwithstanding the recent observation of the Missouri Court of Appeals that there is no such thing as the "*Missouri Computer Tampering Act*"; instead, Missouri statutes authorise a civil "*computer tampering claim*": *Shuttlewagon, Inc. v. Higgins*, No. WD 83882, 2021 WL 2546036, at *2, n.3 (Mo. Ct. App. June 22, 2021).

Case 1:23-mc-00005-UA-JLW   Document 3-9   Filed 02/24/23   Page 91 of 136

171.3A. In any event, the allegation advanced at paragraph 157 is that the Defendants were "*party to the computer tampering*". Paragraph 157 pleads that "*[t]he hacking amounted to computer tampering*". Mr Gerrard is not alleged to have personally engaged in hacking. No conspiracy claim is advanced in relation to the MCTA (nor could it be, in the circumstances of this case: paragraph 153.2A.2 is repeated). It is accordingly denied that Mr Gerrard is liable as alleged.

171.4. Further and in any event, Mr Azima is required to prove that he has incurred any damage as alleged, including expenditures reasonably and necessarily incurred to verify that a system, network, or data was not altered, damaged, or deleted by the access. Mr Gerrard ~~and Dechert~~ repeats paragraphs 179 to 181 below in relation to Mr Azima's ~~present inability to particularise his~~ alleged losses. Response 27 of the RAKIA RFI Response purports to provide further particulars of the losses suffered by Mr Azima. This Response includes a claim in respect of unparticularised damage to Mr Azima's business interests including loss in the value of trade secrets and confidential information. ~~Such losses are not recoverable under the MCTA: Mr Azima is not entitled to recover damages in respect of alleged misappropriation of any trade secrets or confidential information under the MCTA. Further and in any event, Mr Azima is put to strict proof in respect of all of the losses alleged in this Response.~~ Such losses are no longer claimed by Mr Azima.

## 5. Invasion of Privacy Torts – Intrusion on the Seclusion of Another

172. As to paragraph 159, no admissions are made as to the position of RAKIA or the other Additional Defendants. As to Mr Gerrard ~~and Dechert~~:

172.1. Mr Gerrard ~~and Dechert~~ had no involvement in, and ~~have~~ has no knowledge of the circumstances of, the hacking and dissemination of Mr Azima's data. As such, it is denied that ~~they were~~ he was party to the hacking, or that ~~they~~ he intentionally intruded on the solitude, seclusion, or private affairs of Mr Azima.

172.2. In any event, it is not admitted that any of the hacked data included secret or private subject matter that the plaintiff (Mr Azima) had the right to keep secret, and Mr Azima is required to prove the same. In particular, Mr Azima is required to demonstrate that the information concerned was truly personal and sensitive (as opposed to being, for example, information of a business entity).

172.2A. Moreover, it is denied that any claim for invasion of privacy can be made in relation to data which reveals serious wrongdoing on the part of Mr Azima. It is denied that accessing such information is either "*justifiable*" or "*highly offensive*". Insofar as the hacked data constituted the Iniquity Documents, it is accordingly denied that any claim can lie for invasion of privacy. Paragraph 17.4 above is repeated.

172.2B. In circumstances where the steps taken to access the hacked data were (it is inferred) taken for the purpose of accessing data revealing serious wrongdoing, and a reasonable person would not regard such steps as unreasonable or highly offensive, it is denied that the hacking gives rise to any legally relevant intrusion on the seclusion of Mr Azima's privacy.

172.3. Save as aforesaid, paragraph 159 is denied.

173. As to paragraph 160, no admissions are made as to the position of RAKIA or the other Additional Defendants. As to Mr Gerrard ~~and Dechert~~:

173.1. In the premises, it is denied that Mr Gerrard ~~and Dechert are~~ is liable to Mr Azima, whether jointly or severally with Dechert or otherwise, for damages.

173.2. It is not admitted, and Mr Azima is required to prove, any losses as alleged. It is denied that Mr Azima is entitled to damages from Mr Gerrard ~~and Dechert~~ for intrusion into his interest in privacy or for mental distress, or to special damages (no basis for which has been particularised). Insofar as Mr Azima relies upon mental distress, he is required to demonstrate that it was medically significant. Any distress suffered was the consequence of the public exposure of his own wrongdoing, in respect of which he is not entitled to damages.

173.3. Mr Gerrard ~~and Dechert~~ repeats paragraphs 179 to 181 below in relation to Mr Azima's present inability to particularise his losses. Response 32 of the RAKIA RFI Response purports to provide further particulars of the losses suffered by Mr Azima. This Response includes a claim in respect of unparticularised damage to Mr Azima's business interests including loss in the value of trade secrets and confidential information. Such losses are no longer claimed by Mr Azima. ~~not recoverable. First, the Missouri Uniform Trade Secrets Act displaces other laws of~~

92

Missouri providing civil remedies for misappropriation of trade secrets. Further, Mr Azima states in Response 5 that his business was conducted through companies; and corporations are not protected by a right of privacy. Further, trade secrets are considered proprietary information rather than privacy. Further and in any event, Mr Azima is put to strict proof in respect of all of the losses alleged in this Response.

173.4. Save as aforesaid, paragraph 160 is denied.

### 6. Invasion of Privacy - Public Disclosure of Private Facts

174. As to paragraph 161, no admissions are made as to the position of RAKIA or the other Additional Defendants. As to Mr Gerrard and Dechert:

174.1. Mr Gerrard and Dechert had no involvement in, and have has no knowledge of the circumstances of, the hacking and dissemination of Mr Azima's data.

174.2. As such, it is denied that they were he was party to the matters pleaded at sub-paragraphs 161(a) to (d).

174.2A. In any event, it is not admitted that any of the hacked data included private matters, and Mr Azima is required to prove the same. In particular, Mr Azima is required to demonstrate that the information concerned was truly personal and sensitive (as opposed to being, for example, information of a business entity).

174.2B. Moreover, it is denied that any claim for invasion of privacy can be made in relation to data which reveals serious wrongdoing on the part of the Claimant. Such information is not a private matter. Insofar as the hacked data constituted the Iniquity Documents, it is accordingly denied that any claim can lie for invasion of privacy. Paragraph 17.4 above is repeated.

174.3. Further and in any event, it is denied that the hacked data contained private matters in which the public had no legitimate concern. There was a strong and legitimate public concern in the exposure of Mr Azima's serious frauds and other wrongdoing as established in the Judgment and summarised in paragraph 20.1 above. It is accordingly denied that the condition for liability at paragraph 161(c) is satisfied.

174.4. Moreover, it is denied that the hacking of Mr Azima for the purpose of accessing evidence of his serious wrongdoing, and using that evidence to bring claims against him, would bring any legally relevant "*shame or humiliation to an individual of ordinary sensibilities*". Insofar as Mr Azima was ashamed or humiliated by such hacking and use of his data (which is not admitted), these were the consequences of his own fraudulent conduct having been exposed. The law does not protect him from those consequences. It is accordingly denied that the condition for liability at paragraph 161(d) is satisfied.

175. As to paragraph 162:

175.1. In the premises, it is denied that Mr Gerrard ~~and Dechert are~~ liable, whether jointly or severally ~~with Dechert or otherwise~~, to Mr Azima for damages.

175.2. It is not admitted, and Mr Azima is required to prove, any losses as alleged.

175.3. It is denied that Mr Azima is entitled to damages from Mr Gerrard ~~and Dechert~~ for intrusion into his interest in privacy or for mental distress, or to damages for "*the specific damages caused by their disclosure*" (which have not been properly particularised despite Mr Azima's RAKIA RFI Response which purports to provide further particulars on this issue at Response 32). As to this:

175.3.1. As to the claim for damages for harm to Mr Azima's privacy interests, he has failed to provide any particulars regarding the shame and humiliation he felt or to explain why the matters relied upon would bring shame and humiliation to a person of ordinary sensibilities. According to paragraph 73, Mr Azima contends that the hacked data included a large number of business documents and communications and information regarding telephone usage. It is inherently unlikely that a person of ordinary sensibilities would suffer shame or humiliation from the publication of information of this nature. Further, Mr Azima is not entitled to recover any damages for shame or humiliation caused by the public exposure of information concerning his own fraudulent conduct and wrongdoing.

175.3.2. Insofar as Mr Azima relies upon mental distress, he is required to demonstrate that it was medically significant. Any distress suffered was

Case 1:23-mc-00005-UA-JLW   Document 3-9   Filed 02/24/23   Page 95 of 136



the consequence of the public exposure of his own wrongdoing, in respect of which he is not entitled to damages.

175.4. Save as aforesaid, paragraph 162 is denied.

## 7. Tortious Interference with Business Relationship and Business Expectancy

176. As to paragraph 163:

176.1. It is admitted that Mr Gerrard ~~and Dechert~~ knew that Mr Azima conducted business in the aviation industry. It is not admitted that ~~they~~ Mr Gerrard knew ~~he~~ Mr Azima conducted business "*as described above*", which is too vague to permit a response.

176.2. It is denied (if alleged) that Mr Gerrard ~~and Dechert~~ knew that Mr Azima had a valid expectancy of continuing to conduct business in the aviation industry and it is not admitted that he had such an expectancy. In view of the serious wrongdoing which was later the subject of the Judgment (as explained above), it is denied that Mr Azima could have had a valid expectancy of continuing to do business in the aviation industry or any professional industry.

176.3. Further, Mr Azima has failed to identify any particular contracts or business opportunities of which the Defendants are alleged to have had knowledge, as would be required to establish a claim in respect of this tort. The mere reference in Response 32 of the RAKIA RFI Response to "*damage to his business, including loss in the value of trade secrets and confidential information*" is not sufficient to permit a response by Mr Gerrard ~~and Dechert~~.

176.4. No admissions are made as to the knowledge of RAKIA or the other Additional Defendants.

177. As to paragraph 164, no admissions are made as to the position of RAKIA or the other Additional Defendants. As to Mr Gerrard ~~and Dechert~~:

177.1. Mr Gerrard ~~and Dechert~~ had no involvement in, and ~~have~~ has no knowledge of the circumstances of, the hacking and dissemination of Mr Azima's data.

177.2. As to sub-paragraphs 164(a) to (e):

95

177.2.1. As to sub-paragraph 164(a), it is denied that Mr Gerrard ~~and Dechert~~ intentionally interfered with Mr Azima's business; and it is denied that Mr Azima had a valid business expectancy for the reasons explained in paragraph 176.2 above. Mr Azima has failed to identify any particular contracts or business opportunities of which Mr Gerrard ~~and Dechert are~~ is alleged to have had knowledge, as would be required to establish a claim against them in respect of this tort; and nor does Mr Azima identify any act(s) of Mr Gerrard ~~and Dechert~~ which caused a third party to breach any contractual relationship with him or to terminate any business expectancy with him.

177.2.2. As to sub-paragraph 164(b), it is denied that Mr Gerrard ~~and Dechert~~ employed improper means (which have not been particularised).

177.2.3. As to sub-paragraph 164(c), Mr Azima is required to prove his allegations as to (i) any severance of business relationships; (ii) any loss of business expectancy (the validity of which is denied); and (iii) causation.

177.2.4. As to sub-paragraph 164(d), it is averred that the Defendants would have had a legal right to interfere insofar as Mr Azima and his businesses had committed serious wrongdoing including against RAKIA. Given the lack of particularity as to the 'interference' alleged, paragraph 164(d) is otherwise not admitted. ~~no admissions are made.~~

177.2.5. As to sub-paragraph 164(e), Mr Azima has deleted his claim for business losses and therefore it is wholly unclear what losses (if any) he is now claiming in respect of this tort. In any event, Mr Azima is required to prove any alleged damage (proper particulars of which have not been provided notwithstanding Response 33 of the RAKIA RFI Response).

8. **Conspiracy**

178. As to paragraph 165, no admissions are made as to the position of RAKIA or the other Additional Defendants. As to Mr Gerrard ~~and Dechert~~:

178.1. Mr Gerrard ~~and Dechert~~ had no involvement in, ~~and have had no~~ knowledge of the circumstances of, the hacking and dissemination of Mr Azima's data. As such, ~~they were~~ he was not parties to any conspiracy, whether under Missouri law or otherwise.

178.2. Further and in any event, it is Mr Azima's case (at paragraph 35) that the Additional Defendants were agents of RAKIA. As a matter of US Federal Law and Missouri law, there can be no conspiracy between an agent and a principal or between the agents of a principal. As such, there is no valid plea of conspiracy against the Defendants in these proceedings.

178.3. Without prejudice to the generality of that contention, as to sub-paragraphs 165(a) to (c):

178.3.1. In the premises, sub-paragraphs 165(a) and (b) are denied <u>insofar as they concern Mr Gerrard. It is noted in addition that the wholly unparticularised assertion in paragraph 165(b) that each Defendant committed *"at least one act in furtherance of the conspiracy"*, without identifying any specific acts whatsoever, is too vague to permit a detailed response.</u>

178.3.2. As to sub-paragraph 165(c), Mr Azima is required to prove any alleged damage (proper particulars of which have not been provided). ~~It is noted that Response 35 of the RAKIA RFI Response purports to provide further particulars of the damage suffered by Mr Azima; but these particulars do not permit a response by Mr Gerrard and Dechert. In particular, Mr Azima claims to have suffered "[d]*amage to his business interests, including loss in the value of trade secrets, and loss of goodwill*" but has failed to provide any details of that damage or those secrets beyond the Table 2 referred to in paragraph 161.2 above.~~

## C. ALLEGED LOSS, DAMAGE AND OTHER RELIEF

### 1. Alleged pecuniary losses

179. As to paragraph 166:

Case 1:23-mc-00005-UA-JLW   Document 3-9   Filed 02/24/23   Page 98 of 136

179.1. It is denied that Mr Azima has suffered loss and damage for which Mr Gerrard ~~and Dechert are~~ is liable to pay compensation. No admissions are made in respect of RAKIA or the other Additional Defendants.

179.2. Further, any loss suffered as a result of the hacking is likely to be the consequence of the public exposure of information regarding Mr Azima's dishonest and fraudulent conduct. It is denied that Mr Gerrard ~~and Dechert are~~ is liable in respect of any such damage, since:

179.2.1. Mr Azima makes no claim in these proceedings in respect of reputational harm that he suffered as a result of publication of the hacked data; and

179.2.2. If any such claim were made, it would be liable to be struck out on the grounds that Mr Azima had been found by the Court to have been dishonest and fraudulent, and any reputational harm he suffered as a result of such publication was accordingly not actionable. Further and alternatively, Mr Azima's conduct was dishonest and fraudulent as set out at paragraphs 16A to 16C and Schedule 1 of the Dechert Defence, and any reputational harm he suffered as a result of such publication was accordingly not actionable.

180. Paragraph 167 is not admitted. Mr Azima is required to prove his losses as alleged under this head, including in particular: the reasons for disposal of his previous devices; the value and details of the devices allegedly disposed of; and the cost and details of the devices allegedly acquired. The total sum claimed, which is $36,058, appears excessive: and if (which is not admitted) Mr Azima has truly incurred those losses in replacing 4 hard drives and purchasing software over a 5 year period, it is averred that Mr Azima has failed to act reasonably to mitigate his loss. It is noted that, as explained in paragraph 9.3.3 above, in the ~~RR~~RACC, Mr Azima has deleted his claim for damages in respect of services allegedly provided by ZP Consultants LLC and the charges allegedly incurred by Mr Azima in relation thereto. Mr Gerrard ~~and Dechert~~ reserves ~~their~~ his rights in relation to this issue and Mr Azima's change of case in this regard.

181. Paragraph 168, in which Mr Azima claimed for "*damage to his business*", has been withdrawn. ~~is not admitted, and paragraph 144 above is repeated. Further:~~

98

181.1. ~~Any damage suffered to Mr Azima's business by the publication of information causing reputational harm to Mr Azima, in respect of which Mr Azima does not, and cannot, advance a claim. Paragraph 179 above is repeated.~~

181.2. ~~Further, there is no connection between the outstanding appeal to the Supreme Court and Mr Azima's ability to particularise his alleged pecuniary losses. Nor is there any connection between a determination as to the extent of the hacking and the parties responsible and Mr Azima's ability to particularise his alleged pecuniary losses.~~

181.3. ~~Still further, even if (which is denied) Mr Azima has suffered damage to his business interests (which has not been identified, as explained above), given that Mr Azima's business was conducted through companies of which Mr Azima is a shareholder (as alleged in Response 5 of the RAKIA RFI Response), Mr Azima is not entitled to pursue any personal claim in respect of such damage.~~

## 2. Alleged non-pecuniary losses

182. As to paragraph 169:

182.1. It is not admitted that Mr Azima suffered any distress or emotional harm as a result of publication of the hacked data.

182.2. If (which is not admitted) such harm was suffered, this was attributable wholly or in large part to the disclosure of Mr Azima's own unlawful conduct as revealed by the hacked data and the consequent reputational damage to him. No damages are recoverable in respect of distress or emotional harm caused by the revelation of Mr Azima's own wrongdoing and the reputational damage this caused.

182.3. Further and in any event, no damages are recoverable in respect of distress or emotional harm caused by the publication of information or data (i) in which Mr Azima had no reasonable expectation of privacy or confidence, including as a result of the revelation of Mr Azima's own wrongdoing, and/or (ii) which was in the public domain.

### 3. Claim for Exemplary Damages

183. As to paragraph 170, it is denied insofar as it concerns Mr Gerrard and Dechert; and it is not admitted insofar as it concerns RAKIA or the other Additional Defendants.

184. As to paragraph 171:

    184.1. As to the first sentence, RAKIA was the investment authority of RAK, rather than an "*organ*" of RAK.

    184.2. As to the second sentence, it is denied that Mr Gerrard and Dechert were was a servants of the Government of RAK; and it is not admitted that the other Additional Defendants were servants of the Government of RAK.

    184.3. As to the third sentence, it is admitted that Dechert was engaged by RAKIA pursuant to the Dechert Retainer. It is denied that Mr Gerrard was so engaged. Save as aforesaid, no admissions are made.

    184.4. As to the fourth and fifth sentences, it is denied that any actions of Mr Gerrard and Dechert constituted wrongs or oppressive and/or arbitrary and/or unconstitutional actions. It is specifically denied that Mr Gerrard and Dechert were was: parties a party to deception or fraud; were parties a party to serious and deliberate breaches of criminal or civil law, or of Mr Azima's rights; or that they were he was motivated (in part or at all) as alleged in sub-paragraph 171(c). No admissions are made in relation to RAKIA or the other Additional Defendants.

185. As to paragraph 172:

    185.1. It is denied that Mr Gerrard and Dechert engaged in any wrongdoing, whether deliberately, cynically or otherwise; and it is denied that they he calculated to make a profit or other gain that would exceed the compensation they were he was at risk of having to pay Mr Azima. No admissions are made in relation to RAKIA or the other Additional Defendants.

    185.2. As to sub-paragraphs 172(a) and to (c), no admissions are made.

    185.3. As to sub-paragraph 172(d):

185.3.1. It is admitted that Dechert was remunerated for its work for RAKIA, namely the lawful provision of legal services.

185.3.2. It is denied that Mr Gerrard was remunerated for his work for RAKIA otherwise than in his capacity as a partner in Dechert.

185.3.3. The pleading that Dechert "*otherwise*" stood to gain "*from assisting RAKIA in making the gains it intended to make*" is not understood, and is accordingly denied.

185.3.4. It is denied that ~~Dechert's remuneration (and~~ Mr Gerrard's remuneration in his capacity as a partner in Dechert~~) were~~ was calculated by ~~them~~ him to exceed the compensation that Mr Gerrard ~~and Dechert were~~ was at risk of being ordered to pay to Mr Azima. Mr Gerrard ~~and Dechert were~~ was not involved in any hacking or conspiracy to hack, did not expect to be sued by Mr Azima, and gave no thought to that prospect.

185.4. Save as aforesaid, paragraph 172 is denied.

185A. Further and alternatively it is denied that it would be appropriate to make an award of exemplary damages in favour of a claimant who has engaged in fraudulent and dishonest conduct, and lied about that conduct to the Court.

186. In the premises, paragraph 173 is denied insofar as it concerns Mr Gerrard ~~and Dechert~~; and it is not admitted insofar as it concerns RAKIA or the other Additional Defendants. Further:

186.1. It is denied that exemplary damages are available in respect of a claim for breach of confidence or misuse of private information.

186.2. Even if (which is denied) Mr Gerrard ~~and Dechert are~~ is liable in respect of any claim in tort, the conditions for making an award of exemplary damages against them are not met.

186.3. Further or alternatively, even if (which is denied) the conditions for making an award of exemplary damages against one of the Defendants and/or Additional Defendants were met, the fact that those conditions are not met in respect of one or

more of the other Defendants or Additional Defendants means that exemplary damages are unavailable as a matter of law against any of the Defendants/Additional Defendants. 

### 4. Claim for Disgorgement

187. As to paragraph 174:

    187.1. As to the first sentence, it is admitted that Dechert received fees for the provision of ~~their~~ lawful services to RAKIA; and it is denied that Mr Gerrard ~~and Dechert~~ invaded Mr Azima's privacy or breached his confidence <u>for the reasons set out in paragraph 17.4 above</u>. No admissions are made in relation to the other Additional Defendants.

    187.2. No admissions are made in relation to the ~~second and~~ third sentence~~s~~.

    187.3. As to the fourth sentence, paragraph 185.3.1 above is repeated.

    187.4. As to the fifth sentence, it is denied that any gains made by Dechert (and by Mr Gerrard in his capacity as a partner in Dechert) were made at the expense of Mr Azima; and it is specifically denied that any gains were made by obtaining, misusing or making available Mr Azima's confidential data. No admissions are made in relation to the other Additional Defendants.

188. As to paragraph 175:

    188.0A. <u>Mr Azima is not entitled to an account of profits in circumstances where he does not come to equity with clean hands. Mr Azima does not come to equity with clean hands, in light of his fraudulent and dishonest conduct as set out in paragraphs 16A to 16C and Schedule 1 of the Dechert Defence.</u>

    188.0B. <u>Further and alternatively, an award of an account of profits for invasion of privacy and breach of confidence (as opposed to an award of damages) would not be appropriate in circumstances where: (i) Mr Azima and Mr Gerrard were not in a fiduciary relationship; (ii) the information that Mr Azima complains was taken from him was not proprietary in nature; and (iii) the information that Mr Azima complains was taken from him did not merit special protection, but demonstrated</u>



iniquity on Mr Azima's part and/or would have ~~been obliged to~~ been disclosed by Mr Azima in the course of the proceedings in any event.

188.1. As to the contention that Mr Azima is entitled to an order requiring Mr Gerrard ~~and Dechert~~ to account to him in respect of all financial gains made as a result of his claims under US law, Mr Gerrard ~~and Dechert~~ responds as follows:

    188.1.1. It is denied that such a remedy is available in respect of Mr Azima's claims under the CFAA, the MCTA, tortious claims for invasion of privacy, tortious interference and conspiracy.

    188.1.2. As to the claims under the Wiretap Act, it is denied that Mr Gerrard ~~and Dechert~~ made any financial gains as a result of using communications of Mr Azima that were intercepted contemporaneously (which is specifically denied as set out in paragraphs 154 to 159 above); and it is accordingly denied that Mr Azima is entitled to such a remedy in respect of any such claims. Further and in any event, it is denied that Mr Gerrard ~~and Dechert~~ made any financial gains as a direct result of the use of Mr Azima's data and it is accordingly denied that Mr Azima is entitled to such a remedy in respect of any such claims.

    188.1.3. As to the claims under the DTSA, it is denied that Mr Gerrard ~~and Dechert~~ made any financial gains as a result of misappropriation of Mr Azima's trade secrets (which is specifically denied as set out in paragraphs 160 to 163 above); and it is accordingly denied that Mr Azima is entitled to such a remedy in respect of any such claims.

188.2. In the premises, paragraph 175 is denied insofar as it concerns Mr Gerrard ~~and Dechert~~; and it is not admitted insofar as it concerns the other Additional Defendants.

## 5. Interest

189. In the premises, the claim to interest at paragraph 176 is denied.

Case 1:23-mc-00005-UA-JLW   Document 3-9   Filed 02/24/23   Page 104 of 136

**6. Injunctive Relief**



190. As to paragraph 177:

    190.1. It is denied that Mr Azima is entitled to injunctive relief against Mr Gerrard ~~and Dechert~~, whether as pleaded at paragraph 177 or at all. There are no continuing wrongs or ongoing breaches of Mr Azima's rights for which Mr Gerrard ~~and Dechert~~ bear<u>s</u> responsibility.

    <u>190.1A</u>  <u>In any event, Mr Azima is not entitled to injunctive relief in circumstances where he does not come to equity with clean hands, in light of his fraudulent and dishonest conduct. Mr Gerrard adopts paragraphs 16A to 16C and Schedule 1 of the Dechert Defence in this connection.</u>

    190.2. As to sub-paragraphs 177(a) to (c):

        190.2.1. Mr Gerrard ~~and Dechert have~~ <u>has</u> no ability to remove or procure the removal of any websites, torrents, WeTransfer links or other Internet sources containing statements about Mr Azima and/or providing means for his private data to be accessed by others.

        190.2.2. There is no basis for an injunction requiring Mr Gerrard ~~and Dechert~~ to deliver up and/or destroy all copies of any private data in ~~their or their~~ <u>his or his</u> agents' possession. The existence of such data is not admitted.

        190.2.3. Mr Gerrard ~~and Dechert~~ do<u>es</u> not know who is responsible for the hacking or the parties involved therein.

    190.3. No admissions are made in relation to RAKIA or the other Additional Defendants.

**7. Orders made by the Deputy Judge**

191. In the premises, there is no basis for the relief sought in paragraph 178 <u>and/or the relief sought in that paragraph (namely variations of the sums awarded to RAKIA by way of interest and costs) is only sought by Mr Azima against RAKIA, with the result that Mr Gerrard does not plead to it.</u>



## VII. THE SET ASIDE COUNTERCLAIM

## A. OVERVIEW

192. As noted in paragraph 7A above, Mr Azima was granted permission to bring an additional counterclaim against RAKIA which is described herein as the Set Aside Counterclaim (and described by Mr Azima, at least within his statement of case, as the Rescission Counterclaim).

193. The Set Aside Counterclaim is pleaded at paragraphs 179-269 of the RRRACC. Although the Set Aside Counterclaim is presently pleaded against RAKIA alone, allegations contained in it are made against Mr Gerrard and are incorporated into the Hacking Counterclaim by paragraphs 131(e) and 134(g) of the RRRACC. Accordingly, Mr Gerrard pleads in response to such of the Set Aside Counterclaim as is appropriate below.

194. Much of what is pleaded in connection with the Set Aside Counterclaim consists of pleas as to (i) evidence and/or (ii) legal argument, neither of which is appropriate for a statement of case. Nonetheless, Mr Gerrard responds below to those paragraphs and in doing so in large part again adopts and/or pleads in the same terms as the Dechert Defence. Mr Gerrard denies that the Set Aside Counterclaim is well-founded or that Mr Azima is entitled to the relief claimed, in broad summary, for the following reasons:

    194.1. It is not sufficient for Mr Azima to prove that evidence given at the First Trial was false (which is denied in respect of Mr Gerrard and not admitted otherwise). It is necessary for Mr Azima to show there was conscious and deliberate dishonesty on the part of RAKIA in relation to relevant evidence given or concealed (which denied in respect of Mr Gerrard and otherwise not admitted).

    194.2. Mr Azima's quotation and characterisation of the evidence given at the First Trial is highly selective and often mischaracterises its true effect. Mr Gerrard will rely upon the full extent of the evidence given at the First Trial.

    194.3. Mr Azima's quotation and characterisation of both the Judgment and the CA Judgment is also highly selective and often mischaracterises their true effect. Mr Gerrard will rely upon the Judgment and the CA Judgment in full for their true findings, reasoning, and effect.

194.4. Mr Azima's reliance on the new evidence obtained since the First Trial frequently overstates the extent to which it is said to demonstrate that the evidence given at the First Trial was false and/or dishonest. Mr Gerrard will rely upon the full extent of the new evidence.

194.5. The allegations that the new evidence is sufficiently material to justify setting aside the Judgment are denied:

194.5.1. Even taking the new evidence at its highest, it does not change the effect and impact of the documentary evidence on which the Deputy Judge primarily relied, and thus it would not have entirely changed the way in which the Deputy Judge approached and came to his decision in the Judgment.

194.5.2. Further, even to the extent that the new evidence may have affected isolated aspects of the Judgment, large swathes of the Judgment – and the evidence underlying the findings in the Judgment – remain entirely unaffected by the new evidence. In particular, as pleaded in paragraphs 16A to 16B above and Schedule 1 to the Dechert Defence, the new evidence does not undermine the Deputy Judge's key findings that Mr Azima was a fraudster who had given false evidence at the First Trial.

194.6. Accordingly, and in any event, even if Mr Azima successfully proves the facts and matters he has alleged in the Set Aside Counterclaim, he will not as a result be entitled to set aside the Judgment, the CA Judgment, and their accompanying Orders.

194.7. Furthermore, and without prejudice to the foregoing, in the event that Mr Azima's Set Aside Counterclaim is successful but only in part, the Judgment, the CA Judgment, and their accompanying Orders should be set aside only to the extent that the Set Aside Counterclaim is successful, and they should otherwise be upheld.

**B. THE PARTIES**

195. Paragraphs 179 and 180 are admitted.

106


### C. MR AZIMA'S SUMMARY OF THE SET ASIDE COUNTERCLAIM

196. As to paragraph 181, paragraphs 17-24 above are repeated.

197. Paragraph 182 is noted as a summary of Mr Azima's Set Aside Counterclaim. It is denied that Mr Azima is entitled to the relief claimed for the reasons summarised in paragraph 194 above and more fully particularised below.

198. Paragraph 183(b) is admitted insofar as it relates to RAKIA as a party to the proceedings rather than RAKIA's witnesses. The remainder of paragraph 183 imprecisely pleads a number of matters which "*RAKIA and/or its witnesses*" are alleged – apparently collectively – to have "*accepted*", "*maintained*", "*insisted*", or "*denied*" in cross-examination at the First Trial. RAKIA's witnesses including Mr Gerrard each gave their own evidence in their own words. Insofar as these matters are consistent with that evidence (as recorded in the transcripts from the First Trial), they are admitted; and, insofar as they are not, they are denied.

199. Paragraph 184 is not admitted insofar as it relates to RAKIA. Insofar as it is alleged in paragraph 184(c) and/or 184(f) (or *sub silentio* in any other sub-paragraph) that Mr Gerrard gave false or dishonest evidence, that is denied.

200. Paragraph 185 is noted as an expression of Mr Azima's intention. Paragraph 199 is repeated.

201. As to paragraph 186, it is admitted that Schedule B to the RRRACC contains (i) selective extracts of some of the evidence given at the First Trial and (ii) lists of Project Update Reports. Mr Gerrard pleads in response to the content of Schedule B in the relevant contexts below. Save as aforesaid, paragraph 186 is not admitted. Paragraph 199 is repeated.

202. Save for the references to RAKIA's conduct and evidence being dishonest and/or fraudulent, which are denied in respect of Mr Gerrard and otherwise not admitted, paragraph 187 is denied:

　202.1 Paragraph 194.1 above is repeated.

　202.2 The proper test for materiality is a matter for submissions in due course. Without prejudice to the aforesaid, it is necessary for Mr Azima to prove that the new

Case 1:23-mc-00005-UA-JLW   Document 3-9   Filed 02/24/23   Page 108 of 136

evidence would have entirely changed the way the Deputy Judge approached and came to his decision in the Judgment. It is denied that the new evidence and/or the allegedly dishonest evidence meets the materiality threshold.

202.3    Paragraph 187(a) is denied for the reasons pleaded below in relation to each individual cause of action.

202.4    Paragraph 187(b) is denied:

202.4.1    As to the first and third sentences, given that the new evidence is not sufficiently material in relation to the individual causes of action or any of them (for the reasons pleaded below), it follows that it is not sufficiently material in relation to "*all issues*" or "*the whole of the Judgment*". Further, as pleaded in paragraph 194.5.2 above, and set out more fully in paragraphs 16A to 16B above and Schedule 1 to the Dechert Defence, large swathes of the Judgment remain entirely unaffected by the new evidence.

202.4.2    The second sentence presupposes an incorrect test. The question of materiality of the new evidence is to be assessed by reference to its impact on the evidence supporting the original decision, not by reference to its impact on what decision might have been made if the issues were to be retried on honest evidence.

202.5    Further, in relation to the entirety of paragraph 187:

202.5.1    In circumstances where the Judgment has already been the subject of a detailed re-examination in the CA Judgment, which held that the Judgment on RAKIA's claims "*must stand*" irrespective of what evidence may emerge in the course of the Hacking Counterclaim, the materiality of the new evidence (which has emerged in the course of the Hacking Counterclaim) must be assessed by reference to the assumptions made by the Court of Appeal in reaching that conclusion in the CA Judgment. In particular, it must be assessed by reference to the assumptions made in Mr Azima's favour at paragraph 40 of the CA Judgment that: "*RAKIA was responsible for [the] unlawful hacking*"; and "*at least some of RAKIA's*



*witnesses gave dishonest evidence about how RAKIA came into possession of the hacked material".*

202.5.2 To the extent that Mr Azima alleges that the new evidence demonstrates that (i) RAKIA's witnesses had knowledge of the hacking of Mr Azima's data, (ii) RAKIA's witnesses were aware of Mr Azima's wrongdoing as revealed by the hacked data prior to September 2016, (iii) RAKIA was conducting investigations into Mr Azima prior to September 2016, and/or (iv) RAKIA's witnesses gave dishonest evidence in respect of any or all of these matters (all of which are denied in respect of Mr Gerrard, and are otherwise not admitted), these possibilities were all encompassed (either expressly or implicitly) by the assumptions made by the Court of Appeal.

202.5.3 Therefore, the new evidence said to demonstrate these possibilities cannot be material.

203. Paragraph 188 is noted.

**D. THE HACKING**

204. The relevance of paragraphs 189 to 200 is not understood in circumstances where Mr Azima's appeal against the original decision in the Hacking Counterclaim was successful and that Hacking Counterclaim has been remitted for a full retrial. In effect, the Judgment insofar as it relates to the Hacking Counterclaim has already been set aside by the Court of Appeal, and the Deputy Judge's findings on the Hacking Counterclaim will be superseded by those of the Assigned Judge following the retrial.

205. Mr Gerrard's case on the hacking (and the alleged cover-up) is pleaded above in response to the Hacking Counterclaim. Insofar as specific allegations are made against Mr Gerrard in paragraphs 198-199:

205.1 It is admitted that Mr Gerrard gave evidence in support of RAKIA's case at the first trial and that Mr Gerrard's evidence was that he had no involvement in, or knowledge of, the hacking.

Case 1:23-mc-00005-UA-JLW   Document 3-9   Filed 02/24/23   Page 110 of 136

205.2 It is denied that this evidence was false. Paragraphs [illegible] are repeated. In particular, it is denied that the fact that Mr Gerrard was aware of, or provided with copies of and/or received briefings in respect of, some of the Project Update Reports shows that Mr Gerrard was involved in the hacking, or gives rise to the inference that he instructed or approved of the hacking, or shows that he was a party to a "cover up" as alleged.

## E. RAKIA'S MISREPRESENTATION CLAIM

### 1. RAKIA's case at the First Trial

206. Paragraph 201 is admitted. RAKIA's HeavyLift Misrepresentation Claim concerned false representations made by or on behalf of Mr Azima, in various communications from September 2013 onwards, as to amounts invested by HeavyLift in the Training Academy Joint Venture with RAK Airways, which induced RAKIA to enter into the Settlement Agreement on the terms that it did and pay US$2.6 million to Mr Azima (paragraphs 4B to 4R of RAKIA's Re-Amended Particulars of Claim). RAKIA's Good Faith Misrepresentation Claim concerned a false representation made by Mr Azima and HeavyLift by way of an express warranty of good faith and utmost professional integrity contained in Clause 3.2 of the Settlement Agreement, which induced RAKIA to enter into the Settlement Agreement (paragraphs 5 to 17 of RAKIA's Re-Amended Particulars of Claim).

207. Paragraph 202 is admitted, save that:

207.1 It is denied that the Settlement Agreement was drafted "*by*" Mr Gerrard. Mr Gerrard had limited involvement in the drafting of the Settlement Agreement.

207.2 The allegation that the Settlement Agreement was "*drafted for RAKIA ... **at the direction of** Mr Gerrard*" (emphasis added) (or indeed "*at the direction of*" Dechert) is not understood, and accordingly no admissions are made in that regard.

207.3 It is denied (if alleged) that Mr Azima and HeavyLift had no involvement in the drafting of the Settlement Agreement. On the contrary, the Settlement Agreement was jointly negotiated and agreed by the parties thereto (in the ordinary way). In particular, the provision for an express warranty of good faith was suggested by Mr

110



Behre on behalf of Mr Azima (as to which paragraphs 8 above are repeated), and the settlement sum of US$2.6 million was based on the amount that Mr Azima claimed that HeavyLift had contributed to the joint venture.

208. Paragraphs 203 and 204 are admitted.

209. As to paragraph 205, the first sentence is admitted. The second sentence is denied insofar as it concerns Mr Gerrard and is otherwise not admitted.

210. As to paragraph 206, it is denied that the new evidence is sufficiently material for the reasons pleaded at paragraphs 194.5 and 202 above (which are repeated) and below.

**2. RAKIA's Good Faith Misrepresentation Claim**

211. Paragraphs 207 to 209 are admitted.

212. Paragraph 210 is admitted as a partial summary of RAKIA's allegations of misconduct by Mr Azima. RAKIA additionally alleged (and the Deputy Judge agreed and found) that the making of the fraudulent HeavyLift Misrepresentation was a further act of misconduct by Mr Azima against RAKIA. RAKIA's allegations of misconduct by Mr Azima are particularised in full at paragraphs 8 to 9 of RAKIA's Re-Amended Particulars of Claim and summarised by the Deputy Judge at paragraph 166 of the Judgment. Further, Schedule 1 to the Dechert Defence sets out the ways in which Mr Azima was guilty of fraudulent and dishonest conduct.

213. As to paragraph 211:

   213.1 Insofar as it is concerns Mr Gerrard, paragraph 211(a) is denied. Mr Gerrard was not cross-examined (and did not given written evidence) about "*wider objectives*". It is denied that his evidence as to the Settlement Agreement could be characterised as a "*specific*" or "*strenuous*" denial as alleged (Transcript Day 5, pages 127-128).

   213.2 Insofar as paragraph 211(b) concerns Mr Azima's contentions at the First Trial, it is admitted.

   213.3 Insofar as paragraph 211(b) concerns the evidence of Mr Gerrard:

213.3.1 It overstates the scope of his denial and is taken out of context. Rather, Mr Gerrard testified that there was some "*evidence*" of Mr Azima's wrongdoing and that he had "*numerous concerns*" in relation to Mr Azima's conduct prior to RAKIA entering into the Settlement Agreement; but that this fell short of "*hard evidence*" and was not "*enough*" to found legal proceedings (First Trial, Day 5 transcript, pages 76 and 126-127).

213.3.2 It is specifically denied that his evidence could be characterised as a "*specific*" or "*strenuous*" denial as alleged.

213.3.3 Mr Gerrard will rely on the relevant evidence from the First Trial in full at the trial.

213.4 Insofar as paragraph 211(b) concerns the evidence of Mr Buchanan, Mr Buchanan's First Witness Statement explained that: by around April 2015, "*His Highness had identified Mr Azima as someone against whom he thought criminal charges could be filed*" (paragraph 21); and "*Prior to the execution of the Settlement Agreement, as a result of matters discussed with various individuals, I was aware of allegations having been made against Mr Azima and concerns expressed about his conduct (for example, I have noted above that the prospect of criminal charges being brought against Mr Azima had been discussed in April 2015)*" (paragraph 66). Accordingly, Mr Buchanan's position was that RAKIA did have suspicions in relation to Mr Azima's conduct (as well as some evidence corroborating those suspicions) prior to entering into the Settlement Agreement, but that: (i) those suspicions fell short of knowledge of Mr Azima's wrongdoing; and (ii) those suspicions related primarily to Mr Azima's conduct in relation to third parties (such as could result in "*criminal charges*") as opposed to Mr Azima's conduct in relation to RAKIA.

214. Paragraph 212 overstates the scope of Mr Buchanan's denial: paragraph 213.4 above is repeated.

215. Paragraph 213 is admitted and averred. The Deputy Judge additionally found: (i) the making of the fraudulent HeavyLift Misrepresentation to be a further breach of the Good Faith Representation; and (ii) RAKIA's remaining allegations of breach of the Good Faith

Case 1:23-mc-00005-UA-JLW   Document 3-9   Filed 02/24/23   Page 113 of 136



Representation to be "*proved in part*" (paragraph 238 of the Judgment), the Deputy Judge was right to do so, for the reasons set out in Schedule 1 to the Dechert Defence.

216. Paragraph 214 is admitted and averred.

217. Paragraph 215 is denied insofar as it concerns Mr Gerrard. Paragraphs 213 and 214 are repeated.

218. As to paragraph 216:

    218.1 The allegations that the evidence given by Mr Gerrard was false and/or dishonest are denied. The allegations in respect of RAKIA and/or its other witnesses are not admitted.

    218.2 Insofar as paragraph 216(a) purports to incorporate the allegations in paragraphs 239 to 252 of the RRRACC, Mr Gerrard pleads in response to paragraphs 239 to 252 in context below.

    218.3 As to paragraph 216(b), Mr Gerrard adopts paragraph 218.3 of the Dechert Defence.

    218.4 As to paragraph 216(c), Mr Gerrard adopts paragraph 218.4 of the Dechert Defence. In addition, paragraph 55E above is repeated as to Mr Gerrard's receipt of and/or briefing as to, and/or knowledge as to the contents of, the Project Update Reports. Mr Gerrard cannot now recall whether at the time he read or was briefed about the aforementioned passing references. Mr Gerrard does not plead as to the alleged knowledge of (unspecified) others.

219. As to paragraph 217:

    219.1 As to paragraph 217(a), the sweeping, unparticularised and conclusory manner in which Mr Azima pleads is not sufficient or appropriate. Mr Gerrard reserves his rights in this regard, including his right to plead further in due course. Without prejudice to that objection, he pleads as follows:

        219.1.1. Paragraph 213 above is repeated in respect of Mr Gerrard and Mr Buchanan's evidence.

113

219.1.2. The extracts from the Project Update Reports quoted in paragraph 4 of Schedule B to the RRRACC are consistent with the denials by Mr Buchanan and Mr Gerrard (once the scope of the denials is properly understood). All of the quoted extracts from Project Update Reports which pre-date the Settlement Agreement express concerns about Mr Azima's conduct (i) in tentative terms and (ii) in relation to third parties (such as crimes), which is consistent with Mr Buchanan and Mr Gerrard having suspicions about his conduct: the Report dated 4 August 2015 refers to there being an "*objective*" to identify "*potential criminal activity by FA*"; and the Report dated 26 January 2016 refers to "*indications for alleged criminal and financial offences made by KM and FA*" and notes that "*additional information might be gathered in the future*". Although the extract from the Report dated 1 July 2016 expresses Mr Azima's likely wrongdoing in more emphatic terms, this Report post-dates the Settlement Agreement.

219.1.3. The extracts from the Project Update Reports quoted in paragraph 5 of Schedule B to the RRRACC are also consistent with the denials by Mr Buchanan and Mr Gerrard (once the scope of the denials is properly understood). To the extent that the quoted extracts from Project Update Reports which pre-date the Settlement Agreement suggest breaches by Mr Azima of (what would become) the Good Faith Representation, they do so either only in speculative terms or indirectly: the Reports dated 6 July 2015 and 26 January 2016 make passing references to Mr Azima's shareholdings (as to which paragraph 218.4.1 of the Dechert Defence is adopted) but do not express concerns about this; the Report dated 17 August 2015 refers to "*documents intentionally concealed by FA from JB*" but then caveats this by saying that this was only "*probably*" the case and that the documents were "*confidential*" (thus suggesting a valid reason why they might not have been shared); the Report dated 24 August 2015 notes that RAKIA "*potentially*" could have a cause of action against Mr Azima; the Report dated September 2015 refers obliquely to Mr Azima "*cross[ing] the lines*" and being involved in "*some issues*"; the Report dated 12 October 2015 recommends the client to "*stay very cautious*"

regarding Mr Azima due to the possibility that *FA has intensions [sic] to gain money out of the client*"; and the Report dated 26 January 2016 notes that it is "*possible that [FA's] interests are not completely identical to those of the client*", and that he "*may be involved in*" some "*past issues*" in ways that are "*apparently deeper and larger than we currently know*".

219.1.4. It is admitted and averred that, aside from the extracts quoted in paragraphs 4 and 5 of Schedule B to the RRRACC, other parts of the Project Update Reports (including those which pre-date the Settlement Agreement) do reveal serious wrongdoing by Mr Azima. In this regard, paragraphs 36B.4.4 and 55C.3 above are repeated. However, these revelations primarily concern Mr Azima's wrongdoing as against third parties (such as could result in criminal proceedings) rather than as against RAKIA or any RAK Entity (as defined in the Settlement Agreement). Accordingly, most of these revelations: (i) are consistent with the denials by Mr Buchanan and Mr Gerrard (once the scope of the denials is properly understood); and (ii) do not suggest breaches by Mr Azima of (what would become) the Good Faith Representation.

219.1.5. The extracts from the Project Update Reports quoted in paragraph 7 of Schedule B to the RRRACC do not demonstrate that RAKIA intended the Settlement Agreement to be a "*trap*". The Report dated 4 August 2015 refers to Mr Azima's potential wrongdoing becoming "*public*" but does not state that this would be by way of litigation (let alone litigation pursuant to a contract which would be signed some 7 months later). The Report dated 24 August 2015 refers to RAKIA "*potentially*" having a cause of action against Mr Azima for breach of contract but does not suggest that this would be pursuant to an as-yet unsigned contract as opposed to pursuant to an existing contract. The Reports dated 4 January 2016 and 20 April 2016 refer only to Mr Azima's own lawyer's belief that the Settlement Agreement may be a trap, which is no evidence at all in support of Mr Azima's case that it was a trap. The relevance of the extract from the Report dated 26 January 2016 is not understood.

219.1.6. Further, paragraph 55E above is repeated as to Mr Gerrard's receipt of and/or briefing as to, and/or knowledge as to the contents of, the Project Update Reports. No admissions are made as to the knowledge of unspecified others as to the contents of the Project Update Reports.

219.1.7. No admissions are made as to the probative value of Mr Page's evidence given that he has, and given the circumstances in which he has, changed his evidence since the First Trial.

219.1.8. Mr Gerrard pleads in response to the other unspecified "*materials referred to in the [Hacking] Counterclaim*", insofar as they are properly particularised, in their proper contexts above.

219.1.9. Further, it is noted that the Deputy Judge rejected the possibility of the Settlement Agreement being a trap as "*inherently unlikely*" (paragraph 312 of the Judgment), and regarded Mr Azima's contentions on this matter as "*not compelling*" (paragraph 378.1 of the Judgment). The new evidence does not affect this conclusion. Paragraph 75.2.2 above is repeated. If RAKIA had actual and sufficient knowledge of Mr Azima's wrongdoing against it (as opposed to mere suspicions and concerns), it remains inherently unlikely that RAKIA would have engineered the Settlement Agreement as a means of trapping Mr Azima; RAKIA could have commenced legal proceedings against Mr Azima without paying him US$2.6 million by way of a settlement sum (thereby pre-funding a significant proportion of his initial litigation costs).

219.1.10. Further, Mr Azima can only properly describe the inclusion of the Good Faith Representation in the Settlement Agreement as a "*trap*" by accepting that he had not in fact acted in good faith. If he had always acted in good faith, then he was simply being asked to represent and warrant what was true: this cannot properly be described as a "*trap*".

219.1.11. In the premises, if (i) the denials by Mr Buchanan and Mr Gerrard "*were false*" (which is denied in respect of Mr Gerrard and otherwise not admitted) and/or (ii) RAKIA induced Mr Azima to enter into the Settlement Agreement "*as a trap*" (which is not admitted) and/or (iii)

116

OFFICE COPY
HIGH COURT
ROLLS BUILDING
OF JUSTICE

RAKIA entered into the Settlement Agreement "*for purposes unconnected with the settlement of HeavyLift's claim*" (which is not admitted), it is denied that the Project Optjast Reports, Mr Page's evidence, or the other unspecified "*materials referred to in the [Hacking] Counterclaim*" "*demonstrate*" or "*show*" this.

219.2 As to paragraph 217(b), Mr Gerrard adopts paragraph 219.2 of the Dechert Defence.

219.3 As to paragraph 217(c), Mr Gerrard adopts paragraph 219.3 of the Dechert Defence.

220. As to paragraph 218, insofar as it concerns Mr Gerrard:

220.1 It is denied that Mr Gerrard gave false evidence as pleaded in paragraph 198 and 211 of the RRRACC. Paragraphs 205 and 213 are repeated.

220.2 If the plea that Mr Gerrard's evidence is "*attributable to RAKIA*" is intended to mean that his evidence was adduced by RAKIA, it is admitted; otherwise, no admissions are made.

220.3 As to paragraph 218(c):

220.3.1 The first sentence is admitted.

220.3.2 As to the allegation that Mr Gerrard "*oversaw*" RAKIA's investigations, paragraph 45.2.2 above is repeated.

220.3.3 As to the allegation that Mr Gerrard "*gave instructions to Mr Page and others*", Mr Azima previously alleged at paragraph 34 of the RACC that Mr Gerrard provided instructions to Mr Page and his companies, but this allegation was withdrawn in the RRACC. It is unclear whether Mr Azima now seeks to resurrect this allegation. If he does, it is denied, and it is noted that Mr Page's affidavit expressly denies that he received instructions from Mr Gerrard. No admissions are made in relation to the unspecified "*others*" to whom Mr Gerrard is alleged to have given instructions, which is too vague to permit a response.



220.3.4  As to the allegation that Mr Gerrard "*impeded the Settlement Agreement*", paragraph 207.1 above is repeated.

220.3.5  Paragraph 218(d) is admitted.

221.  As to paragraph 219:

221.1  The allegations of "*fraud*" and "*concealment*" by RAKIA are denied insofar as they concern Mr Gerrard, and otherwise not admitted.

221.2  It is denied that the new evidence is sufficiently material in relation to the Deputy Judge's findings that the Good Faith Representation was false to Mr Azima's knowledge. Mr Gerrard adopts paragraph 221.2 of the Dechert Defence in this connection.

222.  As to paragraph 220:

222.1  The allegations of "*fraud*" by RAKIA and "*fraudulent evidence*" are denied insofar as they concern Mr Gerrard, and otherwise not admitted.

222.2  It is denied that the new evidence is sufficiently material in relation to the Deputy Judge's finding that RAKIA relied upon the Good Faith Representation: paragraphs 194.1, 202, and 219 above are repeated.

223.  As to paragraph 221:

223.1  As to paragraph 221(a), insofar as it concerns Mr Gerrard it is denied, and otherwise not admitted, that any evidence was "*fraudulent*". It is denied, if alleged, that the Deputy Judge "*specifically identified*" any particular evidence of Mr Gerrard as the basis of his conclusions on reliance. In any event, it is denied that the new evidence is sufficiently material in relation to the Deputy Judge's finding that RAKIA relied upon the Good Faith Representation: paragraphs 194.1, 202, 219, and 222.2 above are repeated.

223.2  As to paragraph 221(b), Mr Gerrard adopts paragraph 223.2 of the Dechert Defence.

223.3 As to paragraph 221(c), Mr Gerrard adopts paragraph 223.2 of the Dechert Defence.

223.4 Paragraph 221(d) is denied for the reasons pleaded in paragraph 219.1 above, which is repeated. As to the specific evidence and allegations pleaded in the sub-sub-paragraphs:

223.4.1 As to the first sentence of paragraph 221(d)(i), it is too vague to permit a response. Without prejudice to the aforesaid: paragraph 219.1.5 above is repeated in relation to the extracts from the Project Update Reports quoted in paragraph 7 of Schedule B to the RRRACC which are said to demonstrate that RAKIA intended the Settlement Agreement to be a "*trap*" (including because of the references therein to potential breach of contract claims); and paragraph 55E above is repeated as to Mr Gerrard's receipt of and/or briefing as to, and/or knowledge as to the contents of, the Project Update Reports. It is not admitted that any of the information contained in the Project Update Reports was confidential, and it is denied that it was confidential insofar as it related to Mr Azima's wrongdoing.

223.4.2 As to the second sentence, it is not admitted that any of the information contained in the Project Update Reports was confidential, and it is denied that it was confidential insofar as it related to Mr Azima's wrongdoing. In addition, the allegation that Mr Gerrard "*continued to receive*" "*illicitly obtained*" information "*throughout the period in which the Settlement Agreement was under negotiation*" is too vague to permit a response. Nonetheless, it is denied in any event that Mr Gerrard at any time knowingly received, or was aware of or complicit in the receipt of, information obtained by illicit means, including hacking. Paragraph 73.1 is repeated in respect of the responsibility for the drafting of the Settlement Agreement and paragraph 55E above is repeated as to Mr Gerrard's receipt of and/or briefing as to, and/or knowledge as to the contents of, the Project Update Reports.

223.4.3 Paragraph 221(d)(ii) is too vague to permit a response. Without prejudice to the aforesaid, it is denied that the Project Update Reports demonstrate

119



that RAKIA intended the Settlement Agreement to be *a trap*": paragraph 219.1 above is repeated.

223.4.4  As to paragraph 221(d)(iii), it is admitted that the Project Update Report dated 26 January 2016 contains the words alleged. No admissions are made as to truth or meaning of those words, or as to the inference Mr Azima seeks to draw. For the avoidance of doubt, it is denied (if alleged) that Mr Gerrard or Dechert prepared any of the Project Update Reports. As to the reference in the Project Update Report dated 26 January 2016 to Mr Azima's shareholdings, Mr Gerrard adopts paragraph 218.4.1 of the Dechert Defence. In any event, even if RAKIA had in fact learned or could have deduced by 2016 (by some means other than disclosure by Mr Azima) that Mr Azima was intending to take an interest in the Hotel (which is not admitted), this does not undermine the Deputy Judge's finding that that there was a "*failure by Mr Azima to give full disclosure to RAKIA of his intended interest in the Hotel*" at the time when the transaction was being executed (in October 2011) and that this was a breach of the Good Faith Representation: paragraph 218.4.2 of the Dechert Defence is adopted.

223.4.5  As to paragraph 221(d)(iv), it is admitted that the Project Update Reports dated 4 January 2016 and 20 April 2016 make references to Mr Azima's lawyer's belief that the Settlement Agreement may be a trap. No admissions are made as to whether those communications were privileged. It is denied that Mr Azima's own lawyer's belief provides any evidence in support of Mr Azima's case that the Settlement Agreement was a trap: paragraph 219.1.5 above is repeated.

223.4.6  As to paragraph 221(d)(v), no admissions are made, since such matters are outside Mr Gerrard's knowledge.

223.5  As to paragraph 221(e), Mr Gerrard adopts paragraph 223.5 of the Dechert Defence.

224.  As to paragraph 222:



224.1 The allegation of "*fraud*" by RAKIA is denied insofar as it concerns Mr Gerrard, and otherwise not admitted.

224.2 It is denied that the new evidence is sufficiently material in relation to "*the entire fact-finding process*": paragraphs 194.1 and 202 above are repeated.

224.3 Insofar as paragraph 222 purports to incorporate the allegations in paragraphs 256-257 of the RRRACC, Mr Gerrard pleads in response to paragraphs 256 to 257 in context below.

### 3. RAKIA's Heavylift Misrepresentation Claim

225. Paragraph 223 is admitted.

226. Save in respect of paragraph 224(c), paragraph 224 is admitted as a partial summary of paragraph 147 of the Judgment. Mr Gerrard will rely on the Judgment in full for its true findings, reasoning, and effect. As to paragraph 224(c), Mr Gerrard adopts paragraphs 226.1-226.5 of the Dechert Defence in this connection.

227. Paragraph 225 is admitted and averred.

228. As to paragraph 226:

228.1 It is noted that Mr Azima refers generically to "*The Project Update Reports*" and does not identify any specific Project Update Reports (let alone specific extracts from specific Project Update Reports) which are relied upon in support of the matters alleged.

228.2 No admissions are made in relation to RAKIA's beliefs.

228.3 Paragraph 55E above is repeated as to Mr Gerrard's receipt of and/or briefing as to, and/or knowledge as to the contents of, the Project Update Reports.

228.4 Mr Gerrard otherwise adopts paragraph 228 of the Dechert Defence in this connection.

229. As to paragraph 227:



229.1 As to the first sentence, it is denied that the Project Update *replies* "*show*" any of the matters alleged: paragraphs 55E and 219.1.1 above are repeated.

229.2 Save as aforesaid, no admissions are made.

230. As to paragraph 228, Mr Gerrard adopts paragraph 230 of the Dechert Defence.

231. As to paragraph 229:

231.1 No admissions are made as to the allegation that RAKIA's case on reliance was false and/or fraudulent. For the avoidance of doubt, even if it was, it is denied (if it is alleged) that Mr Gerrard was aware of the same.

231.2 Mr Gerrard adopts paragraph 230.4 of the Dechert Defence. Accordingly: (i) the word "*therefore*" is denied insofar as it is intended to suggest that the pleaded allegation logically follows from the preceding pleaded allegations; and (ii) if RAKIA did not rely upon the HeavyLift Misrepresentation (which is not admitted), it is denied that the new evidence demonstrates this.

232. As to paragraph 230:

232.1 The allegation of "*fraud*" by RAKIA is denied insofar as it concerns Mr Gerrard, and otherwise not admitted.

232.2 Mr Gerrard otherwise adopts paragraphs 232.2-232.5 of the Decehert Defence in this connection.

232.3 Mr Gerrard pleads in response to paragraphs 256 to 257 below.

**F. RAKIA'S CONSPIRACY CLAIM**

233. Paragraph 231 is admitted.

234. As to paragraph 232, Mr Gerrard adopts paragraph 234 of the Dechert Defence.

235. As to paragraph 233, Mr Gerrard adopts paragraph 235 of the Dechert Defence.

236. As to paragraph 234, Mr Gerrard adopts paragraph 236 of the Dechert Defence.

Case 1:23-mc-00005-UA-JLW   Document 3-9   Filed 02/24/23   Page 123 of 136



237. Paragraph 235 is denied. In particular, RAKIA relied upon the contents of the Adams Memorandum: Mr Gerrard adopts paragraph 236.4 of the Dechert Defence in this connection.

238. Paragraph 236 is admitted.

239. As to paragraph 237, Mr Gerrard adopts paragraph 239 of the Dechert Defence.

240. As to paragraph 238, Mr Gerrard adopts paragraph 240 of the Dechert Defence:

241. As to paragraph 239:

    241.1 The allegations that RAKIA gave false and/or dishonest evidence at the First Trial are denied insofar as they concern Mr Gerrard, and otherwise not admitted.

    241.2 Paragraph 55E above is repeated as to Mr Gerrard's receipt of and/or briefing as to, and/or knowledge as to the contents of, the Project Update Reports. It is not admitted that: (i) any "*information*" was "*gathered and passed to RAKIA*"; (ii) RAKIA was conducting an "*investigation*" into Mr Azima as alleged; or (iii) RAKIA in fact had "*documentary evidence on point*".

    241.3 It is admitted that the extracts from the Project Update Reports relied upon are logically "*consistent*" with Mr Azima's case that he effected the introduction of the Potential Buyers of the Hotel to RAKIA. It is denied that this means that they are (or that they are in fact) "*inconsistent*" with or contradictory to RAKIA's case that he did not. It is denied that they "*materially corroborate*" Mr Azima's case: they do no more than support the Deputy Judge's conclusion that Mr Azima "*was actively involved in facilitating the possible purchase*" (paragraph 174 of the Judgment).

    241.4 As to paragraphs 239(a) to 239(g), Mr Gerrard adopts paragraphs 241.4-241.8 of the Dechert Defence.

242. As to paragraph 240:

    242.1 As to the first sentence, the Project Update Reports relied upon have dates covering a period of 10.5 months. No admissions are made as to whether this is a "*long period*", which is too vague to permit a response.

Case 1:23-mc-00005-UA-JLW   Document 3-9   Filed 02/24/23   Page 124 of 136

242.2 As to the second sentence, Mr Gerrard pleads only to the allegation against him. Paragraph 241 above is repeated as to what does and does not emerge from the "*statements to this effect*" referred to. Paragraph 55C above is repeated as to Mr Gerrard's receipt of and/or briefing as to, and/or knowledge as to the contents of, the Project Update Reports. It cannot be "*inferred*" from the statements in the Project Update Reports referred to that Mr Gerrard would have been in a position to "instruct" Mr Page about Mr Azima's involvement in the Hotel sale (even had it been appropriate for him to do so, given Mr Gerrard did not instruct or provide instructions to Mr Page).

243. As to paragraph 241:

243.1 As to the allegation that "*RAKIA's case [was] that it did not have any relevant evidence in respect of the relevant transaction*", Mr Gerrard adopts paragraphs 237 and 239 of the Dechert Defence in this connection.

243.2 The allegation that RAKIA's case was false and/or dishonest is denied insofar as it concerns Mr Gerrard, and otherwise not admitted.

243.3 Even if RAKIA's case was false and/or dishonest (which is not admitted): it is denied (if it is alleged) that Mr Gerrard was aware of the same; and it is denied that the new evidence "*establishes*" this (as to which paragraph 241 above is repeated).

244. As to paragraph 242:

244.1 The allegations that RAKIA's case was false and/or dishonest and/or involved concealment are denied insofar as it concerns Mr Gerrard, and otherwise not admitted.

244.2 Even if RAKIA's case was false and/or dishonest and/or involved concealment (which is not admitted), it is denied (if it is alleged) that Mr Gerrard was aware of the same. Further, it is denied that the new evidence demonstrates this: paragraph 241 above is repeated. Therefore, the word "*accordingly*" is denied insofar as it is intended to suggest that the pleaded allegation logically follows from the preceding pleaded allegations.

245. As to paragraph 243:

245.1    As to paragraph 243(a):

245.1.1    It is denied that the Project Update Reports contain "*findings*" in relation to the Hotel transaction as alleged: paragraph 241 above is repeated.

245.1.2    No admissions are made as to: (i) whether the Ruler "*commissioned*" substantial investigations into the Hotel transaction (whether by way of the Project Update Reports or otherwise); or (ii) had any information contained in the Project Update Reports "*relayed to him*".

245.1.3    In the premises, no admissions are made as to the allegation that information was "*omitted*" from the Ruler's Witness Statement.

245.2    As to paragraph 243(b):

245.2.1    Mr Gerrard pleads in response to paragraphs 245 to 252 below.

245.2.2    Even if Mr Al Sadeq believed that Mr Azima had introduced the Potential Buyers of the Hotel to RAKIA (which is not admitted), it is not admitted that the Ruler would have had knowledge of Mr Al Sadeq's belief.

245.2.3    In the premises, no admissions are made as to the allegation that information was "*omitted*" from the Ruler's Witness Statement.

245.3    As to paragraph 243(c):

245.3.1    The allegation that the Ruler's Witness Statement was untrue and/or false and/or dishonest is not admitted.

245.3.2    In any event, it is denied that the pleaded inference falls to be drawn: paragraphs 245.1 and 245.2 above are repeated.

245.3.3    It is denied that the new evidence "*shows*" that "*the Ruler's denial of involvement in or approval of hacking*" was false, for the reasons pleaded above in response to the Hacking Counterclaim.

246.    As to paragraph 244:

125



246.1 It is denied that the new evidence "*contradicts Mr Buchanan's case*" as alleged: paragraph 241 above is repeated.

246.2 No admissions are made as to whether Mr Buchanan was aware of the extracts in the Project Update Reports upon which Mr Azima relies.

246.3 In the premises, no admissions are made as to the allegation that Mr Buchanan's evidence "*failed*" to make reference to any material.

247. As to paragraph 245:

247.1 It is admitted that meetings or interviews were conducted between representatives of Dechert with Mr Al Sadeq, and that he was detained in RAK at the time.

247.2 It is admitted that notes of these meetings or interviews were disclosed in the Al Sadeq Proceedings, including (i) the Gerrard Email, (ii) the Handwritten Note, and (iii) typed notes that appear to include the contents of the Handwritten Note.

247.3 Save as aforesaid, no admissions are made.

248. As to paragraph 246:

248.1 It is admitted that the Gerrard Email was sent on 23 September 2014 by Mr Gerrard to Mr Bustami and Mr Buchanan, copied to other lawyers at Dechert.

248.2 It is admitted that the Gerrard Email contains the quoted words.

248.3 Mr Al Sadeq was formerly the General Counsel and Deputy CEO of RAKIA. No admissions are made as to the allegation that Mr Al Sadeq was "*RAKIA's chief legal adviser at the relevant time*", i.e. in 2011.

248.4 Even if Mr Al Sadeq believed that Mr Azima had effected the introduction of the Potential Buyers of the Hotel to RAKIA (which is not admitted), it is denied that the Gerrard Email shows this. The relevant statement consists of 12 words in parentheses in an email the accuracy of which is not admitted.

248.5 No admissions are made as to the second sentence.

248.6 As to the third sentence:

248.6.1 No admissions are made as to the knowledge of Mr Buchanan. Paragraph 55E above is repeated as to Mr Gerrard's receipt of and/or briefing as to, and/or knowledge as to the contents of, the Project Update Reports.

248.6.2 While Mr Gerrard attended interviews with Mr Al Sadeq in September 2014, those interviews were in relation to an investigation into Dr Massaad. Any references to Mr Azima were not significant to that investigation.

248.6.3 In any event, it is denied that Mr Gerrard's sending or Mr Buchanan's receiving of the Gerrard Email demonstrates that they "*knew*" that Mr Al Sadeq believed (if he did) that Mr Azima had effected the introduction of the Potential Buyers of the Hotel to RAKIA. This allegation proceeds upon the false premise that Mr Gerrard and Mr Buchanan believed what Mr Al Sadeq had said on this issue to be true.

249. As to paragraph 247:

249.1 The Handwritten Note is a manuscript note made by Ms Caroline Black during a meeting between Mr Gerrard, Ms Black, and Mr Al Sadeq on 9 September 2014. Save as consistent with the aforesaid, the first sentence is denied.

249.2 The content of the Handwritten Note is admitted, save that Ms Black has approved a transcript of the Handwritten Note (for the purposes of the Al Sadeq Proceedings) which: (i) confirms that the "*illegible*" word is "*official*"; and (ii) indicates that it was Mr Al Sadeq who was speaking at the time the relevant words were noted.

250. As to paragraph 248, the typed note is an earlier version of the transcript mentioned in paragraph 249.2 above, prior to it being reviewed, amended, and approved (and then re-approved) by Ms Black. The transcript was originally prepared by Enyo Law LLP for the purposes of the Al Sadeq Proceedings. It is admitted that the earlier version of the transcript contained the quoted words, but these words were revised in the approved (and then re-approved) version following Ms Black's review. Save as consistent with the aforesaid, paragraph 248 is denied.

251. As to paragraph 249, it is admitted that the typed note records a "Guidance Note of discussions between Mr Gerrard, Ms Black, and Mr Al Sadeq, and that it contains the quoted words. The note is dated 15 September 2014, but no admissions are made as to whether it was prepared on that date.

252. Paragraph 250 is admitted. That plea in their Defence in the Al Sadeq Proceedings does not accept that Mr Gerrard and Mr Hughes (and Dechert) believed everything Mr Al Sadeq ever said to them to be true. Their plea that they believed Mr Al Sadeq's evidence to be true was specifically in relation to two witness statements signed by Mr Al Sadeq on 9 December 2015, which related to Mr Al Sadeq's involvement in fraudulent transactions involving the sale of Poti Sea Port and Pioneer Cement.

253. As to paragraph 251:

    253.1 The reference to "*any of the other documents*" is too vague to permit a response.

    253.2 The typed note pleaded at paragraph 248 was produced for the purposes of the Al Sadeq Proceedings, so was not in existence at the time of the First Trial, so could not have been disclosed in advance of the First Trial.

    253.3 It is admitted that the Gerrard Email, the Handwritten Note, and the typed note pleaded at paragraph 249 were not in the Trial Bundle for the First Trial. No admissions are made as to whether these documents were disclosed in advance of the First Trial, which is outside of Mr Gerrard's knowledge.

    253.4 As to sub-paragraphs (a)-(c), save that it is admitted that paragraph 1.2 of the said Order required RAKIA to seek material documents from its agents and consultants, and then to provide standard disclosure, "*in relation to the Hacking Allegation*", and that the Gerrard Email was sent to Mr Buchanan and Mr Bustami, no admissions are made, since such matters are outside the knowledge of Mr Gerrard.

254. As to paragraph 252:

    254.1 The first sentence is admitted.

    254.2 The second sentence is denied. The plea in the Al Sadeq Proceedings does not relate to the Hotel transaction: paragraph 252 above is repeated. Therefore, there is no



inconsistency between the plea in the Al Sadeq Proceedings and RAKIA's case at the First Trial in relation to the Hotel transaction.

255. As to paragraph 253:

    255.1   The allegations that RAKIA gave false and/or dishonest evidence at the First Trial are denied insofar as they concern Mr Gerrard, and otherwise not admitted. It is further denied that Mr Gerrard was aware of specific "*documents and information that RAKIA had obtained in Project Update Reports*" that "*supported Mr Azima's case*". Paragraph 55E above is repeated as to Mr Gerrard's receipt of and/or briefing as to, and/or knowledge as to the contents of, the Project Update Reports.

    255.2   As to paragraph 253(a), paragraphs 241 to 246 above are repeated.

    255.3   As to paragraph 253(b), paragraphs 247 to 254 above are repeated.

256. As to paragraph 254:

    256.1   This paragraph presupposes an incorrect test: paragraph 202.4.2 above is repeated.

    256.2   In any event, it is denied that the new evidence is sufficiently material to impugn the Deputy Judge's finding that Mr Azima had not effected the introduction of the Potential Buyers of the Hotel to RAKIA:

        256.2.1   Paragraphs 194.1 and 202 above are repeated.

        256.2.2   The new evidence in the Project Update Reports relied upon by Mr Azima neither "*materially corroborate*" Mr Azima's case nor are "*inconsistent*" with RAKIA's case: paragraph 241 above is repeated.

        256.2.3   The new evidence in the Project Update Reports does not undermine the evidence given by the Ruler or by Mr Buchanan at the First Trial: paragraphs 245 and 246 above are repeated. In any event, even if it did, the fact that the Ruler did not attend the First Trial to give oral evidence meant that the Deputy Judge did "*not propose to attach significant weight*" to the Ruler's evidence (paragraph 59 of the Judgment). In the context of considering the Hotel transaction, the Deputy Judge expressly stated that he placed "*limited weight*" on the Ruler's evidence (paragraph 174 of the

Judgment). In the context of the Conspiracy Claim more generally, the Deputy Judge does not appear to have placed any weight on the Ruler's evidence at all, since the Ruler is not referred to in this section of the Judgment or in the earlier paragraphs to which cross-reference is made.

256.2.4 The new evidence in relation to Mr Al Sadeq does not advance Mr Azima's case: paragraphs 247 to 254 above are repeated. In any event, even if the new evidence demonstrated that Mr Al Sadeq believed that Mr Azima had effected the introduction of the Potential Buyers of the Hotel to RAKIA, it is denied that this would have had a material impact on the Deputy Judge's findings: (i) the Deputy Judge found Mr Al Sadeq to be a co-conspirator alongside Mr Azima, implicated in the forgery of documents to assist Mr Azima, so very little weight would have been placed on his evidence; (ii) still less weight would have been placed on his evidence in circumstances where Mr Al Sadeq is (and was at the time of the First Trial) incarcerated in the UAE, making it very unlikely that he would have been able to attend the First Trial to be cross-examined; and (iii) the Deputy Judge held that Mr Azima's case was not assisted by the beliefs of "*RAKIA's lawyers*" because "*they may have been misinformed*" (paragraph 174 of the Judgment).

256.2.5 The Deputy Judge's key reason for finding in RAKIA's favour was that the Adams Memorandum "*fatally undermines*" Mr Azima's case that he introduced the Potential Buyers of the Hotel to RAKIA: Mr Gerrard adopts paragraph 236.4 of the Dechert Defence in this connection. The new evidence does not undermine the Adams Memorandum in any way.

256.3 Further, even if the new evidence was sufficiently material to impugn the Deputy Judge's finding that Mr Azima had not effected the introduction of the Potential Buyers of the Hotel to RAKIA (which is denied), it is not sufficiently material to undermine the Deputy Judge's finding on the Conspiracy Claim as a whole:

256.3.1 The Deputy Judge's conclusion on the Conspiracy Claim was based on inferences from two key facts: (i) "*the fact that Dr Massaad received a bribe out of the illicit payments*"; and (ii) "*the involvement of Mr [Al]*"

130



*Sadeq in the retrospective drafting of the Referral Agreement*" (paragraph 249 of the Judgment).

256.3.2 The Deputy Judge's finding that the Referral Agreement was a sham relied on many reasons which were entirely independent of the finding that Mr Azima had not effected the introduction of the Potential Buyers of the Hotel to RAKIA: Mr Gerrard adopts paragraphs 218.3.1 and 235.2.3 of the Dechert Defence in this connection.

256.3.3 The Deputy Judge's finding that the payment to Dr Massaad was a bribe relied only indirectly and minimally (if at all) on his finding that Mr Azima had not effected the introduction of the Potential Buyers of the Hotel to RAKIA: Mr Gerrard adopts paragraphs 218.3.2 and 235.2.3 of the Dechert Defence in this connection.

257. As to paragraph 255:

257.1 The allegation of "*fraud*" by RAKIA is denied insofar as it concerns Mr Gerrard, and otherwise not admitted.

257.2 It is denied that, if Mr Azima's case on the introduction of the Potential Buyers of the Hotel had been accepted, this would have materially affected the Deputy Judge's "*assessment of Mr Azima's credibility more generally*", for the reasons pleaded in paragraph 258.2 below.

257.3 It is denied that the new evidence is sufficiently material in relation to "*the entire fact-finding process*": paragraphs 194.1 and 202 above are repeated.

257.4 Mr Gerrard pleads in response to paragraphs 256 to 257 below.

## G. THE JUDGE'S ASSESSMENT OF RAKIA'S CLAIMS GENERALLY

258. As to paragraph 256:

258.1 It is denied that the new evidence would have had a material effect on the Deputy Judge's "*assessment of the claims generally*". Paragraphs 194.1, 202, 221 to 224, 232, and 256 to 257 above are repeated.



258.2   Paragraph 256(a) is denied:

    258.2.1   For the reasons set out above, it is denied that the new evidence would have "*shown*" Mr Azima and Mr Adams "*to have been giving correct and truthful evidence on key contested issues*".

    258.2.2   It is denied that the new evidence "*would have materially affected the Deputy Judge's assessment of Mr Azima's credibility (as well as that of Mr Adams)*" generally. The Deputy Judge was clear that the evidence of Mr Azima and Mr Adams "*was frequently inconsistent with the contemporaneous documents and inherently implausible*" (paragraph 71 of the Judgment). Nothing in the Set Aside Counterclaim permits Mr Azima to challenge this conclusion: he does not plead any further contemporaneous documents which would have affected the Judge's assessment of his (or Mr Adams') evidence.

258.3   Paragraph 256(b) is admitted and averred. It is denied that the new evidence demonstrates that the Deputy Judge was wrong to reject the evidence of Mr Azima and Mr Adams on these matters.

259.  Paragraph 257 is denied for the reasons set out above.

**H. MR AZIMA'S STRIKE OUT DEFENCE**

260.  Paragraphs 258 and 259 are admitted.

261.  Paragraph 260 is denied: paragraph 258.1 above is repeated. Further, it is an abuse of process for Mr Azima to seek now to reopen the questions of whether RAKIA's claims should have been struck out and/or RAKIA's evidence should have been excluded in circumstances where (i) Mr Azima appealed the Deputy Judge's conclusions on these questions to the Court of Appeal, (ii) the Court of Appeal dismissed Mr Azima's appeal on these questions, and (iii) the Supreme Court refused to give Mr Azima permission to appeal on these questions, noting that Mr Azima's application did not raise an arguable point of law.

262.  Paragraph 261 is admitted and averred.

263. As to paragraph 262:

    263.1  Save that the intended implication of the word "*only*" is denied, paragraph 262(a) is admitted and averred. The assumptions made by the Court of Appeal in Mr Azima's favour were broad and wide-ranging. They encompassed the possibility that all of RAKIA's witnesses gave dishonest evidence.

    263.2  Paragraph 262(b) is admitted.

264. As to paragraph 263:

    264.1  The allegation that RAKIA's case was fraudulent is denied insofar as it concerns Mr Gerrard, and is otherwise not admitted.

    264.2  It is denied that the Project Update Reports "*show*" RAKIA's case to have been fraudulent (for the reasons set out above), and it is accordingly denied that they impact the Court of Appeal's reasoning in paragraphs 60 and 61 of the CA Judgment.

    264.3  The assumptions made by the Court of Appeal in Mr Azima's favour in paragraph 40 of the CA Judgment were broad and wide-ranging: paragraphs 202.5.1 and 263.1 above are repeated. Even if RAKIA's case was fraudulent to the extent alleged by Mr Azima (which is not admitted), that possibility would still have been encompassed by the Court of Appeal's assumptions, and it is accordingly denied that those assumptions would in that case "*understate*" the situation.

265. Paragraph 264 is denied. Even if the Judgment were to be set aside, it would not necessarily follow that the CA Judgment should be set aside too.

266. Paragraph 265 is denied for the reasons set out above.

## I. RELIEF

267. Paragraphs 266 and 267 are denied:

    267.1  For the reasons pleaded above, it is denied that the Judgment, the CA Judgment, and/or their accompanying Orders should be set aside.

267.2 Further or in the alternative, in the event that Mr Akhmedov's Defence to Counterclaim is successful but only in part, the Judgment, the CA Judgment, and their accompanying Orders should be set aside only to the extent that the Defence to Counterclaim is successful, and they should otherwise be upheld.

268. Paragraphs 268 and 269 are denied for the reasons set out above.

~~ROGER MASEFIELD QC~~

~~ADAM WOLANSKI QC~~

~~CRAIG MORRISON~~

~~LAURA NEWTON~~

~~LAURA NEWTON~~

~~ROBERT HARRIS~~

**FIONN PILBROW KC**

**AARUSHI SAHORE**

**Statement of truth**

I believe that the facts stated in this Re-Amended Defence to Counterclaim are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Second Additional Defendant to Counterclaim – David Neil Gerrard

Signed:       …………………………………….
Date:         ~~1 April 2022~~ 16 January 2023
Name:         David Neil Gerrard

Third Additional Defendant to Counterclaim—Dechert LLP



Signed: ..............................................

Date: 1 April 2022

Name: Charles Wynn-Evans, Partner and International General Counsel, Dechert LLP