**EXHIBIT 10**

<u>**IN THE HIGH COURT OF JUSTICE**</u>                    **Claim no. QB-2020-002492**
<u>**QUEEN'S BENCH DIVISION**</u>

**B E T W E E N : -**

**STOKOE PARTNERSHIP SOLICITORS**

**Claimant**

**and**

**(1) MR PATRICK TRISTRAM FINUCANE GRAYSON**
**(2) GRAYSON + CO LIMITED**
~~**(3) MR STUART ROBERT PAGE**~~
~~**(4) PAGE CORPORATE INVESTIGATIONS LIMITED**~~
**(5) DECHERT LLP**
**(6) MR DAVID NEIL GERRARD**

**Defendants**

---

**RE-RE-AMENDED PARTICULARS OF CLAIM**

---

**Parties**

1.    The Claimant is a firm of solicitors. It is instructed by Mr Karam Al Sadeq in ongoing High Court proceedings under claim number QB-2020-000322 (the "**Al Sadeq Litigation**").

2.    The First Defendant has had a long career in corporate investigation. He was a founding partner of GPW, from which he resigned in or about December 2018.

3.    The Second Defendant is a company registered in England and Wales with company number 10907649. The First Defendant and his wife are its directors and shareholders. The Claimant believes and avers that the Second Defendant is the company through which the First Defendant provides investigation services.

1

4. Mr Stuart Robert Page ("**Mr Page**") ~~The Third Defendant~~ is an investigation agent. He has admitted being instructed by the ruler (the "**Ruler**") of Ras Al Khaimah ("**RAK**"). RAK is the Emirate in which the Claimant's client Mr Karam Al Sadeq is detained.

5. Page Corporate Investigations Limited ~~The Fourth Defendant~~ is a company registered in England and Wales with company number 05985794. ~~The Third Defendant~~ Mr Page is a director of the company and is registered as a person with significant control over it. The Claimant believes and avers that ~~the Fourth Defendant~~ Page Corporate Investigations Limited is the company through which ~~the Third Defendant~~ Mr Page provides investigation services.

5A. The Fifth Defendant ("**Dechert**") is a limited liability partnership registered in England and Wales with registration number OC306029, authorised and regulated by the Solicitors Regulation Authority of England and Wales, with its registered address at 160 Queen Victoria Street, London EC4V 4QQ.

5B. The Sixth Defendant ("**Mr Gerrard**") is a former police officer and a solicitor of the Senior Courts of England and Wales. He was until about 1 January 2021 a Partner at Dechert, where he was global co-head of Dechert's white collar and securities litigation practice.

5C. Mr Gerrard was a member of Dechert at all material times. His acts were attributable to Dechert. Further, Dechert is vicariously liable for the wrongful acts of its members in the course of its business, or with its authority, pursuant to section 6(4) of the Limited Liability Partnerships Act 2000.

## Obtaining of the Claimant's confidential information

6. From about January 2020, the First Defendant instructed Mr Paul Robinson to investigate the Claimant and to obtain information about the Claimant which (as explained below) was plainly confidential to the Claimant, for reward. Mr Robinson has explained this in his affidavit dated 6 July 2020. In particular:

    (1) The first such instructions were given ~~in or about~~ on 30 January 2020 at a meeting at the Goring Hotel in Belgravia, London. At that meeting, the First Defendant

2

asked Mr Robinson whether he knew anyone who was able to investigate the Claimant and obtain banking information.

(2) The First Defendant asked Mr Robinson a number of follow-up questions from time to time based on the information that Mr Robinson obtained, in particular by encrypted text messages sent using the Signal system which the First Defendant set to be automatically deleted.

7. Mr Robinson in turn requested Mr John Gunning to obtain such information about the Claimant. Mr Gunning and Mr Robinson have confirmed this in affidavits dated respectively 2 and 6 July 2020. Mr Gunning in turn made requests of Mr Oliver Moon, as Mr Moon has confirmed in an affidavit dated 2 July 2020. In particular:

(1) On or about 2 April 2020, Mr Robinson requested Mr Gunning to obtain the banking co-ordinates of the Claimant.

(2) On or about 9 April 2020, Mr Robinson requested Mr Gunning to access the Claimant's main bank account and to obtain transactional data for the past three months.

(3) On or about 21 April 2020, Mr Robinson requested Mr Gunning to obtain information as to the "*movements in and out of Dubai – for Feb 2020*" of Mr Haralambos Tsiattalou.

(together, the "**Example Requests**").

8. The subjects of each of the Example Requests coincided with the Al Sadeq Litigation in that:

(1) As to the first: Around 2 April 2020, enquiries were being made in the course of the Al Sadeq Litigation concerning the source of funding in those proceedings.

(2) As to the second: The Claim Form in the Al Sadeq Litigation was filed on 28 January 2020.

(3) As to the third: Mr Tsiattalou is the partner of the Claimant with conduct of the Al Sadeq Litigation. He visited Dubai for the purposes of that litigation in February 2020.

3

9.  The link with the Al Sadeq Litigation and parties thereto is supported by the following facts, namely that:

    (1)  On or about 22 April 2020, the First Defendant also requested Mr Robinson to obtain information relating to the Claimant's client account, including transactional information for March 2020, which request was passed on by Mr Robinson to Mr Gunning. According to Mr Gunning in his said affidavit, he was told by Mr Robinson that it was likely that transactional information of the Claimant would also be sought for the period November 2019 to February 2020. It is to be inferred that this latter information came to Mr Robinson from the First Defendant. The period in question overlaps with the period of the Claimant's instruction by Mr Al Sadeq.

    (2)  The First Defendant also requested Mr Robinson to obtain information from other persons connected to the Al Sadeq Litigation. In particular:

        (a)  In or about October to December 2019, the First Defendant requested the obtaining of confidential information about Ms Radha Stirling of Detained in Dubai, which is a human rights advocacy organisation assisting Mr Al Sadeq.

        (b)  In or about February and March 2020, the First Defendant requested and obtained financial records and monthly transactional data from a bank account held by Maltin PR, which is a public relations and litigation support entity assisting the Claimant with the Al Sadeq Litigation.

    (2A)  On 12 March 2020, the First Defendant sent an email from finucane03@gmail.com to cloverdock@protonmail.com. The email attached a chart which was described in the said email as "*B-A-E-D Relationship Chart*" (the "**Chart**") with a large dramatis personae and alleged links between the individuals and entities depicted. Those depicted include many connected to the Al Sadeq Litigation. It is to be inferred that the First Defendant's investigation of the Claimant was part of a wider campaign, linked in part to the Al Sadeq Litigation.

    (3)  In or about April 2020, the First Defendant requested the obtaining of three months of corporate banking transactions of Hogan Lovells, an international firm of

4

solicitors. Hogan Lovells have no role in the Al Sadeq Litigation. However, Hogan Lovells act on behalf of Eurasian ~~Natural~~ ~~National~~ Resources Corporation ("**ENRC**") in court proceedings commenced by ENRC against Dechert ~~LLP~~ and Mr ~~Neil~~ Gerrard. Dechert ~~LLP~~ and Mr Gerrard are defendants in the Al Sadeq Litigation.

9A.   The Chart states that Maltin PR "*paid RS for raising profile of KAS*". That information was confidential and could only have been added by someone party to a breach of confidence. The Chart's metadata suggest that it was created on 24 February 2020 and modified on 11 March 2020. It is to be inferred that the First Defendant and/or an associate modified the Chart following receipt of Maltin PR's confidential information as a result of the First Defendant's requests to Mr Robinson to investigate Maltin PR.

10.   The information which was the subject of the Example Requests was plainly confidential in that:

(1)   A solicitors' firm's bank details and transactional data are not generally available. A solicitors' firm would not wish such information to be generally available.

(2)   The movements of a solicitor while acting for a client engaged in litigation are not generally in the public domain. A solicitor would not wish such information to be generally available, in particular because it is likely to reveal privileged information.

(3)   Those considerations would have been obvious to the reasonable recipient. They were emphasised by the surreptitious way in which the information was gathered and conveyed.

10A. The information was also private information, and information in respect of which the Claimant had a reasonable expectation of privacy.

11.   The Claimant cannot be sure if the Example Requests are the only instances on which its confidential information was requested and/or obtained, and reserves its right to supplement these Re-Re-Amended Particulars of Claim to the extent that further instances are discovered.

11A. In particular, in a period between about March 2020 and September 2020, the Claimant and others working on the Al Sadeq Litigation received a heightened number of spear-phishing emails. The Claimant does not presently know if any of these were successful and reserves the right to supplement these Re-Re-Amended Particulars of Claim to the extent that further information is uncovered.

11B. On or about 25 June 2020, the First Defendant met Mr Robinson outside the Goring Hotel in London. From there, they travelled in a minivan around Hyde Park. During the journey, the First Defendant:

    (1) informed Mr Robinson that they had a problem, in that the Claimant had discovered the nature of Mr Robinson's investigation;

    (2) warned Mr Robinson that there could be legal proceedings in respect of their activity;

    (3) asked Mr Robinson to destroy and/or sanitise any material which could connect the First Defendant or Mr Nicholas Del Rosso to any of the investigation work which Mr Robinson had carried out. By 'sanitise', the First Defendant intended, and Mr Robinson understood him to intend, that Mr Robinson would erase from any documents he held any detail linking the First Defendant and/or Mr Del Rosso to Mr Robinson's work and/or to remove any detail which could substantiate an allegation of wrongdoing against the First Defendant and/or Mr Del Rosso.

11C. It is therefore to be inferred that:

    (1) the First Defendant was in receipt of confidential information regarding the progress of the Claimant's investigations and intentions to commence litigation. The precise nature of the information the First Defendant obtained, and the manner in which the First Defendant obtained that information, remain unknown to the Claimant. The Claimant reserves the right to supplement these Re-Re-Amended Particulars of Claim to the extent that further information is uncovered.

    (2) the First Defendant instructed Mr Robinson to destroy and/or sanitise any material which could connect him or Mr Del Rosso to any of the investigation work in an attempt to eliminate any documentary record of their wrongdoing.

6

11D. The Claimant will rely upon the exchange with Mr Robinson as further evidence of Mr Grayson's awareness (and of the awareness of those instructing Mr Grayson) that his instructions to Mr Robinson involved the unlawful procuring of the Claimant's confidential and private information.

11E. At or about the same time as (and in any event subsequently to) the meeting on 25 June 2020, the First Defendant deleted his cloverdock@protonmail.com email account, which had been used inter alia to receive the Chart. It is to be inferred that:

   (1)   the First Defendant deleted his cloverdock@protonmail.com email account as part of an attempt to eliminate any documentary records he held;

   (2)   for the same reason, the First Defendant took further steps to delete his own records.

## Confidential information obtained by the First and Second Defendants

12.   Mr Robinson provided the confidential information, including that obtained from the Example Requests, to the First Defendant. In particular:

   (1)   In or about ~~early March~~ April 2020, Mr Robinson met the First Defendant in Sloane Square, London. Mr Robinson provided him with a hard copy print out of the information, and a USB stick containing the same information electronically.

   (2)   On other occasions, Mr Robinson sent the information using a Proton Mail encrypted email account to the address cloverdock@protonmail.com.

13.   The Claimant believes that, in requesting and/or receiving the information, the First Defendant was acting through the Second Defendant (being the company through which he appears to provide investigation services).

13A. The First Defendant provided the confidential information that the Claimant had discovered the wrongdoing perpetrated against it, and was planning legal proceedings, to Mr Robinson on or around 25 June 2020.

13B. There was no justification for any intrusion into the Claimant's privacy, and no public interest served by the intrusion.

7

<u>Confidential information obtained by the Third and Fourth Defendants</u>

14. The Claimant believes and avers that the Third and/or Fourth Defendants have accessed some or all of, and have misused, its confidential information, including that obtained from the Example Requests. The Claimant relies in particular on the following facts and matters:

(1) The Third Defendant is an investigation agent who has admitted being instructed by the Ruler of the Emirate in which the Claimant's client Mr Al Sadeq is detained, meeting the Ruler regularly (sometimes monthly) and alone. The Third Defendant made such admission in the course of giving evidence on behalf of the Ras Al Khaimah Investment Authority ("**RAKIA**") in High Court proceedings between RAKIA and Mr Farhad Azima (the "**Azima Action**") tried in January-February 2020 before Mr Andrew Lenon QC (sitting as a Deputy Judge of the High Court).

(2) In his judgment in the Azima Action — *Ras Al Khaimah Investment Authority v. Azima* [2020] EWHC 1327 (Ch) (the "**Azima Judgment**") — at paragraph 369 the Judge held that "*Mr Page operates in a world of covert surveillance in which agents acquire confidential information unlawfully and that Mr Page has dealings with such agents.*" He further found that "*it would be a reasonable inference … that Mr Page has access to agents with the capacity to hack emails.*"

(3) In the Azima Judgment, it was found that the Third Defendant was instructed by the Ruler to arrange covert surveillance monitoring and investigation of persons whom the Ruler viewed as adverse to him and/or RAK and/or RAKIA, and towards whom the Ruler felt hostile, including Mr Azima (see in particular paragraph 377 of the Azima Judgment). The Third Defendant briefed the Ruler on such projects by way of "*Project Updates*", which briefings were also provided to Mr Neil Gerrard of the law firm Dechert LLP (see in particular paragraphs 32, 266 and 273 of the Azima Judgment). Mr Gerrard and Dechert LLP are both defendants in the Al Sadeq Litigation, having carried out work in relation to Mr Al Sadeq on behalf of the Ruler and/or RAK and/or RAKIA in respect of which Mr Al Sadeq claims redress.

(4) The Claimant believes that the unlawful accessing of its confidential information has been caused or procured by those interested in and/or associated with the

8

defence of the Al Sadeq Litigation. The Azima Judgment shows the way in which the Third Defendant has provided his investigation and monitoring services for or on behalf of persons whom the Claimant avers have an interest in defeating the Al Sadeq claims or those acting for and/or associated with them.

(5) A public Internet Protocol address used to access the Claimant's confidential information has been geolocated to an address in the vicinity of the premises at 5-8 Sanctuary, London SW1P 3JS which were at material times the address of both the Third and Fourth Defendants.

(6) The Fourth Defendant is a company providing investigation services of which the Third Defendant is a director.

(7) The Claimant's lawyers saw the Third Defendant at close quarters at their hotel in Dubai when they were working on the Al Sadeq Litigation. They believe that the Third Defendant and/or his associates were at the time surveilling them.

(8) According to information provided by the Third Defendant through solicitors instructed by him (Stephenson Harwood) in a letter to the Claimant dated 28 July 2020, Mr Robinson has worked with the Third Defendant on a number of investigations and they have allegedly discussed merging their businesses. It is thereby to be inferred that Mr Page knows of and approves of Mr Robinson's business and methods, and vice versa. Mr Robinson's said business and methods include the wrongful accessing of the Claimant's confidential information, to which Mr Robinson has admitted in his affidavit, as set out above.

(9) Mr Robinson contacted the Third Defendant when Mr Robinson was served with an application for *Norwich Pharmacal* relief and an injunction arising out of the Example Requests (claim number QB-2020-002218).

(10) The Third Defendant offered to assist Mr Robinson with funding a lawyer in connection with defending such claim.

(11) Although, in a short affidavit sworn by the Third Defendant on 27 July 2020, the Third and Fourth Defendants appear to deny obtaining confidential information from the Claimant, the Third Defendant has previously failed to give a true account

9

of his discovery of information in High Court litigation, this being the finding in the Azima Judgment at paragraphs 355 to 356.

(12) In paragraph 64 of the Azima Judgment, the Third Defendant was described as "*an unsatisfactory and unreliable witness*" whose "*witness statement was misleading in relation to two significant matters*". The Deputy Judge concluded that "*it would be unsafe to rely on any evidence from [the Third Defendant] that was not corroborated by some other source.*"

(13) It is to be inferred that Mr Robinson contacted the Third Defendant as alleged above because they had a mutual interest in the proceedings concerning the Example Requests since the Third Defendant (and through him, the Fourth Defendant) was/were involved with, party to or otherwise complicit in the wrongdoing comprised within the Example Requests.

15. As providers of investigation services, it is to be assumed that each of the First to Fourth Defendants typically obtain information on the instructions of others, to whom they pass it on, rather than for their own use.

**Confidential information requested and/or obtained by the Fifth and Sixth Defendants**

14. The Fifth and/or Sixth Defendants have accessed, and/or conspired with others for the purpose of unlawfully accessing, confidential information of the Claimant. In particular:

   (1) In or about early February 2020, Mr Gerrard met Mr Page together with Mr Amir Handjani at the Royal Automobile Club in Pall Mall, London.

   (2) Mr Gerrard and Mr Handjani instructed Mr Page to find out who was funding the Al Sadeq Litigation.

   (3) At the time of these instructions, Mr Gerrard was aware that Mr Page had access to and was likely to utilise agents who were skilled in the unauthorised interception of communications, in particular an agent known as Amit Forlit:

      (i) Mr Forlit was and is a contractor who provided services through Insight Analysis and Research ("**Insight**"), an entity that uses hacking to obtain

10

information, and was also associated with another entity, SDC-Gadot ("**Gadot**"), which also uses hacking to obtain information.

(ii) Mr Forlit had on previous occasions provided reports to Mr Gerrard and Mr Page as part of investigations he conducted into Dr Khater Massaad and Mr Farhad Azima. The content of those reports (or some of it) was derived from the unauthorised interception of communications (that being a core part of Mr Forlit's intelligence gathering methodology, as Mr Gerrard knew).

(iii) Mr Page, Mr Forlit and Mr Gerrard had established a protocol through which Mr Forlit's reports were to be provided in order to leave no paper trail and ensure that the reports were destroyed after they had been read.

(iv) Mr Gerrard had also attended meetings with both Mr Forlit and Mr Page present. In particular, all three men had attended two meetings in Cyprus in October and November 2018, and a further meeting in a hotel outside Bern in Switzerland between 1 and 4 December 2019. The purpose of those meetings was to plan how to conceal Mr Forlit's role in obtaining unauthorised access to confidential information of Mr Farhad Azima.

(4) It is to be inferred that Mr Gerrard's expectation and intention was that unauthorised interception would be attempted again, when executing his instructions to find out who was funding the Al Sadeq Litigation.

(5) Shortly after the RAC meeting, phishing and/or spear phishing emails were received by the following individuals, each of whom is associated with the Al Sadeq Litigation:

(i) Ms Stirling (who had been assisting Mr Al Sadeq since November 2019);

(ii) Mr Alastair Tomson, a barrister practising out of 4 Stone Buildings, instructed as counsel by Mr Al Sadeq in the Al Sadeq Litigation;

(iii) Mr Nicholas Wright, a barrister practising out of 4 Stone Buildings, instructed as counsel by Mr Al Sadeq in the Al Sadeq Litigation;

(iv) Mr Tsiattalou; and

11

(v) Mr Barry Ley, an employee of Detained in Dubai.

(6) In or about April or May 2020, Mr Forlit produced a report responding to the instructions.

(7) Shortly thereafter, Mr Page showed the report to Mr Gerrard at a meeting arranged at a service station near Gatwick Airport.

(8) The meeting was arranged at this location because Mr Gerrard was aware of the clandestine nature of the report and Mr Gerrard believed that he could not easily be observed covertly at such a location.

15A. It is to be inferred from the facts and matters set out in paragraph 14 above and in paragraphs 19B and 19C below that such confidential information of the Claimant as was obtained by, through or at the instigation of the First and/or , Second , Third and/or Fourth Defendants was obtained at the request of and/or passed on to the Fifth and/or Sixth Defendants.

**Breaches of confidence and/or misuse of private information**

16. In the premises, the Claimant believes that the Defendants have each committed the wrong of breach of confidence by using its confidential information, in that they have procured access to and/or examined, made, retained and/or supplied copies of it and/or otherwise misused such information. The Claimant does not at present have full knowledge of the precise use of its confidential information, because of the clandestine nature of the conduct, and reserves the right to amend or supplement its claim as further details emerge through disclosure or otherwise.

17. As a result of such breaches, the Claimant has suffered loss and damage, in particular:

(1) loss of confidential information;

(2) ongoing costs of investigating the wrongdoing;

(3) ongoing costs of pursuing wrongdoers, including the defendants to claim QB-2020-002218.

12

The Claimant is entitled to and claims damages in respect of the foregoing. Full particulars will be supplied in due course.

18. Further or alternatively, the Claimant is entitled to and claims an account of the Defendants' profits from the said breaches of confidence, together with all necessary inquiries.

18A. In the premises, the Defendants each committed the wrong of misuse of private information.

18B. As a result of such breaches, the Claimant is entitled to and claims:

    (1)   compensation for the loss and damage suffered;

    (2)   an award for the lost right to control private information;

    (3)   aggravated damages.

**Unlawful means conspiracy**

*The First and Second Defendants*

19. As set out in paragraph 6, the First Defendant (and/or the Second Defendant to the extent that the First Defendant was acting on its behalf) agreed with Mr Robinson to commit the breaches of confidence described above. As set out in paragraph 7, Mr Robinson in turn agreed with Mr Gunning, who in turn agreed with Mr Oliver Moon. Loss was thereby caused to the Claimant. In the premises, the First and/or Second Defendants have committed the tort of conspiracy.

*The Third and Fourth Defendants*

19A. It is to be inferred that the Third and/or Fourth Defendants were party to the underlying conspiracy. This is to be inferred from:

    (1)   The matters alleged in paragraph 14 above.

    (2)   On 16 September 2020, Allen & Overy LLP sent a letter by email to Stephenson Harwood LLP (the "**Allen & Overy Letter**"). Allen & Overy LLP state: "*We*

13

understand from Mr Jamie Buchanan that your client, Mr Stuart Page [the Third Defendant], *has made a number of statements in communications that he had with Mr Buchanan in August and September 2020 that appear to refer to our clients, the Ruler and the Government of Ras Al Khaimah"*. Mr Jamie Buchanan, to whom the Third Defendant is said to have conveyed this message, is the former Chief Executive Officer of Ras Al Khaimah Development LLC, which holds and manages assets and liabilities previously owned by Ras Al Khaimah Investment Authority (an investment entity of RAK). The Allen & Overy Letter states:

"*your client* [sc. Mr Stuart Page, the Third Defendant] *referred to English High Court proceedings that have been commenced against him by Stokoe Partnership Solicitors and said: "if I have to implicate Nick / Patrick, Decherts, Neil and the boss to get me out of this I will." We understand that your client's reference to "the boss" is intended to be a reference to the Ruler.*"

(3)   It is to be inferred that:

(a)   "*Nick*" is Mr Del Rosso;

(b)   "*Patrick*" is the First Defendant;

(c)   "*Decherts*" is the Fifth Defendant;

(d)   "*Neil*" is the Sixth Defendant;

(e)   The Ruler of RAK is (as Allen & Overy LLP surmise) "*the boss*". Mr Al Sadeq alleges in the Al Sadeq Litigation that charges brought against him were politically motivated on the part of the Ruler.

(4)   The Allen & Overy Letter demonstrates that the Third Defendant has knowledge of the underlying wrongdoing against the Claimant, sufficient to enable him to implicate various individuals as wrongdoers. It is to be inferred that the Third Defendant obtained this information through his (and/or the Fourth Defendant's) participation in the underlying conspiracy to injure the Claimant by unlawful means.

14

(5)   By a WhatsApp message sent on 29 July 2020 at 1.50pm, the Third Defendant
wrote to his colleague Caroline Timberlake: "*Grayson is protecting NDR*". The
Third Defendant thereby demonstrated his knowledge of the background facts and
in particular that the First Defendant's activities in this matter were connected with
Nicholas Del Rosso. The First Defendant did not refer to Mr Del Rosso in these
proceedings until his Part 18 response dated 19 March 2021. The Third (and
therefore Fourth) Defendants were thus privy to the covert wrongdoing of the
First/Second Defendants and/or Mr Del Rosso.

### *The Fifth and Sixth Defendants*

19B. The First Defendant made the Example Requests, and the wider enquires pleaded at
paragraph 9, as part of his work for Mr Nicholas Del Rosso of Vital Management
Services, Inc. ("**Vital**"). This is apparent from the following facts:

(1)   The First Defendant was retained by Vital from about 2018. Pursuant to that
retainer, he signed a non-disclosure agreement made on and effective 30 August
2018 (the "**NDA**") for a term of 36 months. The term spans the matters in question
in these proceedings.

(2)   The First Defendant has stated in response to a Part 18 Request (and confirmed in
his witness statement dated 14 May 2021) that he was interested in the Claimant's
affairs due to an enquiry from Mr Del Rosso.

(3)   Mr Del Rosso paid Mr Robinson for his investigation into the Claimant.

(4)   Mr Del Rosso spoke to Mr Robinson by telephone on 1 July 2020, following
service of these proceedings on Mr Robinson. Mr Del Rosso asked Mr Robinson
not to mention his name.

(5)   Mr Del Rosso contributed to Mr Robinson's legal fees through his lawyer, Mr
Brandon Neuman, by way of a loan agreement.

19C. Mr Del Rosso's instruction of the First Defendant was made pursuant to an instruction
from Dechert and/or Mr Gerrard. This is to be inferred from the following facts:

15

(1) Mr Del Rosso provides consulting services through Vital. His enquiry is, for that reason, likely to have been on behalf of a client.

(2) Vital was retained by Dechert and instructed by Mr Gerrard from at least 2014. Mr Del Rosso admits to having paid $1 million to an Indian company, CyberRoot. An employee of CyberRoot admits to having hacked Mr Farhad Azima to obtain evidence for a civil claim which Dechert's client, RAKIA, subsequently brought against Mr Azima (the Azima Action). Dechert and Mr Gerrard therefore have the means and propensity to order such wrongdoing and rely upon Mr Del Rosso to carry it out.

(3) Mr Gerrard and Dechert are defendants to the Al Sadeq Litigation. Information sought was associated with and/or relevant to the Al Sadeq Litigation.

(4) Mr Gerrard gave false evidence in the Azima Action about his involvement with Mr Al Sadeq, suggesting that he was involved in clandestine and improper activity regarding Mr Al Sadeq.

(5) Dechert and Mr Gerrard were, at the time the First Defendant was actively seeking the information, interested in the funding of the Al Sadeq Litigation. Solicitors acting for Mr Gerrard and Dechert wrote to the Claimant asking a series of questions about the same on 16 April 2020.

(6) Parallel attempts were made to access the private affairs of Radha Stirling, Maltin PR and Hogan Lovells. Dechert and Mr Gerrard have direct interest in and links to the group targeted and the wider group in the Chart. Dechert and Mr Gerrard also have motive and means to investigate that group's private affairs. Paragraphs 9(2A) and 9A above are repeated.

(7) Matthew Banham is and was at all material times a Partner at Dechert. Mr Banham's areas of practice overlapped with Mr Gerrard's. Mr Banham was personally involved in investigating Radha Stirling. Mr Banham made his investigations via Ms Stirling's former colleague David Haigh up to at least early 2020. Ms Stirling is and was an advocate of the plight of Mr Al Sadeq.

16

(8)   Stuart Leach is a public relations adviser who worked at material times with Dechert. He was also involved in the process of investigating Ms Stirling via Mr Haigh.

(9)   Mr Page claims to hold information which would incriminate the First, Fifth and Sixth Defendants in the Claimant's case.

(10)  In their response dated 25 May 2021 to letters before claim dated 10 May 2021, the solicitors to the Fifth and Sixth Defendants (Enyo Law) declined to admit or deny the matters set out in sub-paragraphs (2) and (5) above, alleging instead that "*they appear to be makeweight points which take matters no further forwards.*"

(11)  Shortly after Mr Robinson was served with these proceedings, he sent certain of the claim documents to Mr Page. Mr Page sent those documents onto the Sixth Defendant.

(12)  As recorded in Allen & Overy LLP's letter to Stephenson Harwood LLP of 16 September 2020, Mr Page had earlier told Mr Jamie Buchanan: "*if I have to implicate Nick / Patrick, Decherts, Neil and the boss to get me out of this I will.*" Mr Page thereby (and long before his settlement of these proceedings with the Claimant) implied that the Fifth and Sixth Defendants were party to the wrongdoing.

19D.  It is further to be inferred that the First and Second Defendants took the actions detailed above pursuant to an agreement with Mr Del Rosso, the Fifth and/or Sixth Defendants. In the premises, the Fifth and Sixth Defendants have committed the tort of conspiracy.

## Damages

20.   The Claimant is entitled to and claims damages from the Defendants in respect of its resultant loss. Full particulars will be supplied in due course.

**Interest**

21. The Claimant further claims interest pursuant to section 35A of the Senior Courts Act 1981 on such sums as may be awarded to it at such rate(s) and for such period(s) as the Court deems fit.

*Norwich Pharmacal* and injunctive ~~Superseded~~ **relief**

22. In the Claim Form, the Claimant further sought injunctions and *Norwich Pharmacal* disclosure orders against ~~all the First~~ and Second ~~to Fourth~~ Defendants. By consent orders dated 24 July 2020 made by Mrs Justice Tipples, ~~the~~ those Defendants each gave undertakings in lieu of such orders. If and to the extent that those undertakings lapse, or prove insufficient, the Claimant maintains its claim for such relief.

22A. The Claimant applies for *Norwich Pharmacal* orders against the Fifth and Sixth Defendants requiring them to swear affidavits providing full information as to: (a) the identity of any persons ultimately providing them with instructions; (b) the extent of the confidential information that they have obtained from the Claimant; and (c) the identity of all persons to whom they have passed on the Claimant's confidential information.

AND the Claimant claims:

(1)  damages to be assessed;

(2)  an account of profits together with all necessary inquiries;

(3)  interest pursuant to statute;

(3A)  *Norwich Pharmacal* orders and/or other appropriate injunctive relief;

(4)  costs; and

(5)  further or other relief.

TIM LORD QC

GERARD ROTHSCHILD

FREDERICK WILMOT-SMITH

RICHARD HILL QC

GERARD ROTHSCHILD

FREDERICK WILMOT-SMITH

18

**Statement of truth**

The Claimant believes that the facts stated in these Re-Re-Amended Particulars of Claim are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed

Name      Haralambos Tsiattalou

Position   Partner

Dated     9 March 2022