**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
MISC. CIV. ACTION NO. 23-MC-5**

| | |
|---|---|
| *IN RE* APPLICATION OF CAMERON FINDLAY FOR AN ORDER UNDER 28 U.S.C. § 1782 TO CONDUCT DISCOVERY FOR USE IN FOREIGN PROCEEDINGS | **RESPONDENTS' MEMORANDUM OF LAW IN OPPOSITION TO § 1782 APPLICATION OF CAMERON FINDLAY** |

This Memorandum is submitted in opposition to the application by Cameron Findlay ("Findlay") (the "Application") to obtain discovery pursuant to 28 U.S.C. § 1782 from Nicholas Del Rosso ("Del Rosso") and Vital Management Services ("VMS" or "Vital") (collectively, "Respondents").

## INTRODUCTION

Cameron Findlay is an agent of the Eurasian Natural Resources Corporation ("ENRC") on a monthly retainer and paid at least £1.1 million by the ENRC as of May 24, 2021.[1] This Application was filed two weeks after Respondents publicly disclosed that the ENRC was improperly funding proxy litigation against Respondents and other third parties in a concerted effort to

---

[1] *ENRC v. Dechert LLP, et al.* [2022] EWHC 1138 (Comm), at ¶ 334; *see* Declaration of Brandon S. Neuman ("Neuman Decl."), **Ex. 1**.

1

frame Respondents for alleged hacking activity as part of the ENRC's efforts to get "revenge" on Dechert LLP ("Dechert") and Neil Gerrard ("Gerrard").

In his Application, Findlay purportedly seeks documents and testimony reflecting Respondents' alleged involvement in a scheme to hack data belonging to Findlay by non-parties: Dechert and Gerrard. The basis for Findlay's 527-page Application package is that, on February 23, 2023 (*i.e.*, one day before this Application was filed), an attorney for one of the ENRC's proxy litigants, Farhad Azima ("Azima"), falsely accused Respondents of participating in the hacking of Findlay. For the avoidance of doubt, Respondents had nothing to do with Findlay or any alleged hacking, and, instead, there is substantial evidence that:

- The ENRC has been funding improper litigation activity against Dechert, Gerrard, and their contractors, including funding Azima's litigation activity since 2018, *see In re Application of Al Sadeq, et al.*, No. 21-mc-6, at D.E. 28, pp.7–9;

- Azima and his agents, including Jonas Rey (through his companies Diligence and Athena Intelligence) and Aditya Jain, stole the confidential bank records of CyberRoot Risk Advisory Private Limited ("CyberRoot") in June or July of 2020, *see id.* at pp.9–11);

- In August and September 2020, the same attorney who purportedly provided notice to Findlay (Dominic Holden) and Aditya Jain unsuccessfully attempted to pressure a former CyberRoot employee (Vikash Pandey) into accepting substantial payments to provide false testimony and "frame CyberRoot in the hacking of Azima," *see* Neuman Decl., **Ex. 2**, at ¶40

2

- Azima used the stolen transactional data to create a false timeline against Respondents, and Azima's co-conspirators published CyberRoot's confidential bank records under false pretenses, similarly through a non-party's 28 U.S.C. § 1782 Application, *see In re Application of Al Sadeq, et al.*, No. 21-mc-6, at D.E. 28, pp.9–11; and

- Despite knowing that Vikash Pandey repeatedly denied that CyberRoot was involved in hacking Azima, Azima and his agents provided a false report of the Pandey's "admissions" through a now-debunked witness statement of Jonas Rey," *see* Neuman Decl., **Ex. 3**, at ¶¶32–51.

Unfortunately, it appears that Findlay's Application is the continuation of coordinated efforts by the ENRC and its co-conspirators to coerce Respondents and fish for information they can use in their dispute with Dechert. Under these extraordinary circumstances, the Respondents respectfully request that the Court scrutinize Findlay's coordination with the ENRC and its proxy litigants and deny the Application for several reasons.

***First***, Findlay's Application is not based on a pending lawsuit or credible indicia that Respondents were involved in alleged hacking activity and, instead, is premised on a pretextual letter sent the day before by Azima's U.K. counsel. As noted herein, Azima and his co-conspirators have stolen confidential records, used the stolen information to pursue bad faith claims against Respondents,[2] and have aggressively pursued expansive and improper discovery against Respondents and others, from which Respondents and several third parties have sought protection from the Court. Given the clear

---

[2] *See Azima v. Del Rosso, et al.*, No. 20-cv-954 (M.D.N.C.) (the "Azima Action").

coordination between Findlay and, at least Azima's legal team, the Court should deny the Application as a transparent effort to circumvent the pending motions in the Azima Action.

**Second**, it appears that Findlay's true motivation for seeking testimony from Respondents is not to seek damages for, *inter alia*, the emotional distress from having his computer hacked, as he alleges. Neither is it to assist Azima in pursuing his own damage claim. Rather, both Findlay and Azima have been engaged in a coordinated campaign to seek discovery to assist the ENRC in another wholly unrelated lawsuit. As reflected below, the ENRC paid Findlay over £1 million to assist the ENRC in that litigation. Similarly, Del Rosso was advised explicitly by a representative of the ENRC that the Azima Action was being funded by the ENRC, further underscoring its intent to coerce Respondents into providing information which the ENRC could use in its unrelated lawsuit against a third party—Dechert.

**Finally**, and as demonstrated below, Findlay admits that his entire reason for seeking discovery from Respondents—who are not even alleged by Findlay to have committed any wrongful act as to Findlay—is predicated on allegations proffered by Azima's counsel. However, these allegations are based on false testimony, stolen bank records, and flatly contradictory factual theories.

4

Each of these reasons, together or standing alone, render Findlay's Application fatally deficient. Resultingly, it should be rejected in full.

## BACKGROUND

### A.    Findlay And His Role Assisting The ENRC.

In 2017, the ENRC filed a lawsuit in the High Court of Justice of England and Wales ("English High Court") alleging that Dechert and one of its partners, Neil Gerrard, engaged in a concerted campaign to damage the ENRC by leaking false and defamatory allegations to law enforcement officials in the United Kingdom (the "ENRC Action"). *See* Neuman Decl., **Ex. 1**, ¶9. According to the allegations in the ENRC Action, this was done while Dechert and Gerrard were representing the ENRC as part of a scheme that would spur an investigation into the ENRC and generate significant legal fees for Dechert and Gerrard. *Id.* One of the individuals who was alleged to have carried out this deceit was Cameron Findlay, who was named as a defendant in the ENRC Action, and was alleged to have been instrumental in leaking the confidential data to United Kingdom ("U.K.") law enforcement officials with the Serious Fraud Office ("SFO"). *See id.* at ¶¶330–331.

Ultimately, the ENRC settled its claims as to Findlay. *See id.* at ¶51(3). But instead of obtaining money damages and costs from Findlay, as originally sought when ENRC filed the case, the ENRC paid Findlay over £1 million as of May 2021 for his assistance in efforts for the ENRC to pursue claims against

Dechert and Gerrard. *See id.* at ¶334. As promised as part of his "cooperation" agreement with the ENRC, Findlay provided evidence against Dechert and Gerrard in the ENRC Action and alleged that he had, in fact, assisted them in leaking information to the SFO. Dechert and Gerrard strongly dispute Findlay's allegations. The English High Court seriously questioned Findlay's credibility, however, commenting that:

> on 19 February 2018 Mr. Findlay entered into a Settlement Agreement with ENRC by which, first, the claim against him was discontinued with no order as to costs. Second, the Settlement Agreement went on to provide for the delivery of services to ENRC by Mr. Findlay over the period of the SFO investigation, including the bringing of any charges against ENRC. The services included having meetings, giving advice, producing signed [witness statements] and giving evidence in court. In return, Mr. Findlay would be paid £210,000 for the first three months and then a monthly retainer of £12,000 plus expenses. The Settlement Agreement was signed on behalf of ENRC by Mr. Vulis. It was later varied so that Mr. Findlay would receive payments grossed up to include his tax liability thereon. In neither of his [witness statements] dated 11 December 2020 and 20 February 2021 filed for this trial did Mr. Findlay deign to say how much in total he had by then received from ENRC pursuant to the Settlement Agreement. In fact, and as at 24 May 2021, it was £1,145,484.

*Id.*

Findlay now asks this Court to approve his current Application to obtain further evidence against Dechert and Gerrard. He explicitly admits that, even though he has not filed an action against any party (and has no intention of suing Respondents (*see* D.E. 3, ¶6.1)), he is desirous of obtaining information as to Dechert and Gerrard to show that they were involved in a hacking

6

campaign. This is purportedly based on the notion that, because Respondents were falsely accused by Azima of hacking Azima's computer, they therefore must also be involved in hacking Findlay's computer. This tortured theory is offered even though there is no credible evidence (or even a plausible allegation) that, even if Dechert and/or Gerrard had some involvement in the hacking of Findlay's computer, they acted with the assistance or involvement of either Del Rosso or VMS.

**B. Findlay Admitted That His Application Is Based On Coordination With Azima, Who Was Also Paid By The ENRC And Who Tried To Pressure Del Rosso And VMS Specifically To "Cooperate" With The ENRC.**

Findlay's Application also represents a transparent coordination with counsel for Azima who—like Findlay—is receiving financial incentives to assist the ENRC. Referring to Azima, Findlay explains how the evidence supporting the Application comes from "counsel for one of the plaintiffs bringing a lawsuit against Gerrard and Dechert," (D.E. 2, p.3; *see also* D.E. 3, ¶5.16), and then goes on to show how it is inextricably intertwined with litigation involving Azima. (*See* D.E. 3, ¶5.8 (detailing Azima litigation against Dechert and Azima and how it supports Findlay's Application)).

In doing so, however, Findlay, tries to mask the real connection with Azima, offering a dubious view as to how he came to file his Application. Supposedly, Azima's counsel wrote to Findlay's counsel after reviewing

Findlay's testimony in the ENRC Action and learning of Findlay's email address, which Azima's counsel then discovered was possibly the subject of a hacking operation by Dechert and Gerrard based on "anonymous" sources. (D.E. 3, ¶5.16). In fact, the connection between Findlay and Azima is far more direct: both are being paid by the ENRC to provide information as to Dechert and Gerrard and are obviously coordinating their efforts to pressure Del Rosso and VMS to provide information to assist in that effort. There is nothing happenstance about how Findlay and Azima's collective efforts of harassment targeted at Respondents somehow fell into lockstep with one another.

By way of further background, while the ENRC Action was pending, Azima was similarly pursuing allegations against Dechert and Gerrard in the English High Court, where Azima was sued by the Ras al Khaimah Investment Authority ("RAKIA"), the sovereign wealth fund for the government of RAK. *See RAK Inv. Auth. v. Azima,* Claim No. HC-2016-002798 (filed Sept. 30, 2016). RAKIA alleged that Azima was involved in substantial fraud, bribery, and corruption directed at RAK. *Id.* The English High Court ultimately ruled that Azima had indeed been involved in bribery and fraud. *RAK Inv. Auth. v. Azima* [2020] EWHC 1327 (Ch), ¶¶159, 246, 250, 381. It also concluded that Azima's testimony was "frequently inconsistent with the contemporaneous documents," "inherently implausible," and at times "untruthful." *Id.* ¶¶ 70–71, 127. The English High Court also found that Azima backdated documents to fabricate

8

his dispute with RAK, fraudulently induced RAKIA to settle its dispute with Azima for millions of dollars, conspired to misappropriate $1,500,000 from RAKIA when a hotel in Georgia was being sold, committed bribery, and devised a "sham" written agreement to "conceal that misappropriation." *Id.* ¶¶ 93, 117, 138–42, 1891, 237, 247–50.

Azima, in turn, defended the lawsuit by filing counterclaims alleging that RAKIA and those assisting it—namely, Dechert, Gerrard, and others—had engaged in a concerted campaign to hack Azima's emails and confidential documents, which were then used to sue Azima and recover the multi-million judgment against him. *(See* D.E. 3-5). Azima again made the same claim in the lawsuit filed in this Court in the Azima Action in October 2020—the only difference being that he relied on U.S. law in seeking damages for the alleged hacking and republication of his data. In the Azima Action, Azima alleges that data relied upon by the English High Court in finding that Azima had engaged in massive fraud directed at RAK constitutes "trade secrets" under North Carolina's Trade Secret Protection Act. *See* Azima Action, D.E. 1. This Court summarily dismissed nine of Azima's eleven claims against Del Rosso and VMS in that action, and substantially limited the two remaining claims. *See id.* at D.E. 65.

Prior to Azima suing Del Rosso and VMS in this Court, the ENRC told Del Rosso directly that it was in fact bankrolling Azima and was behind efforts

to persuade Del Rosso to provide evidence against Dechert and Gerrard. On June 6, 2020, an individual with whom Del Rosso was acquainted, Yuri Koshkin, called Del Rosso to tell him that he had been approached by a representative of the ENRC, Dimitri Vozionav, who is a non-lawyer legal project coordinator and consultant that manages the ENRC's strategy in several matters. Koshkin told Del Rosso that he had been told explicitly by Vozionav that the ENRC is "bankroll[ing]" Azima. *See* Neuman Decl., **Ex. 4**, at Ex. A, p.3. Koshkin also disclosed to Del Rosso the deal which had been struck between the ENRC and Azima in return for the ENRC funding Azima's litigation. Koshkin explained that Vozionav:

> would cooperate with anyone who was fighting with Neil [Gerrard]. He said Azima came to them sometime in 2018 and put his position on the table saying that they had common interest in . . . cornering Neil [Gerrard], explaining that this was his MO, that he made a lot of people unhappy, and that he was prepared to tell them everything that he knew and share all information he had to facilitate their case. So, essentially, it was money in exchange for information.

*Id.*, p.4.

The ENRC later tried more forcefully to enlist Del Rosso's assistance in developing information regarding Dechert and Gerrard. On October 13, 2020**,** Azima's counsel sent Del Rosso's counsel a draft complaint of the Azima Action, alleging that Del Rosso was involved in an effort with Dechert and Gerrard to "hack" information from Azima. *See* Neuman Decl., **Ex. 5** (M&C Oct. 13, 2020

10

letter w/attached draft Complaint). In the letter transmitting the draft complaint, which was ultimately filed in this Court on October 15, 2020, Azima's counsel noted that his client is not interested in damages for publishing trade secrets, but rather is interested in information that could be used in pursuing Dechert and Gerrard. Specifically, the letter stated "[i]f you are willing to cooperate fully with us in recovering damages from those involved, we will consider releasing you from Mr. Azima's claims in all jurisdictions." *Id*.

Around the same time, the same individual who previously approached Del Rosso on behalf of the ENRC, Yuri Koshkin, again contacted Del Rosso by text message. *See* Neuman Decl., **Ex.** 4, at Ex. C6. Koshkin told Del Rosso that the ENRC's representative, Vozionav, was "authorized to negotiate on Azima's behalf," and wanted to let Del Rosso know "what [the ENRC is] offering and expecting in return." *Id*. at p.1. Significantly, referring to the same draft complaint received the day before from Azima's counsel, Koshkin told Del Rosso that "[Vozionav] told me you should have received a draft suit." *Id*. at 2. Koshkin then forward to Del Rosso the identical draft complaint Azima's counsel had sent the day before. *Id*. Del Rosso was told that the ENRC would give him 48 hours to respond to the offer by Azima's counsel to provide information in lieu of being sued. *Id*. at p.4. When Del Rosso failed to accept

the "offer," Azima filed suit two days later, on October 15, 2020. *See* Azima Action, D.E. 1.

**C. Findlay's Efforts To Obtain Discovery From Del Rosso And VMS Follows Disclosures That The Evidence Relied Upon By Findlay Is Based On Efforts To Solicit False Testimony, Stolen Bank Records, And False Representations Made To This Court.**

In Findlay's Application, he admits that it is based on information obtained from Azima's counsel, and even attaches a copy of the correspondence from Azima's counsel inviting Findlay to take action. (*See* D.E. 3-11). Azima's correspondence with Findlay again trots out the spurious allegation in the Azima Action against Del Rosso and VMS that "Vital was hired by Dechert LLP through partner Neil Gerrard on behalf of RAKIA, and Defendants then hired CyberRoot Risk Advisory Private Limited ("CyberRoot") to provide the technical support necessary to hack Azima." *See* Azima Action, D.E. 1, ¶2. Correspondence from Azima's counsel to Findlay again stresses the CyberRoot connection, by alleging that evidence has been adduced showing that Del Rosso and VMS paid CyberRoot substantial sums specifically in relation to hacking Azima's computer. (*See* D.E. 3-11).

But this is the same CyberRoot allegation which Respondents have already shown to have been based on false testimony and stolen evidence. In fact, the author of the letter relied upon by Findlay, Dominic Holden, is the

same individual who previously tried to bribe a witness to provide false testimony about CyberRoot, to support allegations of a "hacking operation."

More specifically, Mr. Holden previously presented a sworn affidavit by Jonas Rey in the English High Court proceedings involving Azima, seeking a re-trial of his hacking counterclaims. *See* Neuman Decl., **Ex. 3**, ¶29, and Ex. E[3] thereto). Mr. Rey swore under penalty of perjury that he had learned from Vikash Pandey that CyberRoot was behind the hacking of Azima's computers. *See id*. at Ex. E, ¶15 (Rey). Pandey, in turn, submitted two sworn declarations in the Azima Action attesting to the fact that he had made no such statement to Rey, and in fact, had been contacted by both Rey and Azima's lawyer, and subjected to the same gameplan employed by the ENRC with Findlay, and unsuccessfully tried with Del Rosso; Rey and Azima's counsel threatened to file a lawsuit against Pandey accusing him of having engaged in the hacking operation, or, if Pandey would cooperate, no lawsuit would be filed, and Pandey would receive a lucrative consulting contract worth approximately $500,000 by simply "cooperating" with Azima's counsel. *See* Neuman Decl., **Exs. 2** and **3**. Pandey declined the offer. *See* Neuman Decl., **Ex. 2**, ¶40; Neuman Decl., **Ex. 3**, at Ex. E, ¶¶ 27–28 (Rey).

---

[3] Ex. E to Ex. 3 of the Neuman Decl. contains both the "Twelfth Witness Statement of Dominic Holden" *and* the "Witness Statement of Jonas Rey".

13

The second basis for the Application fares no better. There, Findlay sets forth bank records supposedly showing that Pandey's former employer, CyberRoot, was paid approximately $1 million to engage in a hacking operation directed by Dechert and Gerrard. As this Court will recall, another application filed under § 1782 by the Stokoe Law Firm, seeking the same relief as Findlay, claimed to be in possession of those same bank records which they claimed had been obtained from an anonymous "whistleblower." *See In re Application of Al Sadeq, et al.*, No. 21-mc-6, at D.E. 4, ¶32 (M.D.N.C. filed Feb. 5, 2021) (hereinafter, the "Al Sadeq/Stokoe Application"). It has now been publicly reported that the Stokoe Law Firm—like Findlay and Azima—are being paid by ENRC. *See* Neuman Decl., Ex. 7 (March 3, 2023 Law360 Article, titled "ENRC Behind Hacking And Torture Suits, Ex-Dechert Pro Says").

Moreover, in the Azima Action, Del Rosso and VMS exposed the falsity of the above statements. *See* Azima Action, D.E. 157, pp.6–7 (explaining how Azima's agents unlawfully obtained CyberRoot's bank statements); D.E. 160 (WhatsApp Messages with Kotak Mahindra bank employees demonstrating bribery and awareness of confidential information by Azima's agents in June 2020); D.E. 159-3 (Action Taken Report prepared by Indian law enforcement, including sworn witness statements); D.E. 159-4 (CyberRoot Complaint); D.E. 159-5 (First Information Report filed by Indian law enforcement); *see also* Neuman Decl., **Exs. 7, 8, 9, 10, 11.** Del Rosso and VMS similarly provided this

14

information in their motion for this Court to reconsider their motion to quash the Stokoe Law Firm's § 1782 application. *See* Al Sadeq/Stokoe Application, at D.E. 26-2–5. Thus, contrary to the Stokoe Law Firm's sworn representations, the bank records referenced by the Stokoe Law Firm were not innocently obtained from a "whistleblower"—rather, they were illegally obtained by Azima's agents, used to create a false timeline and theory against Respondents, and filed in this Court in support of the Stokoe Law Firm's § 1782 application after Azima failed to obtain expedited discovery to cover their knowledge of the stolen data.

### D. Findlay's Application Is Based On False Allegations And Assumptions.

As shown above, the representations made to this Court regarding Rey and the CyberRoot bank statements, upon which Findlay's Application is predicated, are false. As if that were not enough, the falsity of the entire theory pursued by the ENRC and Azima in order to pressure Del Rosso, VMS, and Pandey to provide evidence against Dechert and Gerrard should have been known well before now. (*See, e.g.*, Neuman Decl, **Ex. 2**, ¶¶17–40 (detailing extensive direct interaction with counsel for Azima during which Pandey denied his or CyberRoot's involvement in the hacking of Azima)). Here, Findlay purports to use the same "source" for his Application. But this neglects the fact that the theory has all been flatly refuted by evidence Azima and his same

counsel, Mr. Holden, themselves provided to the English High Court. This information was publicly available at the time that Findlay filed this Application.

Contrary to Azima's false, debunked accusations, Respondents' limited involvement in assisting Dechert retrieve the data at issue occurred *after* it was publicly available. At the U.K. trial in 2020 between Azima and Dechert/Gerrard, Del Rosso testified that: (1) he was not involved in hacking any information from Azima; (2) he was told that another individual, Stuart Page, had provided Gerrard with publicly available links to information relating to Azima; and (3) that Gerrard passed that information on to Del Rosso. *See* Neuman Decl., **Exs.** ~~12 and 13~~**11, at Exs. A and B.** (Del Rosso's First and Second Witness Statements, respectively). The English Court deemed Del Rosso's testimony, which was subject to cross-examination, credible. *See RAK Inv. Auth. v. Azima* [2020] EWHC 1327 (Ch), at ¶69.

Indeed, after the U.K. Court ruled against Azima, he and his co-conspirators appear to have "settled" claims against Page, and—as he tried unsuccessfully to do with Del Rosso, VMS, and Pandey—entered  into a "cooperation" agreement with Page. This time, instead of "bankrolling" a lawsuit as the ENRC did with Azima, Page was dismissed as a defendant in the U.K. case and told that he would be "looked after" if he gave evidence against Gerrard. *See* **Ex. 7** (Law360 Article). But instead of testifying that data

16

allegedly "hacked" from Azima had come from Del Rosso, VMS, or CyberRoot, Page corroborated Del Rosso's testimony given at the U.K. trial—namely, that the data was publicly available on links provided by Page. Specifically, correcting his earlier false testimony at the U.K. trial (that he had been told about the information from an Israeli journalist named Halabi), he testified that:

> [i]n August 2016, Amit [Forlit] provided to me the link to a tranche of Mr. Azima's confidential data. To the best of my recollection, he shared the link with me using Signal. I do not know whether Amit found the data or whether he was passing on information that had been found by one of his analysts, but at the time I did not believe that Amit or his team had been involved in unlawfully accessing or disseminating the data. I then passed on the information to Jamie and Neil [Gerrard] for their further handling.

(D.E. 3-8, at ¶34).[4]  Page therefore corroborated Del Rosso's testimony that when he (Del Rosso) received links to the data from Gerrard, Gerrard told him that it had come from Page, and there was no indication that any of the data had been hacked by Del Rosso or VMS from Azima's computers.

Findlay's motivations for filing this Application seem to be another money-for-information deal struck with the ENRC, for which he had been paid over £1 million as of two years ago as part of the ENRC's vendetta against

---

[4] Because Del Rosso had no dealings with Amit Forlit or his company, Insight, he has no knowledge whether Forlit was in fact the source of the links ultimately provided by Page to Gerrard, and subsequently passed on to Del Rosso.

Dechert and Gerrard. Whatever merit the ENRC's claims against Dechert and Gerrard may have, it is fundamentally unfair for the ENRC, Findlay, Azima, the Stokoe Firm, and their respective bevy of lawyers to harass and make false allegations against Del Rosso and VMS, seeking to pressure them into cooperating in the ENRC's campaign against Dechert and Gerrard. It is also a gross miscarriage of justice for that same group to try to circumvent rulings by this Court, which dismissed all allegations of hacking against Del Rosso and VMS, and which is currently considering multiple discovery motions regarding the same information Findlay now seeks.

## ARGUMENT

### I.  STANDARD UNDER 28 U.S.C. § 1782

The Court should deny Findlay's Application because, on its face, it reflects numerous insurmountable deficiencies and an improper use of the discovery process. As the Application fails to show why discovery is warranted, it should be denied in its entirety. Subjecting Del Rosso and VMS to baseless discovery grounded solely in misappropriated "evidence" and false theories would be unduly burdensome and extremely oppressive.

Even when an applicant meets the baseline statutory prerequisites under 28 U.S.C. § 1782, the Court still has broad discretion to deny the request. The Supreme Court recognized this discretion when it set forth a list of non-exclusive factors in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241,

18

264–65 (2004). In reaffirming a reviewing court's power to deny a § 1782 application, the *Intel* court provided four additional considerations: (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding;" (2) the "nature of the foreign tribunal," along with the "character of the proceedings underway abroad," and the "receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance;" (3) whether the "request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States;" and (4) whether the request is "unduly intrusive or burdensome." *Id.*

Findlay's' Application fails for a multitude of reasons, including (1) that it would create a severe burden on both Del Rosso and VMS, (2) there is no colorable set of facts likely to be adduced by Findlay to support any alleged involvement of Del Rosso or VMS in hacking Findlay's computers, (3) U.K. courts do not allow the depositions Findlay seeks, and (4) perhaps most importantly, the entire basis of the Application is premised on illegally-obtained evidence and theories Findlay and his co-conspirators know (or should know) to be false. Each of these circumstances, standing alone, supports the denial of the Application.

## II. THE REQUEST SHOULD BE DENIED FOR ATTEMPTING TO CIRCUMVENT RULINGS BY THIS COURT AS TO DEL ROSSO AND VMS

There are at least three reasons to deny Findlay's Application: it is (A) made in bad faith; (B) based on illegally-obtained evidence and theories known to be false, and (C) part of an oppressive and abusive discovery plan and burden intended to bludgeon Respondents into providing evidence in support of a third party. Each of these grounds are addressed in turn below.

## A. Because Findlay's Application Is Made In Bad Faith, It Should Be Denied.

In considering a § 1782 application, courts consider whether it is made in bad faith. As the Second Circuit has opined, "[o]f course, if the district court determines that a party's discovery application under section 1782 is made in bad faith, for the purpose of harassment, or unreasonably seeks cumulative or irrelevant materials, the court is free to deny the application in toto, just as it can if discovery was sought in bad faith in domestic litigation." *Euromepa S.A. v. R. Esmerian*, Inc., 51 F.3d 1095, 1101 n.6 (2d Cir. 1995).

Moreover, if a party's true purpose in issuing a discovery request is for seeking information for use in a matter different than the one at hand, then the request is properly denied. *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 364 n.17 (1978). Similarly, if a party's discovery request amounts to nothing more than a fishing expedition with only a "hope" of uncovering wrongful actions, then it too should be denied. *See Elsayed v. Fam. Fare LLC*, No. 1:18CV1045, 2019 WL 8586708, at *4 (M.D.N.C. Oct. 31, 2019).

Here, it is apparent that the real motivation behind the Application is to circumvent this Court's dismissal of hacking claims against Del Rosso and VMS by seeking discovery which Findlay well knows is currently the subject of pending discovery motions in the Azima Action. *See, e.g.,* Azima Action, D.E. 142, 157, 216. It would be a perversion of justice if Findlay were able to obtain discovery from Del Rosso and VMS, obviously for the purpose of assisting ENRC and Azima, that those parties would not be entitled to obtain themselves.

## B. The Entire Factual "Basis" For Findlay's Application Is Flawed.

As previously shown, Findlay's Application is based on illegally obtained evidence, spurious and speculative assumptions, and misrepresentations previously made to this Court. In *Intel*, the Supreme Court stated that a court which is asked to rule on a § 1782 Application may consider whether the request "conceals an attempt to circumvent foreign proof-gathering limits or other policies of a foreign country or the United States." 542 U.S. at 244. Courts in the U.K. would not countenance an application based on false statements, stolen bank records, and false statements to the court. Neither should this Court.

Even assuming *arguendo* that Findlay's purported "evidence" were somehow acceptable in a U.K. court, it does not mean that this Court should

automatically accept this purported evidence or this Application. Courts in the U.S. regularly reject § 1782 applications which fly in the face of the Federal Rules of Civil Procedure. *See In re Palantir Techs. Inc.*, No. 22-mc-00062, 2022 WL 2356298, at *8 (D. Colo. June 30, 2022) ("Thus, even assuming that the statutory requirements are met and certain of the discretionary factors listed by the Supreme Court in *Intel* would militate in favor of allowing discovery, discovery should not be permitted under § 1782 if the requested discovery would not normally be available under the Federal Rules of Civil Procedure in an American proceeding."); *Heraeus Kulzer, GMBH v. Biomet, Inc.*, 633 F.3d 591, 595 (7th Cir. 2011) (noting the interplay between the statutory requirements of § 1782 and Federal Rules of Civil Procedure 26 and 45).

The infirmities of Findlay's Application are further compounded by the fact that U.K. courts would not permit Findlay to conduct pre-trial depositions. Other courts across the U.S. have found this reality to be dispositive of the third *Intel* factor. *See In re WildBrain Family International Limited*, No. 19-MC-527, 2020 WL 6135765, at *2 (S.D.N.Y. Oct. 19, 2020) (explaining that "[t]he 'nature' and 'character' of the UK proceedings are not such that they include live pretrial testimony, but only witness statements" and concluding that "ordering live testimony would be in tension with the proof-gathering procedures that govern the UK tribunal overseeing this dispute"). When a § 1782 application seeks that which is otherwise unobtainable in a foreign

court, domestic courts will regularly deny them. *See Saint-Gobain Adfors S.A.S. v. 3M Co.*, No. 20-mc-00052, 2020 WL 6111632, at \*6 (D. Minn. Oct. 16, 2020) (denying a § 1782 application which sought to obtain information of a far "greater scope . . . than would be permitted by the UK Court."). Findlay's Application seeks information in a form and fashion which neither U.K. nor U.S. courts would allow.

Considering this Application's basis in, among other things, false narratives, improperly obtained evidence, and false statements, coupled with the history and collusive nature of Findlay's relations with Azima and the ENRC, the improper essence of this Application is laid bare for all to see. Accordingly, Findlay's Application should be denied in its entirety.

**C.     The Discovery Sought By Findlay Should Be Denied Because It Is Part Of A Concerted Effort To Pressure Del Rosso And VMS Through Burdensome, Oppressive, And Abusive Discovery.**

Finally, Findlay's Application should be denied for another reason. "[U]nduly intrusive or burdensome requests may be rejected or trimmed." *Intel*, 542 U.S. at 245 (first citing *Bayer,* 146 F.3d, at 196 (remanding for district-court consideration of "appropriate measures, if needed, to protect the confidentiality of materials"); and the citing *In re Application of Esses,* 101 F.3d 873, 876 (C.A.2 1996) (affirming limited discovery that is neither "burdensome [n]or duplicative")).

It is telling that Findlay's Application parrots the unfounded and debunked claims of Azima and others, while presenting little more than conjecture and speculation. Setting aside the baseless "evidence" which, as previously shown, was either improperly obtained or is outright false, "mere speculation or conjecture" are not grounds for a valid discovery request. *See Neogenix Oncology, Inc. v. Gordon*, No. CV 14-4427, 2017 WL 1207558, at *10–12 (E.D.N.Y. Mar. 31, 2017) (denying motion to compel, finding "conjecture" and "speculation" insufficient for movant to meet his burden under Rule 26). Accordingly, Findlay's vague and unsubstantiated theories and speculative litigation against Dechert and Gerrard in the U.K. should not serve as a bases for the discovery he now seeks. *See generally In re Blue Oil Trading Ltd.,* No. 3:09-mc-152-RJC, 2009 WL 3247854, at *2 (W.D.N.C. Oct. 5, 2009) (denying § 1782 application where "several of the document requests and depositions seek information that is general in nature and not focused specifically on the UK litigation").

Moreover, Findlay's requested discovery would impose an undue burden on Respondents, as this discovery is more properly sought from Dechert or Gerrard, which can be done in the U.K. *See In re Elliott Assocs. L.P.*, No. 3:21-mc-00160-RJC-DSC, 2022 WL 1159692, at *4–5 (W.D.N.C. Apr. 19, 2022) (finding fourth *Intel* factor weighed against applicant where applicant "could obtain requested from other sources" in Germany). As non-parties to Findlay's

24

speculative litigation in the U.K., Respondents should not be forced to fend off yet another ENRC-funded litigant/applicant in their attempt to pressure Respondents into providing information on Dechert and Gerrard. Indeed, "§ 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad." *In re Blue Oil Trading Ltd.*, No. 3:09MC152-RJC, 2009 WL 3247854 (W.D.N.C. Oct. 5, 2009) (citation omitted).

In addition to lacking any colorable grounds for relief, Findlay's Application creates a further undue burden for Del Rosso and VMS by seeking to force them to—yet again—state what Findlay already knows to be true; *the information sought simply does not exist*. Bearing in mind that Del Rosso and VMS are non-parties to Findlay's (currently speculative) suit against Gerrard and Dechert, this status further points to the unduly burdensome nature of this Application. Indeed, in determining if discovery poses an undue burden a court will look at whether "the benefits of discovery to the requesting party outweigh the burdens on the recipient." *Spring v. Bd. of Trustees of Cape Fear Cmty. Coll.*, No. 7:15-CV-84-BO, 2016 WL 4204153, at *1 (E.D.N.C. Aug. 8, 2016). Where the recipient is a non-party to the suit, that non-party status is afforded "special weight." *Va. Dep't of Corrections v. Jordan*, 921 F.3d 180, 188 (4th Cir. 2019).

In sum, Respondents request that this Court—in considering the burden on Respondents—consider the present § 1782 Application in its full context, as recited in this Opposition.  This coordinated campaign intended to drown Del Rosso and VMS in discovery requests in furtherance of Azima and the ENRC's vendetta against Dechert and Gerrard should not be permitted to persist.

## CONCLUSION

For all the reasons explained above, Respondents respectfully request that this Court deny Findlay's § 1782 Application.


Respectfully submitted, this the 29th day of May 2023.


**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By:    */s/ Brandon S. Neuman*
Brandon S. Neuman, NCSB# 33590
John E. Branch III, NCSB# 32598
Sam Rosenthal (*pro hac vice*)
J. Matthew Gorga, NCSB# 56793
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
Telephone: (919) 329-3800
Facsimile: (919) 329-3799
brandon.neuman@nelsonmullins.com
john.branch@nelsonmullins.com
sam.rosenthal@nelsonmullins.com
matt.gorga@nelsonmullins.com
*Counsel for Respondents*

26

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of May 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send electronic notification of filing to the following:

Clay C. Wheeler
Kilpatrick Townsend & Stockton LLP
1001 West Fourth Street
Winston-Salem, NC 27101-2400
T: (336) 607-7333
cwheeler@kilpatricktownsend.com

*Attorney for Applicant Cameron Findlay*

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By:     */s/ Brandon S. Neuman*
Brandon S. Neuman, NCSB# 33590
John E. Branch III, NCSB# 32598
Sam Rosenthal (*pro hac vice*)
J. Matthew Gorga, NCSB# 56793
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
Telephone: (919) 329-3800
Facsimile: (919) 329-3799
brandon.neuman@nelsonmullins.com
john.branch@nelsonmullins.com
sam.rosenthal@nelsonmullins.com
matt.gorga@nelsonmullins.com
*Counsel for Respondents*

27

## WORD COUNT CERTIFICATION

Pursuant to Local Rule 7.3(d)(1), I hereby certify, subject to Fed. R. Civ. P. 11, that the accompanying brief contains 6,015 words, according to the word count feature of the word processing system used to prepare the brief. Accordingly, the brief does not exceed the 6250-word limitation.

Respectfully submitted this 29th day of May 2023.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By:   */s/ Brandon S. Neuman*
Brandon S. Neuman, NCSB# 33590
John E. Branch III, NCSB# 32598
Sam Rosenthal (*pro hac vice*)
J. Matthew Gorga, NCSB# 56793
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
Telephone: (919) 329-3800
Facsimile: (919) 329-3799
brandon.neuman@nelsonmullins.com
john.branch@nelsonmullins.com
sam.rosenthal@nelsonmullins.com
matt.gorga@nelsonmullins.com
*Counsel for Respondents*